UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK


WESCO INSURANCE COMPANY,
TECHNOLOGY INSURANCE COMPANY, INC. and
ASSOCIATED INDUSTRIES INSURANCE COMPANY, INC.

                                         **Case:**

              **Plaintiffs,**

v.

LIAKAS LAW, P.C.,
DEAN N. LIAKAS,
NICHOLAS E. LIAKAS,                        ("*Liakas Defendants*")

GOTHAM NEUROSURGERY, P.L.L.C.,
ANDERS J. COHEN, D.O.,                   ("*Gotham Defendants*")

MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES,
P.L.L.C. s/d/b/a NEW YORK SPORTS AND JOINTS
ORTHOPAEDIC SPECIALISTS,             ("*McCulloch Ortho*
DAVID R. CAPIOLA, M.D.,                *Defendants*")
SIDDHARTHA SHARMA, DPM,

WERT SPECIALTY ORTHOPEDICS, P.C. a/k/a ATLANTIC
ORTHOPEDICS & SPORTS MEDICINE a/k/a WERT
ORTHOPEDICS AND SPORTS MEDICINE,
MATTHEW WERT, M.D.,                   ("*Wert Defendants*")

HEALTH PLUS MANAGEMENT, LLC,
DHD MEDICAL P.C.,
PHYSICAL MEDICINE & REHABILIATION OF NY, P.C.,
NJS PHYSICAL MEDICINE AND REHAB, P.C.,     ("*HPM Clinic Defendants*")
SPORTS MEDICINE & SPINE REHAB, PC,

NJMHMC, LLC d/b/a HUDSON REGIONAL HOSPITAL,
YAN MOSHE a/k/a YAN LEVIYEV,
BRONX SC, LLC d/b/a/ EMPIRE STATE
AMBULATORY SURGICAL CENTER,          (*"Facilities Defendants"*)
NEW YORK SURGERY CENTER QUEENS, LLC,

              **Defendants.**

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ............................................................................................ 1

**I.    JURISDICTION AND VENUE** ........................................................................... 4

**II.   PARTIES** ................................................................................................................ 4

**III.  RELEVANT STATUTORY AND LEGAL CONTEXT** .................................... 11

**IV.   THE FRAUD SCHEME** ...................................................................................... 15

**V.    THE FRAUD SCHEME ENTERPRISE** ............................................................ 20

**VI.   DEFENDANTS' ROLES IN THE FRAUD SCHEME ENTERPRISE** ..................... 24

**VII.  DEFENDANTS' PATTERN OF RACKETEERING ACTIVITY** .............................. 54

   **A.    Claimant A** ................................................................................................. 54

   **B.    Claimant B** ................................................................................................. 63

   **C.    Claimant C** ................................................................................................. 80

   **D.    Claimant D** ................................................................................................. 90

**VIII. "IN FURTHERANCE" OR "JUSTIFIABLE RELIANCE"** ................................... 105

**IX.   DAMAGES** ......................................................................................................... 106

**X.    CAUSES OF ACTION** ...................................................................................... 110

**IX.   JURY TRIAL DEMAND** ................................................................................... 147

## COMPLAINT

## PRELIMINARY STATEMENT

This action arises from Defendants' coordinated scheme to manufacture personal injury exposure through falsified claims and fraudulent medical escalation directly causing Wesco Insurance Company, Technology Insurance Company, Inc. and Associated Industries Insurance Company, Inc. subsidiaries of AmTrust Financial Services, Inc. (collectively within the preliminary statement, "AmTrust"), to incur substantial defense costs, investigative expenses, settlement expenditures, and other related damages.

AmTrust Financial Services, Inc. was founded in New York in 1998 as a specialty insurer focused on protecting small and mid-sized businesses – companies that form the backbone of New York's economy but often operate with thin margins and limited ability to absorb unexpected losses. For nearly three decades, AmTrust has operated on a simple premise essential to the functioning of the civil justice and insurance systems: that accidents occur, that injuries are treated in good faith, and that claims presented to insurers reflect legitimate events rather than manufactured opportunity. This action arises because Defendants deliberately set out to subvert those assumptions.

As alleged herein, Defendants constructed and operated a coordinated an association-in-fact enterprise designed to exploit New York's personal injury litigation and medical treatment systems for profit. Specifically, Defendants used standardized referral pipelines, templated medical records, and unnecessary surgical procedures to artificially inflate claim value and subject AmTrust to fear of catastrophic verdict exposure, thereby coercing payment. Among other things,

1

the Defendants staged and exaggerated accidents, falsified medical documentation, engineered, invested and implemented litigation-driven medical treatment protocols, and medically unnecessary surgeries, to falsely manufacture the appearance of serious injury where none existed, or grossly inflate the value of minor complaints to force inflated settlements from the Amtrust primary insurers.

This was a designed system. Runners recruited claimants. Attorneys filed lawsuits. Gatekeeper Clinics generated treatment records. Radiology providers manufactured reports supporting surgical indication. Surgeons performed invasive procedures. Litigation funders financed the process in exchange for repayment from settlement proceeds. Each participant played a defined and indispensable role in transforming routine accidents into high-value litigation assets designed to coerce settlements under the pressure of mounting defense costs and catastrophic exposure. Teamwork was essential, not incidental.

At the center of the scheme was surgical escalation. Once invasive procedures were performed, often at facilities financially connected to the treating physicians, the value of the underlying lawsuits increased dramatically, exposing insurers to the risk of outsized verdicts and mounting defense costs. Faced with this artificially created exposure, insurers were pressured to settle claims that would otherwise have little or no value.

The alleged association-in-fact enterprise, described herein, was structured to target primary insurers, including but not limited to the AmTrust primary insurers, as the intended and foreseeable payors of fraud-inflated personal injury claims. Each underlying fraudulent lawsuit immediately triggered AmTrust's legally mandated duty to defend, foreseeably causing defense expenditures upon filing. Defendants then escalated fabricated exposure through falsified medical records, unnecessary surgeries, and inflated liens, intentionally manufacturing the threat of

2

catastrophic verdicts or excess judgments to extort and coerce settlement payments. The very object of the scheme was to extract insurers' money through fear of economic harm. The AmTrust primary insurer's defense costs, investigative expenses, and settlement payments flowed in a straight causal line from the Defendants' conduct constituting predicate acts. These injuries were not contingent on intervening decisions by third parties, were not derivative of harm to claimants or insureds, and did not depend on speculative reliance; they were the foreseeable, intended, and legally duty-bound consequence of Defendants' use of the mails, wires, interstate facilities, and extortionate medical escalation to exploit and enforce sham claims against insurance carriers, including AmTrust.

The consequences extend far beyond AmTrust. Fraud-driven claim inflation increases insurance costs, distorts the medical system, and burdens courts with manufactured litigation. Defendants' conduct represents a coordinated effort to monetize the legal and healthcare systems themselves. AmTrust brings this action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*., to dismantle this enterprise and recover the damages caused by Defendants' pattern of racketeering activity. Indeed, much of the Complaint herein identifies AmTrust as the third identified victim of a wide-ranging scheme engaged in by the core enterprise Defendants.

Plaintiffs WESCO INSURANCE COMPANY, TECHNOLOGY INSURANCE COMPANY, INC. and ASSOCIATED INDUSTRIES INSURANCE COMPANY, INC. by and through their attorney THE WILLIS LAW GROUP, PLLC, allege as follows:

3

## I.    JURISDICTION AND VENUE

1.      This is a civil action arising out of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 USC § 1961, et seq. This Court has subject matter jurisdiction pursuant to 18 USC § 1964, and 28 USC § 1331 in that certain of the claims arise under the laws of the United States and over other claims herein under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.      Venue is proper in this District under and pursuant to 18 USC § 1965, and pursuant to 28 U.S.C. § 1391, in that numerous of the acts, practices, and events giving rise to the claims alleged in this Complaint occurred in this District, and many of the Defendants reside in this District, as well as conduct their business within this District.

## II.    PARTIES

3.      Plaintiffs, WESCO INSURANCE COMPANY ("Wesco"), TECHNOLOGY INSURANCE COMPANY, INC. ("TIC") and ASSOCIATED INDUSTRIES INSURANCE COMPANY, INC. ("AIIC") are duly licensed property and casualty insurance companies owned by AmTrust Financial Services, Inc. ("AmTrust Financial") and administered by AmTrust North America, Inc. ("AmTrust North America").

4.      AmTrust, Wesco and TIC are duly organized and existing under the laws of the State of Delaware. AIIC is duly organized and exists under the laws of the State of Florida.

5.      TIC is a property and casualty insurer, specializing in providing commercial insurance solutions for small and middle market insureds, including the insured defendants in the underlying actions brought by Claimants A and D.

4

6.     AIIC is a property and casualty insurer, specializing in providing commercial insurance solutions for small and middle market insureds, including the insured defendants in the underlying action brought by Claimant B.

7.     Wesco is a property and casualty insurer, specializing in providing commercial insurance solutions for small and middle market insureds, including the insured defendants in the underlying action brought by Claimant C.

8.     Associated Industries Insurance Company, Inc., Technology Insurance Company, Inc. and Wesco Insurance Company are referred to collectively as "Plaintiffs," or "Plaintiff primary insurers."

### *Liakas Defendants*

9.     Defendant LIAKAS LAW, P.C. ("Liakas Firm") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, the Liakas Firm maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

10.     Upon information and belief, Defendant DEAN N. LIAKAS ("Dean Liakas") resides in and is a citizen of the State of New York. He is also the Managing Partner of Liakas Firm. At all times relevant, Dean Liakas was licensed or otherwise authorized to practice law in the State of New York.

11.     Upon information and belief, Defendant NICHOLAS E. LIAKAS ("N. Liakas") resides in and is a citizen of the State of New Jersey. He is also the Senior Partner of Liakas Firm. At all times relevant, Nicholas Liakas was licensed or otherwise authorized to practice law in the State of New York.

5

12.     Liakas Firm, Dean Liakas and Nicholas Liakas are collectively referred to herein as the "Liakas Defendants."

### *Gotham Defendants*

13.     Defendant GOTHAM NEUROSURGERY, P.L.L.C. ("Gotham") is a professional service limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, Gotham maintained its principal place of business in the State of New York and is authorized to and does conduct business in the State of New York.

14.     Defendant ANDERS J. COHEN, D.O. ("Cohen") was at all times relevant herein a physician licensed to practice medicine in, and a resident of, the State of New York and was the owner, operator, officer, director and/or otherwise controlled Gotham.

15.     Gotham and Cohen are collectively referred to as the "Gotham Defendants."

### *McCulloch Defendants*

16.     Defendant MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C. s/d/b/a NEW YORK SPORTS AND JOINTS ORTHOPAEDIC SPECIALISTS ("McCulloch Ortho" or "NY S&J" when utilizing the alias) is a professional service limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, McCulloch Ortho maintained its principal place of business in the State of New York and is authorized to and does conduct business in the State of New York.

17.     Defendant DAVID R. CAPIOLA, M.D. ("Capiola") resides in and is a citizen of the State of New York. At all relevant times herein, Capiola has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of McCulloch Ortho and NY S&J.

6

18.     Defendant SIDDHARTHA SHARMA, DPM ("Sharma") resides in and is a citizen of the State of New York. At all relevant times herein, Sharma has been licensed or otherwise authorized to practice podiatry in the State of New York and was the owner, operator, officer, director and/or employee of McCulloch Ortho and NY S&J. Sharma does not maintain, and at no relevant time herein maintained, Standard or Advanced Ankle privileges in the State of New York.

19.     McCulloch Ortho, NY S&J, Capiola, and Sharma are collectively referred to as the "McCulloch Defendants."

### *Wert Defendants*

20.     Defendant WERT SPECIALITY ORTHOPEDICS, P.C. a/k/a ATLANTIC ORTHOPEDICS & SPORTS MEDICINE a/k/a WERT ORTHOPEDICS AND SPORTS MEDICINE ("Wert Ortho") is a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, Wert Ortho maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

21.     MATTHEW WERT, M.D. ("Wert") resides in and is a citizen of the State of New York. At all relevant times herein, Wert has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Wert Ortho.

### *HPM Clinic Defendants*

22.     Defendant HEALTH PLUS MANAGEMENT, LLC ("HPM") is a limited liability company organized and existing under the laws of the State of Delaware. At all times relevant herein, HPM maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. In January 2019, the controlling interest in HPM was

acquired by Investcorp., a foreign private equity firm headquartered in the Kingdom of Bahrain, with offices in New York.

23.    Defendant DHD MEDICAL P.C. ("DHD") is a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, DHD maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

24.    Defendant PHYSICAL MEDICINE & REHABILIATION OF NY, P.C. ("PMR") is a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, PMR maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

25.    Defendant NJS PHYSICAL MEDICINE AND REHAB, P.C. ("NJS") is a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, NJS maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

26.    Defendant SPORTS MEDICINE & SPINE REHAB, PC ("SMSR") is a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, SMSR maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

27.    HPM, DHD, PMR, NJS, and SMSR are collectively referred to as the "HPM Clinic Defendants".

28.    At all times relevant herein, DHD, PMR, NJS, and SMSR pledged the entirety of their non-governmental receivables to HPM, leased their space and equipment from HPM, and delegated the virtual entirety of their business operations to HPM.

8

*Facilities Defendants*

29.     Defendant NJMHMC, LLC d/b/a HUDSON REGIONAL HOSPITAL ("HRH") is and was at all relevant times herein a limited liability company organized and existing under the laws of the State of New Jersey. At all times relevant herein, HRH maintained its principal place of business in the State of New Jersey and is ostensibly authorized to and does conduct business in New Jersey.

30.     YAN MOSHE a/k/a YAN LEVIYEV ("Moshe") is and was at all relevant times herein a resident of the State of New York, and the 99% owner of HRH.

31.     Defendant BRONX SC, LLC d/b/a/ EMPIRE STATE AMBULATORY SURGICAL CENTER ("ESASC") is a limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, ESASC maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

32.     Defendant NEW YORK SURGERY CENTER QUEENS, LLC ("NYSCQ") is a limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, NYSCQ maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

33.     HRH, Moshe, ESASC, and NYSCQ are collectively referred to as the "Facilities Defendants."

*Relevant Non-Parties: "Funders," "Runners," and "Non-Physician Owners"*

34.     "Funders" are litigation finance companies which fund and fuel lawsuits by advancing money to claimants during the pendency of a claim and/or lawsuit as a "purchase of receivables." Funders frequently pay upfront amounts to medical providers, including Medical

9

Provider Defendants, to induce performance of surgeries. Advances are structured as non-recourse and not "loans" as they are provided at rates which would otherwise be usurious. This structure incentivizes the prolonging of lawsuits and rendering of unnecessary care, often leaving Claimants as the party (in theory supposed to be recovering near 66.6%) receiving the smallest portion of recovery.

35.    "Runners" are individuals who participated in the fraudulent scheme by recruiting Claimants to stage and/or perpetuate fraudulent accidents throughout New York, or by soliciting individuals involved in minor or non-injury accidents to pursue fraudulent claims, coaching Claimants to exaggerate or feign injuries, undergo unnecessary medical treatment and surgeries, initiate litigation, while coordinating their participation in a predetermined course of medical care.

36.    "Non-physician owners" utilize "doc-in-a-box" schemes, wherein a non-physician will unlawfully invest in, open, and subsequently exercise control over a professional corporation or PLLC, through use of an "on-paper" physician or otherwise licensed owner, permitting them to bill otherwise inaccessible channels including no-fault and Workers' Compensation.

37.    These schemes contain conspicuous hallmarks: background financing agreements wherein the money flows to the non-physician owners, pay-to-play arrangements often disguised as "rent," shared patient bases amongst related providers under the same roof, and true-owner managed hiring, firing, marketing, accounting, management, and dominance over securing patient streams and referrals: essentially, the on-paper doctor "owner" just "shows up" – sometimes just on the billing.

38.    Such arrangements are not legal. The owners or members of a professional corporation or PLLC must be professionals licensed to practice within the profession. BCL § 1503; LLC §§ 1203, 1204. An individual not licensed within the same profession as the professional

corporation may not engage in the practice of the profession, or exercise control or ownership of such entity either directly or by proxy. BCL §§ 1504, 1508; LLC §§ 1203, 1207, 1209.

39.     This scheme is not new.[1] The policy concern is prioritization of profits over patient care, and the commonplace overbilling and fraud such arrangements engender. These concerns are not misplaced. Such facilities are designed to execute rote protocol schemes.

### III.     RELEVANT STATUTORY AND LEGAL CONTEXT

40.     New York law prohibits unprofessional conduct in the practice of medicine, nursing, and chiropractic, which includes exploiting patients for financial gain. 8 N.Y.C.R.R. § 29.1(b)(2) (prohibiting medical, nursing and chiropractic professionals from exercising undue influence on the patient/client, including the promotion of the sale of services, goods, appliances or drugs so as to exploit the patient/client for financial gain of the practitioner or of a third party.)

41.     New York law prohibits physicians and physician assistants from "[d]irectly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services." See N.Y. Educ. Law § 6530(18); see also 8 N.Y.C.R.R. § 29.1(b)(3) (prohibiting physicians, physician assistants, nurse practitioners, and chiropractors from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services"). Consideration to and from a third party includes

---

[1] https://nypost.com/2000/07/16/clinics-paying-5000-a-year-for-rent-a-docs-med-mills-get-no-show-pros-to-act-as-fronts/

an arrangement in excess of fair market value or that provides compensation that varies directly or indirectly based on the volume or value of any referrals or business between the parties.

42. Under 42 U.S.C. § 1320a-7b (the "Anti-Kickback Statute"), it is an unlawful act for someone who "knowingly and willfully solicits or receives any remuneration directly or indirectly, overtly or covertly, in cash or in kind" "in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program" and for someone who "knowingly and willfully offers or pays any remuneration directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person."

43. Courts have construed violations of the Anti-Kickback Statute to constitute an offense that is properly considered a form of "bribery" that satisfies statutes wherein an underlying predicate act includes, *inter alia*, bribery offenses, such as 18 U.S.C. § 1952, the Travel Act.

44. New York Business Corporation Law § 1507 prohibits a professional service corporation from issuing shares to individuals unless they are "engaged in the practice of such profession in such a corporation." It also prohibits such shareholder(s) from entering into any agreement, granting proxies, or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice.

45. A medical provider's representations about the medical necessity of treatment provided is material because proximate causation is a necessary element of a negligence claim, and where treatment was not medically necessary, indicated or justified, the cost, expense, pain and suffering, and other alleged damages resulting from such treatment are not proximately related to the subject incident and such treatment can constitute an intervening and superseding event.

46.    A medical provider's representations contained within the medical records themselves regarding observations and treatment rendered are plainly material, as they are source material relied upon by the parties, the Court, and jurors to render conclusions, findings of fact, and holdings of law.

47.    Under RICO, predicate acts sufficient to demonstrate a pattern of racketeering activity include mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), Hobbs Act violations (18 U.S.C. § 1951), Travel Act violations (18 U.S.C. § 1952), and bribery under state law.

48.    While a RICO plaintiff must plead a "pattern" of racketeering activity (predicate acts) as that term is defined in 18 U.S.C. § 1961(5), a RICO plaintiff need only plead that one of such defendant's predicate acts proximately caused its injury.

49.    The mail and wire fraud statutes apply where use of the mail or wires occurs in furtherance of a scheme or artifice whereby one intends to defraud another of property. Whether the scheme succeeds as intended, or the target of the scheme is in fact deceived, is irrelevant. Mailings in furtherance of a scheme can in fact be facially truthful and may still serve as a violation and, as relevant here, a predicate act.

50.    The use of the mail or wires need not be by a Defendant themselves; it is sufficient that the use of the mail or wires was foreseeable, and such mail or wires were a necessary step in furtherance of the scheme.

51.    18 U.S.C. § 1951 is a sufficient predicate act regardless of whether such offense is a completed extortion, attempted extortion, or a conspiracy to extort; each suffices under §§ 1951 & 1961(a). An attempt or conspiracy to obtain a victim's money/property (18 U.S.C. § 1951[a]) through prohibited extortionate mechanisms aimed to induce the victim's consent (§1951[b][2]) is a properly pled Hobbs Act violation. 18 U.S.C. § 1951(b)(2) does not require that the use of force

13

or violence alleged be against the extortion scheme's intended target. Fear of economic harm is recognized as a sufficient "fear" within the statute's ambit.

52. Conduct in violation of 18 U.S.C. § 1951, including conspiracy, New York PL §§ 215.00 & 215.05, and any other recognized form of bribery (including Anti-Kickback Statute violations, *supra*) are expressly defined and specified as "unlawful activity" that is sufficient to trigger violations of the Travel Act, 18 U.S.C. § 1952.

53. New York law requires an insurer to abide by the duty to defend, which is triggered upon the filing of a claim or complaint, regardless of whether such claim is fraudulent or meritless.

54. General Business Law ("GBL") § 349 provides that (a) "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are…unlawful," and (h) "any person who has been injured by reason of any violation of this section may bring an action… to recover his actual damages... [and t]he Court may award reasonable attorney's fees to a prevailing plaintiff." While consumer-focused, corporate entities may properly bring an action to enforce the statute where the conduct alleged has an impact on consumers at large, and the same conduct "sideswipes" another business who suffers a distinct special injury and is economically better suited to enforce the provision than an individual consumer.

55. To the extent New Jersey law governs particular statutory claims (specifically, N.J.S.A. § 17:33A-1 et seq., the New Jersey Insurance Fraud Prevention Act, or "NJ IFPA"), those claims are asserted based on New Jersey conduct, entities, and claims activity.

56. The New Jersey Insurance Fraud Prevention Act (N.J.S.A. § 17:33A-1 et seq., "NJ IFPA") provides that "[a]ny insurance company damaged as the result of a violation… may sue therefor in any court of competent jurisdiction to recover compensatory damages, which shall include reasonable investigation expenses, costs of suit and attorneys' fees," as well as "shall

14

recover treble damages if the court determines that the defendant has engaged in a pattern of violating this act." The NJ IFPA covers a variety of overt and contributory acts, omissions, and conspiracies related to perpetration of insurance fraud.

## IV.   THE FRAUD SCHEME

57.   From at least 2020 to the present, Defendants, together with others known and unknown, for their financial benefit, orchestrated a widespread fraud scheme to defraud the Plaintiff primary insurers and others (the "Fraud Scheme") by:

    (i)     preparing and collecting documentation as well as submitting, filing, prosecuting and asserting claims and fraudulent personal injury lawsuits on behalf of Claimants that were frequently directly related and within short temporal proximity;

    (ii)    fraudulently misrepresenting pre-existing, degenerative or nontraumatic conditions as acute trauma, transforming minor or localized injuries into inflated full-body claims, and otherwise manufacturing purported injuries from whole cloth;

    (iii)    providing or alleging to have provided medically unnecessary and excessive healthcare services to such Claimants;

    (iv)    providing monies directly or indirectly to Medical Provider Defendants and to Claimants to fund the fraud scheme; and/or

    (v)    using the fraudulent diagnoses and medically unnecessary and excessive healthcare services to manufacture and inflate perceived exposure, and thereby settlement value.

58.   The relationships among the Defendants are symbiotic in that they each serve reciprocal and necessary roles and, only together, can effectively further and perpetuate the Fraud Scheme.

59.   Despite the complexity of the granular facts of each matter, the goal and *modus operandi* are relatively straightforward: get desperate people to fake and/or grossly exaggerate

minor accidents, fake and/or grossly exaggerate injuries, and undergo needless surgeries to prolong litigation and obtain fraudulent windfall settlements from Plaintiff primary insurers and others. The Claimants were compelled to cooperate by promises of windfalls by the Liakas Firm, litigation funding often timed with, if not directly contingent on, filing suit and undergoing needless surgeries, by the urging of the Runners, and in some instances, kickbacks by the Medical Provider Defendants and others known and unknown.

60.     Runners, under the direction of the Liakas Defendants, Medical Provider Defendants, and/or Funders, and in furtherance of and as a necessary step for the execution of the Fraud Scheme, recruited Claimants into staging and/or perpetuating fake trip-and-fall accidents at various locations throughout the State of New York and/or participating in staged motor vehicle accidents. The Runners then referred, transported, assigned, or otherwise presented these Claimants to the Liakas Firm, where its attorneys and/or other employees met with these Claimants. In other circumstances, Claimants were referred and/or transported to the Clinic Defendants, who would in turn sign them up with the Liakas Firm.

61.     Regardless of any actual bodily injury or lack thereof stemming from the purported accidents, these Claimants were instructed by the Runners and others, under the direction of the Liakas Firm, Medical Provider Defendants, and others known and unknown, to manufacture and/or grossly exaggerate particular specified bodily injuries that purportedly resulted from such accidents and to seek medical treatment from providers who would render treatment and documentation in furtherance of the scheme.

62.     The Liakas Firm filed lawsuits on behalf of the Claimants, setting forth purported facts about the subject "accidents" and seeking payment for the manufactured and/or grossly exaggerated injuries and needless, unjustified treatment. These suits were initiated by filing a

16

"Complaint" which was verified, under penalty of perjury, by Defendant Dean Liakas himself and/or employees of the Liakas Firm at the Liakas Firm's instruction.

63.     New York law mandates insurers to discharge their duty to defend, a legally mandated obligation that is *immediately* triggered by the filing of a complaint. Even if a complaint's allegations are false, groundless or fraudulent, an insurer must abide its duty to defend its insured, including investigation, claims handling, and litigation defense. In each underlying case, CPLR § 3101(f) required disclosure of applicable insurance coverage, thereby providing the Liakas Firm and other participants in the Fraud Scheme with knowledge of the insurers responsible for the defense and for indemnity payments and the policy limits available for exploitation, to satisfy each fraudulent claim.

64.     As a direct result of the Fraud Scheme: (a) Plaintiff primary insurers incurred direct out-of-pocket losses and expenditures upon the filing of the underlying complaints, and through subsequent predicate transmissions and mailings directed to them and their panel counsel; (b) the Liakas Firm knowingly and intentionally targeted insurance carriers responsible for defense and indemnity payments; and therefore (c) the Plaintiff primary insurers were the **sole** intended victims of this iteration of the Fraud Scheme.

65.     To inflate the purported value of the underlying claims and maximize proceeds from the Fraud Scheme, the Liakas Defendants, directly and indirectly through Runners, Medical Coordinators, and others acting under their direction and control, referred, directed and guided Claimants to affiliated medical providers that knowingly participated in the Fraud Scheme.

66.     These providers, including the Medical Provider Defendants, rendered coordinated radiology, physical therapy, pain management, and orthopedic surgical services at scheme-affiliated facilities located in both New York and New Jersey. The objective of the scheme was to

17

manufacture and substantiate serious injury claims through unwarranted procedures, most lucratively spinal fusion surgeries, irrespective of medical indication or necessity.

67. The intended targets of the Fraud Scheme were Plaintiff primary insurers, as fabricated medical records, verified Bills of Particulars, and verified Supplemental Bills of Particulars were repeatedly transmitted to Plaintiffs, their employees, and panel counsel, with success of the Fraud Scheme typified *via* settlement payments by Plaintiff primary insurers.

68. In furtherance of the Fraud Scheme, the Liakas Defendants prepared and served verified Bills of Particulars and Supplemental Bills of Particulars containing false or fabricated accident and injury claims, verified by Claimants or individuals acting at the Liakas Defendants' direction, and transmitted by mail and wire to Plaintiffs to increase exposure and pressure settlement payouts under fear of economic harm.

69. The Second Circuit has expressly recognized that state court litigation may be utilized as a vehicle to further and effectuate a broader fraudulent scheme. *State Farm Mut. Auto. Ins. Co. v. Tri-Borough N.Y. Med. Prac. P.C.*, 120 F.4th 59 (2d Cir. 2024).

70. Likewise, it was the Plaintiff primary insurers who were engaged by the Liakas Firm for settlement negotiations and any resulting settlement payments or awards were ultimately paid by the Plaintiff primary insurers.

71. As in *State Farm*, intake clinics, therapy providers, and surgeon Defendants consistently ordered an array of radiological imaging, including spinal and extremity MRIs, from radiologists participating in the Fraud Scheme, whose reports materially overstated or misrepresented the Claimants' actual conditions reflected in the underlying imaging studies.

72. Rather than independently reviewing the underlying imaging studies, the Surgeon Defendants knowingly relied upon the radiology reports in order to facially justify unnecessary

18

procedures. While the specific body parts at issue varied among the Claimants, they *always* included the spine and an extremity or joint, or both.

73.    Through these coordinated practices, the Medical Provider Defendants furnished false and exaggerated diagnoses, the Surgeon Medical Defendant performed invasive operations utilizing the Facility Defendant resources to render unnecessary, excessive, unwarranted, and/or causally unrelated medical services and surgeries in exchange for increased referral streams, direct compensation from the Funders and liens asserted against the anticipated lawsuit proceeds.

74.    The Liakas Defendants in turn utilized the documented medical diagnoses and purportedly accident-related medical services rendered to extract settlement payments from the Plaintiff primary insurers by threat of financial harm from artificially inflated perceived value of the lawsuits.

75.    Plaintiff primary insurers are uniquely susceptible to this form of strong-arming through fear of economic harm. Each additional surgery positions them into the Fraud Scheme's intended horns of dilemma: tender the policy limits or face the potential of an outsized excess verdict.

76.    In cases where Plaintiff primary insurers fail to comply, they are exposed to bad faith allegations, often forcing them to capitulate *even if the claim is knowingly fraudulent* because of their legal duty to absorb the first step harm, so as to shield their insureds from exposure in excess of policy limits.

77.    Liakas Defendants further provided, by mail or by electronic service to Plaintiff primary insurers and/or their panel counsel, medical authorizations and HIPAA releases signed by each Claimant (or by someone else *via* Power of Attorney) for the release of each Claimant's medical records. Liakas Defendants had actual knowledge or were recklessly indifferent regarding

19

the falsity of the contents of such records. Liakas Defendants had actual knowledge the HIPAA releases would be transmitted to the Medical Provider Defendants by mail or wire.

78.     The herein Fraud Scheme shares many structural elements similar to those found in *United States v. Rainford, et al.*, 110 F.4th 455 (2d Cir. 2024).

> *The scheme involved recruiting poor and homeless people to fake accidents at properties around the New York area. The recruit would stage an accident and then seek unnecessary medical treatment— sometimes including surgery—from doctors who were part of the scheme. The organizers of the scheme would then refer the recruit to a lawyer, who would sue the property owner or the owner's insurance company for damages. The proceeds from the lawsuits, which often settled, were then divided among the co-conspirators, with the recruits receiving relatively little.* Rainford, at 468 (2d Cir. 2024).

79.     Further evoking the structure and modus operandi in Rainford, the claimed injuries herein virtually always centered around the shoulders, knees, and most lucratively the neck and back. Rainford, *supra*.

## V.     THE FRAUD SCHEME ENTERPRISE

80.     The Fraud Scheme operated *via* an association-in-fact enterprise (the "Fraud Scheme Enterprise") within the meaning of 18 U.S.C. § 1961(4).

81.     The members of the Fraud Scheme Enterprise ("Count I Defendants") operated with a common purpose: to generate and monetize personal injury claims through falsified injuries, causation statements, testimony, medical necessity, and performance of unnecessary surgeries. The relationships among Count I Defendants and others enabled the enterprise's functions (referrals, imaging, surgeries, liens, funding and litigation coordination); and the Fraud Scheme Enterprise has maintained sufficient longevity to pursue its purpose and continues through the present.

20

82.    The Fraud Scheme Enterprise was generally structured and operated/operates as depicted below:



83.    The Fraud Scheme Enterprise was an ongoing organization with a decision-making and operational structure that, while informal, was coordinated and functioning, including: (i) leadership, management, and pursuit of claims necessary to the Fraud Scheme by Liakas Firm and Dean Liakas; (ii) operators who executed day-to-day acts, including Liakas Firm employees at the instruction of the Liakas Firm, (iii) Medical Provider Defendants who purportedly treated

21

Claimants, but whose true purpose was to provide documentation of clinical, diagnostic, and surgical treatment; and (iv) facilitators who provided financial and logistical support, including Runners and Funders. The Enterprise used established channels, email, phone, mail, bank wires, and corporate entities, to achieve its common purpose.

84.    The Fraud Scheme Enterprise is distinct from any single Defendant named herein. Each Defendant is a separate legal/real person who conducted or participated in the conduct of the Enterprise's affairs, not merely its own affairs, and indeed without the Fraud Scheme Enterprise machinery operating, could not have profited from the Fraud Scheme on its own.

85.    The Enterprise engaged in, and its activities affected interstate commerce, including through interstate communications, mailings, and financial transactions across state lines, and Claimant and Medical Provider Defendant transit to utilize out of state surgical centers.

86.    Each Defendant so charged in Count I, *infra*, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, exercising decision-making authority, directing subordinates, and/or carrying out essential functions of the Enterprise.

87.    Each Defendant so charged in Count II, *infra*, agreed to participate in the Fraud Scheme Enterprise through a pattern of racketeering activity, and while not necessary to establish at the pleading stage, did in fact engage in overt acts in furtherance of the Fraud Scheme Enterprise and its common purpose ("Count II Defendants").

88.    From approximately 2020 through the present and continuing, Count I Defendants committed at least two predicate acts of racketeering within the past ten years, including but not limited to violations of 18 USC § 1341 (mail fraud), § 1343 (wire fraud), and § 1952 (Travel Act violations), specifically as pled *infra*.

22

89.    The predicate acts were horizontally related, in that the predicate acts were related to other predicate acts alleged, with the same participants, victims, methods, and purpose, often with one leading to the next and could **only** occur in coordination. The predicate acts were vertically related, in that that were in direct furtherance of the Fraud Scheme and the Enterprise's common goals.

90.    The Fraud Scheme Enterprise conduct presents an identifiable threat of continued criminal activity; indeed, at least one exemplar Claimant has a pending lawsuit, with new claims filed meeting the Fraud Scheme criteria on an ongoing basis.

91.    The pattern of racketeering activity described above and set forth in detail below reflects continuity in that:

    a.    the predicate acts occurred repeatedly over a substantial period of time, at least 6 years and continuing, not a single, isolated scheme (closed-ended); and/or

    b.    the Fraud Scheme Enterprise's regular way of doing business relies on the same unlawful methods and remains ongoing or, at minimum, poses a specific threat of repetition at the time of this filing (open-ended).

92.    The Fraud Scheme Enterprise was not merely a centralized conspiracy; rather, each component of the Enterprise was substantially interrelated, interdependent, and coordinated with the others, such that the success of the scheme depended upon the participants acting in concert and relying upon one another to perform their respective roles in furtherance of the Enterprise's unified common purpose.

93.    The Fraud Scheme Enterprise alleged, and in large part its core Defendants, is the same Enterprise and Scheme alleged in *Union Mutual v. Liakas Law, P.C.*, *et al.*, EDNY Case #:

23

1:25-cv-01857-FB-JRC ("*Union Action*"), and *Greater New York v. Liakas Law, P.C.*, *et al.*, EDNY Case #: 1:26-cv-00450-FB-PK ("*GNY Action*").

94.     This is neither chance nor recycled allegations; it is expressly alleged that the Plaintiff primary insurers herein are additional victims of the same Enterprise and Scheme. Plaintiffs herein seek recovery of their own damages incurred as a result of the operations of this Enterprise and Scheme.

## VI.     DEFENDANTS' ROLES IN THE FRAUD SCHEME ENTERPRISE

95.     At all relevant times, the Count I Defendants constituted an association-in-fact enterprise engaged in, and affecting, interstate commerce, and each Count I Defendant knowingly participated in the operation, management, and conduct of the Enterprise's affairs.

96.     Each Count II Defendant knowingly agreed with one or more other participants to operate and further the Enterprise and was aware of the Enterprise's common purpose and the general nature and contours of the Fraud Scheme.

97.     Each Count I Defendant performed distinct but coordinated roles within the Enterprise, which evolved over time as the Fraud Scheme progressed. Each exercised discretion and control over their respective portion of the scheme, knowingly acted in furtherance of the Enterprise's objectives, and understood that the ultimate goal of the scheme was to fraudulently induce Plaintiff primary insurers to pay illegitimate and inflated claims. Each Defendant functioned as an essential and interdependent component of the Enterprise, the success of which depended upon the organized cooperation of its participants.

98.     Each Count II Defendant agreed, explicitly or implicitly, to aid in this conduct, and was generally aware of the overarching Fraud Scheme, with the circumstantial and/or direct evidence and facts alleged herein sufficient to proffer a sufficient inference of same.

24

*Liakas Defendants' Participation in the Fraud Scheme Enterprise*

99.     Since at least 2020, and with a marked escalation beginning that year, the Liakas Firm has been involved in thousands of lawsuits, many of which arose from purported trip-and-fall incidents and alleged bodily injuries purportedly covered by various insurers, including Plaintiff primary insurers. Liakas' filed case count peaked in 2022, precipitously dropping thereafter and notably, in the context of negligence causes of action, tapering off *precisely* as purported occurrences from 2020 would begin to pass the statute of limitation, and then plummeting upon its passage. Dean Liakas personally verifies the vast majority of the Complaints filed by the Liakas Firm.



100.    Liakas Defendants directed, authorized, coordinated and controlled the conduct engaged in by the Runners to recruit individuals (i.e., Claimants) to stage trip and fall accidents and/or falsely claim injuries unrelated to the alleged trip and fall accidents, coordinated and arranged for funding to ensure continued claimant cooperation.

101.    The Liakas Defendants, acting in concert and with mutual understanding, represented Claimants in personal injury lawsuits and directed, authorized, coordinated, and controlled the prosecution of such actions, including assigning duties and responsibilities to attorneys and employees of the Liakas Firm, and knowingly preparing, filing, submitting, and

causing the submission of false allegations, fraudulent medical documentation, and misleading representations to courts within the State of New York and to involved parties.

102.    Liakas Defendants, directly and through employed medical coordinators, paralegals and case managers, directed the Claimants to seek medical treatment from the Medical Provider Defendants specifically, knowing and understanding that the Medical Provider Defendants would provide, in exchange for continuing to funnel patients, the kind of false and misleading medical documentation needed to prolong litigation and treatment, facially but falsely justify escalating and more invasive treatments to inflate case values.

103.    Liakas Defendants knowingly transmitted and received by mail, facsimile, and/or email documents that contained assertions of legitimate trip and fall accidents, the existence of injuries, and the necessity of medical treatment that they knew or reasonably should have known were false.

104.    As set forth at greater length in the *Union* Action and *GNY* Action, and remaining relevant here, a statistically significant number of Liakas Claimants are from the Dominican Republic, often from the same small town therein, Jarabacoa (population ~70,000), and reside and/or first reside upon arrival in the US in Freeport, NY (Long Island) and the surrounding, yet *universally* have purported trip and falls on sidewalks in Bronx, Brooklyn, and Queens.

105.    This phenomenon was noted, specific to the GNY Action, by New York State Governor Kathy Hochul on February 11, 2026 during an address discussing the legislative agenda to combat fraud.

106.    The intent behind the unnecessary treatment was to falsely bolster Claimants' personal injury lawsuits, thereby inflating claim value to maximize the Liakas Defendants' financial recovery.

107. Upon information and belief, Runners would typically be internally referred to as "investigators," "brokers," "liaisons," "paralegal" and "client services liaison" for their roles in bringing in claimants and facilitating the initial phases of the Fraud Scheme.

108. The Liakas Defendants coordinated with the Funders in providing high-interest funding loans, structured as advances against proceeds, to Claimants in furtherance of and as a necessary step for the execution of the Fraud Scheme.

109. Funders often paid Medical Provider Defendants upfront for unnecessary and expensive surgeries to secure their cooperation with the scheme. Through securing cooperation of Claimants and Medical Provider Defendants through advances and upfront payments, Funders, in coordination with Liakas Defendants, increased the amount of their own recovery via astronomical interest and simultaneously increased the amount of the Liakas Defendants' contingency fees.

110. While certain Funders occasionally complied with regulatory requirements by filing UCC statements disclosing their funding interests, others, including Jumpstart Funding LLC, an entity owned in whole or in part by principals of the Liakas Firm and registered to the Liakas Firm's New Jersey office, routinely issued advances without such disclosures, despite, upon information and belief, continuing operations after its corporate status was revoked in 2023. As a result, the precise terms of the funding arrangements, the relationships among the participants in the Fraud Scheme, and in some instances the existence of such funding itself, cannot be fully ascertained absent discovery.

*HPM Clinic Defendants' Participation in the Fraud Scheme Enterprise*

111. Since at least 2020, each of SMSR, DHD, PMR, and NJS has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

27

112.    Each of SMSR, DHD, PMR, and NJS operated under the "Musculoskeletal Resources Injury Doctors" ("MSR") umbrella. MSR is in fact owned and operated by Defendant HPM, a non-physician owned management company, which was acquired by a private equity firm, InvestCorp., in January 2019.

113.    That same year, and no later than September 26, 2019, HPM perfected its secured interest in DHD's entire accounts receivable, less Medicaid/Medicare funds; *i.e.*, the very liens and funding flows at issue herein.

> 1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names
> 1a. ORGANIZATION'S NAME **DHD Medical, P.C.**
>
> 3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)
> 3a. ORGANIZATION'S NAME **Health Plus Management, LLC**
>
> 4. This FINANCING STATEMENT covers the following collateral:
> **Accounts receivable of the practice (excluding governmental receivables), inventory, equipment and general intangibles whether now or hereinafter acquired, and the proceeds thereof.**

114.    One day thereafter, on September 27, 2019, HPM perfected its secured interest in NJS's entire accounts receivable, less Medicaid/Medicare funds; *i.e.*, the very liens and funding flows at issue herein.

> 1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names
> 1a. ORGANIZATION'S NAME **NJS Physical Medicine and Rehabilitation, P.C.**
>
> 3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)
> 3a. ORGANIZATION'S NAME **Health Plus Management, LLC**
>
> 4. This FINANCING STATEMENT covers the following collateral:
> **Accounts receivable, past, present and future (excluding governmental receivables), contract rights and reimbursement rights and the proceeds thereof related to the medical practice.**

28

115.    Three days thereafter, on September 30, 2019, HPM perfected its secured interest in PMR's entire accounts receivable.



116.    Three days thereafter, on October 2, 2019, HPM perfected its secured interest in SRSM's entire accounts receivable, less Medicaid/Medicare funds; *i.e.*, the very liens and funding flows at issue herein.

117.    HPM further provides the marketing, capital, staffing, backroom office functions, HR, payroll, recruiting, intake, and scheduling. Importantly here, HPM also provides the referral network, including specifically "medical and legal referral sources."

118.    Indeed, in later emails in February 2022 with the non-party successor to the nominal owner/medical director role of the DHD and SMSR practices, Ashley Simela, D.O., the initial correspondence was to commence immediate referrals:

29

On Wed, Feb 23, 2022 at 4:52 PM Becky Love <rlove@healthplusmgmt.com> wrote:

Good day Dr. Simela,

My name is Becky Love, I am one of the Regional Directors for Health Plus Management. I have recently received your practice information to begin sending patient referrals to your Bronx, NYC, NJ and Queens locations and would like to ensure my offices are sending over the pertinent information to your staff via email that you will need to schedule. Below are the items I can have my staff send over when requesting an appointment via this email address.

---

Greetings,

It is wonderful to connect with you and the Health Plus team. Allow me to apologize for the late reply. You can certainly send any referrals to the info@doctorsimela.com email address. My office admin Angela is also cc'd. Once we receive the consult request the office will reach out to the patient and get them in ASAP. I will personally send you an email with the consult note attached after I have had the opportunity to evaluate the patient. Please do not hesitate to reach out to me directly, if you have any questions or concerns.

Thank you,

Dr. Simela

---

**MIDTOWN | DHD Medical, P.C.**
265 Madison Ave., 4th Fl., New York, NY 10016
t: 212.682.5800 · f: 212.682.5179 | nyc@msrmedrecords.com
Owner/Medical Director: Ashley Simela, D.O., FAAOS
*Orthopedic on-site*

**BUSHWICK | DHD Medical, P.C.**
1801 Broadway, Brooklyn, NY 11207
t: 718.701.6099 · f: 516.295.9438
Owner/Medical Director: Ashley Simela, D.O., FAAOS
*Orthopedics only*

**CANARSIE | DHD Medical, P.C.**
2132 Ralph Ave., Brooklyn, NY 11234
t: 718.763.1400 · f: 718.763.6967 | canarsie@msrmedrecords.com
Owner/Medical Director: Ashley Simela, D.O., FAAOS
*Orthopedic on-site*

**SUNSET PARK | DHD Medical, P.C.**
3907 4th Ave., Brooklyn, NY 11232
t: 718.435.9745 · f: 718.435.9746 | sunsetpark@msrmedrecords.com
Owner/Medical Director: Ashley Simela, D.O., FAAOS
*Orthopedic on-site*

**MERRICK | Sports Medicine & Spine Rehabilitation, P.C.**
2131 Merrick Rd., Merrick, NY 11566
t: 516.221.6800 · f: 516.221.6810 | bellmore@msrmedrecords.com
Owner/Medical Director: Ashley Simela, D.O., FAAOS
*Orthopedic on-site*

**HEMPSTEAD | Sports Medicine & Spine Rehabilitation, P.C.**
160 North Franklin St., Hempstead, NY 11550
t: 516.485.5060 · f: 516.485.4946 | hempstead@msrmedrecords.com
Owner/Medical Director: Ashley Simela, D.O., FAAOS
*Orthopedic on-site*

**WESTBURY | Sports Medicine & Spine Rehabilitation, P.C.**
990 Westbury Road, Suite 201, Westbury, NY 11590
t: 516.876.8800 · f: 516.876.8808 | westbury@msrmedrecords.com
Owner/Medical Director: Ashley Simela, D.O., FAAOS
*Orthopedic on-site*

119.    Dr. Simela similarly executed a pledge of receivables to HPM.

30

| 3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b) | | | |
|---|---|---|---|
| 3a. ORGANIZATION'S NAME  Health Plus Management, LLC | | | |

| OR | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | 3c. MAILING ADDRESS  50 Charles Lindbergh Blvd. | CITY  Uniondale | STATE  NY  POSTAL CODE  11553 | COUNTRY  US |

4. This FINANCING STATEMENT covers the following collateral:

All property now owned or at any time hereafter acquired by Ashley Simela, DO P.C. or in which Ashley Simela, DO P.C. now has or at any time in the future may acquire any right, title or interests, including (without limitation): (i) all accounts, chattel paper, deposit accounts, documents, equipment, general intangibles, instruments, inventory, investment property, letter of credit rights and any supporting obligations related to any of the foregoing; (ii) all commercial tort claims; (iii) all books and records pertaining to the other property described herein; (iv) all property of Ashley Simela, DO P.C. held by Health Plus Management, LLC, including all property of every description, in the custody of or in transit to Health Plus Management, LLC for any purpose, including safekeeping, collection or pledge, for the account of Ashley Simela, DO P.C. or as to which the Ashley Simela, DO P.C. may have any right or power, including but not limited to cash; (v) all other goods and personal property of the Ashley Simela, DO P.C., whether tangible or intangible and wherever located; and (vi) to the extent not otherwise included, all proceeds of the foregoing.

120.    In the process of becoming the nominal owner/medical director of DHD/SMSR, it has been previously alleged that Dr. Simela violated a non-compete with his prior employer; call logs were produced in that dispute of claimed solicitation calls to desired referral sources. These were the first three calls:

| Referral Sources | Date | Time | Duration |
|---|---|---|---|
| Eliseo Naciemiento | 2/11/2022 | 2:56:03 PM | 2 |
| Paula Lapas | 2/1/2022 | 9:43:56 PM | 85 |
| Nick Liakas | 3/15/2022 | 4:08:23 PM | 26 |

121.    Eliseu Nascimento (*sic*) is a Newark-based PT provider which funnels Runner-referred patients to two particular law firms and to surgeries at Moshe's HRH. This is not a speculative assertion. The runner's name is Fabio Aguiar, this is his website, and he is directly referenced in Simela's affirmation in that matter as a "translator" (also his title in several relevant non-party law firm filings).

31



**ACIDENTE DE TRABALHO EM NY**

Fabio Aguiar
▮▮▮▮▮▮gmail.com

**CONSULTA GRATIS 201 7594243**

Ha' quinze anos lutando pelos direitos dos trabalhadores da construção civil



> 9. For the patients referred by Dr. Nascimento, they were referred to me specifically for spine surgery and Dr. Nascimento assisted in their appointments in conjunction with Fabio Aguiar who served as a language translator. After I left the Practice, I would work at Hudson Regional Hospital every other Friday. Knowing this schedule, Mr. Aguiar would personally drive the patients to the Hospital on those Fridays for me to provide treatment for them. Again, there was no need, nor did I solicit these patients in any way.

Sworn and notarized Affidavit of Ashley Simela, D.O. dated June 23, 2023, *Newark Rehabilitation, et al.* Index No. 651425/2022.

122. The two relevant law firms, and the two primary surgeons affiliated with the Aguiar-Nascimento funnel (other business concerns of Moshe and HRH) are not at issue in this matter. This information is presented to show the theme of which connections were the *first few* calls to open a non-physician, profit-driven clinic and stock it.

123. The second call was to Paula Lapas. Ms. Lapas is neither a lawyer nor a doctor. She is the Director of Business Development at Defendant HRH.



124.    The third call, and first to an attorney, was Defendant N. Liakas. In sum, the first three calls were to a runner and law firm-cuffed PT facility, the surgical facility the patients are funneled to – and Defendant N. Liakas.

125.    Approximately 19 days after the call above, the following exchange between a Liakas Firm Medical Coordinator and the new DHD Clinic owner's assistant took place:



126.    Having the ultimate right to the income stream in addition to controlling nearly all aspects of the business renders HPM in effective control of the professional corporations, and turns the on-paper owners into employees. In other words, providers like SMSR, DHD, PMR, and NJS

33

become a "doc-in-a-box," allowing private equity to access income streams and business ownership of entities they are, in fact, excluded and prohibited from under New York State law, and effectively turning the on-paper physician owners into, at best, employees.

127. The owners or members of a professional corporation or PLLC must be professionals who are licensed to practice the profession. BCL § 1503; LLC §§ 1203, 1204. An individual not licensed within the same profession as the professional corporation may not engage in the practice of the profession, or exercise control or ownership of such entity either directly or by proxy. BCL §§ 1504, 1508; LLC §§ 1203, 1207, 1209.

128. HPM is an institutional-grade violation of these laws.

129. This scheme is not new. The policy concern therein is prioritization of profits over patient care, and the commonplace overbilling and fraud such arrangements engender. These concerns are not misplaced. Such facilities are designed to execute rote protocol schemes.

130. And indeed, HPM maintains a separate "concierge" branding and website, through which they market directly to personal injury attorneys. In other words, HPM offers a one-stop shop backed by private equity - where attorney referrals turn into a web of self-referrals, and overtreatment is directly tied to bottom line metrics.

**Welcome to the Musculoskeletal Resources Concierge**
Your trusted, single-stop destination for top administrative support and access to premier injury doctors.

131. As part of the Fraud Scheme, SMSR intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff primary insurers and/or their panel counsel and others involved in Claimants' personal injury

34

lawsuits in order to assert liens for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

132.    As part of the Fraud Scheme, SMSR provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render and/or facially justify additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

133.    As part of the Fraud Scheme, SMSR provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants, Plaintiff primary insurers, and others, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, prolong litigation and inflate settlement value.

134.    SMSR knowingly profited from upfront payments from the Funders and liens for the alleged medical and diagnostic services rendered by SMSR and/or any employee/agent of SMSR which were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

135.    SMSR also knowingly profited from the increased number of patients who were referred to them as part of the Fraud, for whom SMSR , and/or any other employee/agent of SMSR, provided medical and diagnostic services and received reimbursement for such services.

136.    As part of the Fraud Scheme, DHD intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff primary insurers and others involved in Claimants' personal injury lawsuits for funding or to assert

35

liens for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

137.    As part of the Fraud Scheme, DHD provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render and/or facially justify additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

138.    As part of the Fraud Scheme, DHD provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants, Plaintiff primary insurers, panel counsel and others, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such lawsuits.

139.    DHD  knowingly profited from upfront payments from the Funders and liens for the alleged medical and diagnostic services rendered by DHD and/or any employee/agent of DHD which were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

140.    DHD also knowingly profited from the increased number of patients who were referred to them as part of the Fraud, for whom DHD Defendants, and/or any other employee/agent of DHD, provided medical and diagnostic services and received reimbursement for such services.

141.    As part of the Fraud Scheme, PMR intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff primary insurers, panel counsel and others involved in Claimants' personal injury lawsuits for

funding or to assert liens for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

142.    As part of the Fraud Scheme, PMR provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render and/or facially justify additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

143.    As part of the Fraud Scheme, PMR provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants, Plaintiff primary insurers, panel counsel and others, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such lawsuits.

144.    PMR knowingly profited from upfront payments from the Funders and liens for the alleged medical and diagnostic services rendered by PMR and/or any employee/agent of PMR which were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

145.    PMR also knowingly profited from the increased number of patients who were referred to them as part of the Fraud, for whom PMR and/or any employee/agent of PMR provided medical and diagnostic services and received reimbursement for such services.

146.    As part of the Fraud Scheme, NJS intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff primary insurers, panel counsel and others involved in Claimants' personal injury lawsuits for funding or to assert

liens for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

147.    As part of the Fraud Scheme, NJS provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render and/or facially justify additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

148.    As part of the Fraud Scheme, NJS provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants, Plaintiff primary insurers, panel counsel and others, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such lawsuits.

149.    NJS knowingly profited from upfront payments from the Funders and liens for the alleged medical and diagnostic services rendered by NJS and/or any employee/agent of NJS which were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

150.    NJS also knowingly profited from the increased number of patients who were referred to them as part of the Fraud, for whom NJS, and/or any employee/agent of NJS, provided medical and diagnostic services and received reimbursement for such services.

_Wert Defendants Participation in the Fraud Scheme Enterprise_

151.    Since at least 2020, Wert Ortho directly and through selective use of, at times, Atlantic Orthopedics & Sports Medicine, and interchangeably, Wert Orthopedics and Sports

38

Medicine, has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

152. Defendant Wert, individually as an orthopedic surgeon and owner, officer, and/or employee of Wert Ortho, knowingly participated in and furthered the affairs of the Enterprise through a pattern of racketeering activity, specifically Wert controlled and directed the medical services provided to Claimants, including evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

153. Within the Enterprise, Wert functioned as a surgical escalation provider, whose role was to evaluate Claimants referred, to recommend and perform orthopedic surgeries that were unnecessary, excessive, unwarranted, or not causally related to the alleged accidents. These surgical procedures were a critical component of the Enterprise's fraudulent treatment protocol because they dramatically increased the claimed value of the underlying personal injury claims.

154. In furtherance of the Enterprise's objectives, Wert knowingly accepted and treated Claimants who had been funneled to him and whose treatment had already been structured to maximize the value of anticipated litigation.

155. Wert then performed procedures on Claimants at his Wert Ortho associated defendant entities, and also funneled claimant(s) to Defendant NYSCQ, an ambulatory surgery center for which Wert served as Medical Director and in which he maintained a financial ownership interest.



**New York Surgery Center Queens**

Published on New York State Department of Health, W

Home  >  New York Surgery Center Queens

**Director:** Matthew A Wert, M.D.

**Expiration Date:** Saturday, February 6, 2027

**Phone Number:** (718) 545-5050

**UID (Facility ID - Site ID):** P418-0000

**Site ID:** 0000

**City:** Long Island City

**CLIA Number:** 33D1003125

**Street Address:** 46-04 31st Avenue

**State:** NY

**Zip Code:** 11103-1842

| New York Surgery Center Queens, LLC | | |
|---|---|---|
| Members | Current | Proposed |
| Daniel J. Lowy | .0095% | - |
| DJLV1 LLC | 23.709% | - |
| David Kleinman | 23.723% | 10.00% |
| Michelle Kleinman | 23.723% | - |
| Dror Rosenfeld, M.D. | 23.723% | 23.723% |
| Matthew Wert, M.D. | 2.564% | - |
| Sanford Wert, M.D. | 2.564% | - |
| Adam Efrem | - | 14.16% |
| Abigail Efrem | - | 14.16% |
| AS 87013011 LLC | - | 28.34% |
| Kira Opepenheim | - | 28.34% |
| Total | 100% | 100% |

156. By directing Claimants to a facility in which he held equity, Wert ensured that the Enterprise captured both the professional surgical fees associated with the procedures and the facility fees generated by the surgery center, thereby creating a financial incentive to perform and bill for additional surgical procedures regardless of medical necessity and maximizing the Enterprise's financial returns..

157. In addition to performing surgeries, Wert participated in the submission and generation of inflated medical billing associated with these procedures, including billing for multiple arthroscopic procedures during single surgical episode and billing components of the

40

same surgery as separate procedures – to artificially increased the value of the purported medical damages associated with Claimants' cases.

158.    In addition to billing inflation, the Wert Defendants knowingly profited from upfront payments from the Funder and liens for the alleged medical and surgical services rendered by the Wert Defendant entities which were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

159.    The Wert Defendants also knowingly profited from the increased number of patients referred to them as part of the Fraud, for whom the Wert Defendants, and/or other employees/agents of Wert provided medical and diagnostic services and received reimbursement for such services.

160.    The financial incentives driving these surgical recommendations were amplified by the structure of the ambulatory surgery center utilized by Defendant Wert. As both the operating surgeon and an investor in NYSCQ, Wert profited from two revenue streams arising from each surgery: the professional surgical fee and the facility fee billed by the surgery center. By directing Claimants to a surgical facility in which he held an ownership interest, Wert ensured that the Enterprise captured both sources of revenue from the same surgical episode, thereby maximizing the financial benefit derived from each Claimant treated pursuant to the Fraud Scheme.

161.    By knowingly accepting referrals, performing unnecessary surgical procedures, directing patients to a physician-owned surgical facility, generating inflated medical billing, and participating in litigation-driven lien arrangements, the Wert Defendants conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity, including acts

of mail fraud and wire fraud, in violation of the RICO Act, and further agreed with other members of the Enterprise to do so, in violation of RICO Conspiracy.

*McCulloch Defendants' Participation in the Fraud Scheme Enterprise*

162.    Since at least 2020, McCulloch Ortho has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

163.    Since at least 2020, McCulloch Ortho, directly and through selective use of NY S&J, has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

164.    Defendant Capiola, as an orthopedic surgeon and employee of McCulloch Ortho and NY S&J, controlled and directed the medical services provided to Claimants, including evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme. This included the repeated use of *identical* operative reports which, despite their purported extensive nature, frequently last less than 20 minutes.

165.    Defendant Sharma, as a licensed podiatrist and employee of McCulloch Ortho, controlled and directed the medical services provided to Claimants by McCulloch Ortho, including evaluating, diagnosing, and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

166.    Notably, since 2014, New York Education Law Section § 7001, et. seq., defines the scope of podiatry and permits treatment of the ankle only if the podiatrist has received a podiatric

42

ankle-surgery privilege. Without this privilege, the practice of podiatry is limited to the foot and certain contiguous wound care.

167.    The ankle privileges are divided into Standard and Advanced, and are set forth Id., at §§ 7009 and 7010. Ankle arthroscopies – which comprise the vast bulk of Sharma's Fraud Scheme-related treatments fall within the category of advanced ankle surgery procedures requiring Advanced Ankle Privileges pursuant to New York Education Law §§ 7009 and 7010. As indicated by the New York State Education Department, Office of Professions, verification of licensure **Sharma does not have an Advanced Ankle Privileges, or any Ankle Privileges.**



Comparator with privileges.



Sharma.

168.    As a podiatrist without Standard or Advanced Ankle Privileges, Sharma is prohibited from consulting regarding, rendering care associated with, performing, or holding himself out as able to perform, ankle surgeries and specifically ankle arthroscopies in the State of

43

New York. The New Jersey DPM license (which does extend to ankle) and location of actual performance of surgery <u>does not cure this</u>.

169.    New York scope of practice laws apply to the services he performs within New York. The location of the ultimate surgery does not change the fact that he is diagnosing, ordering imaging, purportedly treating, referring for care, recommending and scheduling surgery, and providing postoperative care related to ankle conditions in New York, which New York law restricts to those with ankle-surgery privileges Sharma does not have.

170.    By meeting patients in his New York office, evaluating ankle pain and conditions, ordering MRIs, counseling them about ankle arthroscopy, and performing postoperative visits, Sharma is diagnosing and treating "conditions of the ankle" in the State of New York, in violation of New York Educ. Law.

171.    As part of the Fraud Scheme, McCulloch Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff primary insurers, panel counsel and others involved in Claimants' personal injury lawsuits for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

172.    As part of the Fraud Scheme, McCulloch Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

173.    As part of the Fraud Scheme, McCulloch Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants, Plaintiff primary insurers,

44

panel counsel and others knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such claims and lawsuits.

174. McCulloch Defendants knowingly profited from case liens and upfront payments from Funders for the alleged medical and diagnostic services rendered by Defendants Capiola, Sharma, and/or any other employee/agent of McCulloch Ortho, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme, including but not limited to their performance of, and receipt of compensation for, unnecessary surgeries upon Claimants herein.

175. McCulloch Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Capiola, Sharma, and/or any other employee/agent of McCulloch Ortho and/or NY S&J provided medical and diagnostic services and received reimbursement for such services.

*Gotham Defendants' Participation in the Fraud Scheme Enterprise*

176. Since at least 2020, Gotham has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

177. Defendant Cohen, as a surgeon and a principal of Gotham, controlled and directed the medical services provided to Claimants by Gotham, including evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

45

178.    Despite being the head of neurosurgery at Brooklyn Hospital Center[2] (located where the majority of the Claimants either lived or fell, and which has an ambulatory surgical center), in relation to the Fraud Scheme, Cohen chose, in virtually every instance, to send Claimants to Defendant HRH to perform surgeries pursuant to, upon information and belief, a compensation arrangement with HRH (and post-2023, to CareWell, another private, for-profit hospital in New Jersey).

179.    Cohen further chose to repeatedly perform lumbar surgeries with only half of the standard instrumentation, a choice that predictably led to the fusions repeatedly failing, including as alleged for two (2) claimants previously described in the *Union* Action (and one such Claimant's brother), others in the *GNY* Action, and at least four (4) others – ***all of whom were similarly represented by Liakas Firm***.

180.    Herein, Claimants B and C received the precise same one-sided surgeries – despite no legitimate justification for surgery, and without any stated rationale for performing unilateral surgery, with laterality of the surgery oftentimes noted for the first time on the operating table.

181.    As for cervical surgeries, Cohen universally utilizes a "Blackhawk" device manufactured by Choice Spine, across the *Union* Action, *GNY* Action, and herein for Claimants A and D, to which Cohen receives royalties and frequently obtains consultation payments.



DR. ANDERS COHEN
DISCUSSES BLACKHAWK®
TI FEATURES AND BENEFITS

Anders Cohen, D.O.
Chief - Neurosurgery at The Brooklyn
Hospital Center in New York, NY

BLACKHAWK TI
Cervical Standalone Spacer System

---

[2] It appears as of this writing that Cohen no longer holds this position.





47

| Company making payment ⬥ | Nature of payment ⬥ | Date ⬥ | Total amount ⬥ |
|---|---|---|---|
| Choice Spine, LLC | Royalty or License | 01/19/2023 | $39,495.49 |
| Choice Spine, LLC | Consulting Fee | 06/30/2023 | $5,500.00 |
| Choice Spine, LLC | Travel and Lodging | 07/25/2023 | $1,372.03 |
| Choice Spine, LLC | Travel and Lodging | 06/30/2023 | $1,000.00 |
| Choice Spine, LLC | Royalty or License | 01/17/2022 | $9,099.63 |
| Choice Spine, LLC | Royalty or License | 04/13/2022 | $8,332.42 |
| Choice Spine, LLC | Royalty or License | 10/18/2022 | $7,279.21 |
| Choice Spine, LLC | Royalty or License | 07/18/2022 | $4,989.27 |
| Choice Spine, LLC | Royalty or License | 07/18/2022 | $1,586.41 |
| Choice Spine, LLC | Royalty or License | 07/18/2022 | $928.80 |
| Choice Spine, LLC | Royalty or License | 01/18/2021 | $17,446.80 |
| Choice Spine, LLC | Royalty or License | 10/19/2021 | $7,916.45 |
| Choice Spine, LLC | Consulting Fee | 05/26/2021 | $4,500.00 |
| Choice Spine, LLC | Consulting Fee | 10/25/2021 | $1,500.00 |
| Choice Spine, LLC | Food and Beverage | 09/30/2021 | $240.41 |
| Choice Spine, LLC | Royalty or License | 01/29/2020 | $30,067.49 |
| Choice Spine, LLC | Consulting Fee | 04/29/2020 | $15,625.00 |

**Associated Products**

**Blackhawk**

Type of product

Drug, Device, Biological or Medical Supply

Category or therapeutic area

National Drug Code (NDC)

**Boomerang**

Type of product

Drug, Device, Biological or Medical Supply

Category or therapeutic area

National Drug Code (NDC)

**Ambassador**

Type of product

Drug, Device, Biological or Medical Supply

Category or therapeutic area

National Drug Code (NDC)

182.    Cohen's wife, who now works for Gotham, was previously a "Medical Coordinator" for the Liakas Firm.

183.    As part of the Fraud Scheme, Gotham Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff primary insurers, panel counsel and others involved in Claimants' personal injury lawsuits for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

184.    As part of the Fraud Scheme, Gotham Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the

48

fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

185. As part of the Fraud Scheme, Gotham Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants, Plaintiff primary insurers, panel counsel and others knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such lawsuits.

186. Gotham Defendants knowingly profited from case liens and upfront payments from Funders for the alleged medical and diagnostic services rendered by Defendant Cohen and/or any other employee/agent of Gotham Neurosurgery, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

187. Gotham Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Cohen and/or any other employee/agent of Gotham Neurosurgery provided medical and diagnostic services and received reimbursement for such services, as well as from usage of spinal implants to which he received royalties and consulting fees.

*Facilities Defendants' Participation in the Fraud Scheme Enterprise*

188. Since at least 2020, HRH has provided facilities in New Jersey wherein numerous Claimants involving purported trip and fall injuries have surgeries performed in furtherance of and as a necessary step for the execution of the Fraud Scheme.

189.   HRH solicits New York-based medical providers and patient flows, including but not limited to patients/Claimants from Gotham Defendants and HPM Clinic Defendants.

190.   As part of the Fraud Scheme, HRH intentionally submitted or caused the submission of knowingly false and/or grossly exaggerated  medical documentation resulting from knowingly unjustified, misrepresented, and/or falsified surgeries by mail, facsimile and/or email to Plaintiff primary insurers, panel counsel and others involved in Claimants' personal injury lawsuits to assert liens for services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accidents.

191.   As part of the Fraud Scheme, HRH provided documentation, which it knew or should have known contained materially misrepresentative medical documentation, by mail, facsimile and/or email to Liakas Defendants knowing that such documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and falsely inflating the settlement value of such lawsuits.

192.   Defendant Moshe is the 99% owner of HRH. The other 1% is owned by his wife, now an admitted attorney and nominal owner of the "Injury Law Group," a practice which amounts to an advertising and referral service to select law firms.

193.   Upon information and belief, HRH also provided the transportation for Claimants to and from surgery in New Jersey, directly or indirectly through companies nominally owned by its director of operations.

194.   HRH knowingly profited from case liens and direct payments from the Funders for the alleged medical, diagnostic, and surgical services caused  to be rendered, overseen, or permitted, that were unnecessary, excessive, unwarranted and/or costly, and were not causally

related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

195.    HRH also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom HRH provided medical, diagnostic, and surgical services and received reimbursement for such services.

196.    Upon information and belief, HRH are engaged in a kickback scheme with certain Medical Providers, including Cohen, whereby financial remuneration or other things of value were provided in exchange for using the Hudson Regional facility despite numerous other available facilities more conveniently located to Cohen and the Claimants, with such other facilities providing opportunities to lower costs or eliminate them through health insurance, or otherwise less costly to the Claimants.

197.    This has taken the form of, upon information and belief, paid "networks," including the "Beschert Network," a paid internal referral network for medical providers operating on liens and funding owned/operated by Moshe's cousin, and "PHIT Health," another internal referral network run by a *funder*[3] which charged *attorneys* per-patient flat fees *determined by how much insurance coverage was available in their cases* to place their patients/claimants onto a conveyor belt leading to HRH surgeries – as well as through inflated factoring and credit agreements on provider liens through, *inter alia*, Moshe's receivables financing company, MedCapital LLC.

---

[3] Villagomez Capital.

# The **Solution**

For all personal injury lawyers and law firms.. the most bespoke experience your client will ever experience



- ⌄ Experienced bilingual paralegals
- — Promoting your brand

We call from a dedicated line, only used to call clients from your firm, always reminding them your firm cares by providing exceptional service, always keeping your client happy. We alert you the moment a client is not pleased or has a query regarding their case.

- ⌄ Personalized attention
- ⌄ Patient liaison
- ⌄ Scheduling and confirming
- ⌄ Diagnostics and procedures
- ⌄ Arranging transportation
- ⌄ Follow up calls
- ⌄ Coordinating for DMEs
- ⌄ Coordinating pharmacies
- ⌄ Procedures
- ⌄ Prevent getting red flagged
- ⌄ Keeping MSPs informed
- ⌄ Lawyer/doctor coordinating
- ⌄ Medical reports

**$1,500/client**

for all $1MM+ liability cases.

- **$1,200/client for the 2nd year.**

- **$650/client for each additional year.**

- **For all $1MM+ cases and New York City cases.**

$1,500/client flat fee for policies of $500,000 and over, and under $1,000,000

**$950/client**

for all $100k/$300k+ liability cases.

- **A one time fee until the case reaches a financial award.**

For all $100k/$300k & $250k/$500k liability cases.

**$650/client**

For all $25k/$50k+ liability cases.

- **A one time fee until the case reaches a financial award.**

For all $25k/$50k & $50k/$100k liability cases.

4

---

[4] Phit Health has recently rebranded to "Phit Med Legal," updated their website, and removed the pricing information. https://phitmedlegal.com/partnerships/

— Procedures

Expeditious patient cooperation in complying with doctor recommended procedures.

— Lawyer/doctor coordinating

We coordinate with the Workers' Compensation (WC) lawyers, doctors and civil lawyers on all matters; keeping track of all WC approved body parts (Notice of Decisions) and monitoring those yet to be approved. We then coordinate with the law firms, and medical service providers to expedite approvals, funding, collecting and disseminating medical reports, etc.

198.    Defendant ESASC, an ambulatory surgical center, knowingly agreed to, and knowingly did, engage in and further the scheme through facilitating knowingly unnecessary surgeries, often with knowingly false, exaggerated, or impossible-in-context paperwork generated by its own staff, arranging logistics regarding such knowingly unnecessary surgeries, and falsifying purported imaging as set forth in detail, *infra*.

199.    Defendant NYSCQ, an ambulatory surgical center, knowingly agreed to, and knowingly did, engage in and further the scheme through facilitating knowingly unnecessary surgeries, often with knowingly false, exaggerated, or impossible-in-context paperwork generated by its own staff, arranging logistics regarding such knowingly unnecessary surgeries, and falsifying purported imaging as set forth in detail, *infra*.

## VII.    DEFENDANTS' PATTERN OF RACKETEERING ACTIVITY

200.    In addition to the activity described above, the Count I Defendants engaged in the following activities in furtherance of the Fraud Scheme Enterprise, and where applicable the Liakas Firm Enterprise, with the cooperation, assistance, agreement, facilitation, and furtherance of the schemes by Count III Defendants, all of which directly damaged Plaintiffs:

### A.  Claimant A

201.    Claimant A, a Brooklyn resident, claimed injuries from an August 24, 2022 accident when she allegedly tripped and fell on broken sidewalk in front of 279 Kosciuszko Street, Brooklyn, New York. A co-resident of Claimant A's specific apartment had his own previous labor law claim before moving to Miami and opening two entities, "$ QUICK CASH $ L.L.C." and "ACCIDENTES LEGAL AID INC." Claimant A's husband owns a business whose address was claimed by another trip and fall claimant, who was represented by Mark Rolnik.[5]

202.    Per a Bill of Particulars verified by Matthew Kerner, Esq. of Defendant Liakas, Claimant A's unwitnessed accident occurred at 9:00 am. Claimant A was 26 years old at the time. The claim[6] ultimately settled on February 26, 2024 for $865,000 to the detriment of and as damages incurred by Plaintiff Technology Insurance Company.

---

[5] Co-Conspirator Firm 1 in the *Union* Action, and Defendant/Referral Source in the *GNY* Action.
[6] Within one year of case resolution, Claimant A "fell" once again on Brooklyn sidewalk, directly across the same street at 270 Kosciuszko St. on February 11, 2025. Liakas Law transmitted a verified summons and complaint via NYSCEF on September 30, 2025, and another Amended Complaint on October 6, 2025. The action remains pending in Supreme Court, Kings County.

203.    Despite the alleged occurrence at 9:00 am, the initial report of the incident to the

FDNY occurred over (12) twelve hours later at 9:11 pm. Upon FDNY arrival to the incident

location at 279 Kosciuszko St. Brooklyn at 9:21 pm, Claimant A was found, purportedly laying

prone on the sidewalk.

| | | | |
|---|---|---|---|
| **Run Type to Scene:** Emergent (Immediate Response) | | **Call Received:** | 21:11:50 |
| **Incident Facility:** | | **Dispatched:** | 21:12:12 |
| **Incident Location:** 279 KOSCIUSZKO ST - Brooklyn, NY 11221 (Kings County) | | **En Route:** | 21:14:03 |
| **Incident Location Type:** Street/Hwy | | **On Scene:** | 21:21:17 |
| | | **Patient Contact:** | 21:22:17 |

204.    Per ambulance and Woodhull emergency room records, Claimant A had finished

exercising and then slipped and fell outside with complaints of lower back pain, yet denied

neck/head pain, and beyond a left arm/right leg abrasion, no other visible signs of trauma.

**Neck:** Normal: Yes
**Chest and Back**
**Cervical:** Normal: Yes
**Thoracic:** Normal: Yes
**Lumbar/Sacral:** Normal: Yes

26 F, denies PMHx, s/p fall from standing while running. She denies syncope. Reports pain to the R knee, R shoulder, and bilateral lumbar paraspine. Denies Numbness/ weakness/ tingling of the distal extremity. She denies dyspnea, chest pain.

**Narrative History Text:**
Upon arrival found A/O x4 26 year old female laying prone on sidewalk in bystanders care on scene. pt complaining of lower back pain. pt state she had finished exercising, and had a slip and fall outside. pt has abrasions to left arm/right leg. pt denies LOC. pt denies pain to head/neck. pt has no other visible signs of trauma noted. pt is not complaining of any other injuries. -active bleeding -deformities -bruising -swelling -lacerations. pt is not ambulatory on scene. +pulse,motor,sensory x4. CTC normal. abdominal field all normal. -dizziness -blurred vision -nausea/vomiting -abdominal pain -fever/cough. pupils equal and reactive. -sob lung sounds clear and equal. -chest pain. vitals stable. pt has no other complains at this time. pt transported to hospital 45 without incident.



205.    A right knee x-ray at the ER revealed no effusion, fracture or abnormalities. Cervical radiology was not performed as Claimant A had no initial head or neck complaints, with normal ROM and no tenderness.

Neck:
  Trachea: No tracheal deviation.
  Comments: **Able to turn neck 45 degrees bilaterally. No midline tenderness.**

206.    Claimant A was discharged from the ER after three hours on August 25, 2022 at 12:53 am with instructions to not return to work until two days later on August 27, 2022.

207.    On August 29, 2022, Claimant A signed a Power of Attorney with Liakas Firm, signed by Defendant Dean Liakas. Within a week she would present to physical rehabilitation and directly to two surgeons, with complaints incompatible with the innocuous hospital visit above.

208.    Three days later, and seven days post-accident, on September 1, 2022 Claimant A presented both to PMR and directly to Defendant Cohen – at the time the Chief Neurosurgeon for Brooklyn Hospital Center – for a neurosurgical consultation with complaints of 9/10 neck and back pain yet normal posture, stance, stride, gait, full motor strength, and full reflexes. Cohen referred her for MRIs of the brain, cervical and lumbar spine, as well as motion X-rays.

209.    On that same day, September 1, 2022, Claimant A purportedly presented to Defendant PMR, with entirely different examination findings (severe ROM deficits, purported strength deficits).

210.    On September 21, 2022 Claimant A underwent a cervical spine MRI which was read as demonstrating normal cervical lordosis, no disc bulge or herniation at C3-C4 with normal facet joints, and at C4-C5 a 1mm sagittal disc bulge indenting the thecal sac. The ultimate impression was *de minimus* – "1mm sagittal disc bulge indenting the thecal sac." No instability, stenosis, or nerve compression.

56

211.    Claimant A returned to Cohen on September 29, 2022, who, undeterred by the actual imaging and report, claimed Claimant A had a C4-5 herniation and a C3-4 disc bulge. Below that review, under "Assessment," this was changed to a disc bulge at C4-5.

212.    On October 11, 2022, Claimant A underwent X-rays. For cervical, this was completely normal, less "mild anterior endplate spondylosis at C5-6."

213.    Undeterred, on December 1, 2022, Cohen claimed Claimant A "would be a candidate for a C3-4 & C4-5 anterior cervical discectomy with decompression and re-expansion of the disc height for sagittal balancing with fusion stabilization."

214.    On December 20, 2022, Claimant A underwent an EMG with Defendant PMR – which found no evidence of cervical radiculopathy.

215.    At the next visit with Cohen on January 26, 2023, despite no radiculopathy finding, and despite that the x-rays performed did not include the flexion-extension imaging Cohen requested, and disregarding the only objective observations at this juncture indicating a 1mm disc bulge at C4-5 and mild endplate spondylosis at C5-6, Cohen confirmed "she is scheduled for upcoming anterior C3-4 & C4-5 cervical decompression and fusion. She recently completed medical clearance."

216.    At that pre-op clearance visit, 10 days prior on January 16, 2023, Claimant A described no restrictions at all, with full range of motion and solely complaints of subjective pain:

**Activities of Daily Living**
Are you able to care for yourself?: Yes
Are you blind or do you have difficulty seeing?: No
Are you deaf or do you have serious difficulty hearing? : No
Do you have difficulty concentrating, remembering or making decisions?: No
Do you have difficulty walking or climbing stairs?: No
Do you have difficulty dressing or bathing?: No
Do you have difficulty doing errands alone?: No
Are you able to walk?: Yes; walks without restrictions
Do you have transportation difficulties?: No

Functional Ability; able to walk up stairs; able to perform heavy work around the house; no difficulty walking up hills; able to walk 4 mph

**Neurologic:** Neurologic: no weakness, numbness, seizures, dizziness, migraines, headaches, tremor, paralysis, loss of consciousness, or gait dysfunction.

**Neurologic:** Gait and Station: normal gait and station. Cranial Nerves: grossly intact. Sensation: grossly intact. Reflexes: DTRs 2+ bilaterally throughout.

**Neck:** Neck: supple, FROM, and **pain with motion**.

217. A week later, on February 3, 2023, Cohen performed the two-level fusion on the 26-year old woman's neck at HRH with the knowingly false justification of herniated discs at two levels – something not even he himself had previously noted, was never identified in *any* diagnostics, and in fact flatly contradicted in clinical notes until the facility on date of surgery.

PRE-OP DIAGNOSIS:
Herniated Discs at C3-C4 & C4-C5

58

218.    In addition to reiterating the unsupported claim of two herniations made for the first time on the date of surgery, Cohen further set forth, for the very first time in the operative report itself, that Claimant A was suffering from radiculopathy at these levels, flatly contradicting the EMG results; loss of lordosis, which is contradicted in all of the imaging and never previously mentioned by Cohen; and, cervicalgia – generic neck pain. Cohen drilled out and destroyed the intervertebral discs at two spinal levels, one of which demonstrated zero pathology on imaging, and one which had, at best, a 1mm disc bulge, and permanently fused these levels in the 26-year-old's neck. All upon a "justification" unsupported by *any* record.

> Preoperative Diagnosis: Injured C3-4 & C4-5 discs with herniations and loss of lordosis with cervicalgia and radiculopathy.

219.    The only inference to be drawn – particularly where this consistently occurs in Cohen's surgeries – is pretext.

220.    Despite purportedly removing two herniated disc fragments, no specimen was preserved.



221.    During the operation, Cohen claimed to identify "excessive mobility" at the C3-C4 – after removing non-existent herniations purportedly seen "compressing the nerves." This was then written as an intraoperative decision to fuse the C3-4 level, despite that the two-level fusion was plainly planned in advance. In performing unjustifiable instrumented fixation at C3-5, Cohen

59

utilized two of the Blackhawk spacer/fixation devices for which Cohen receives royalties. The implants alone were billed out at $30,840.

```
                    ***   278 M/S OTHER IMPLANTS ***                    92.79
02/03/23  21003360        SP ORDER IMPLANT $0-$10,000; CHOICE      1    12000.00
                          PO 2301629 #S-TT10-1412606
02/03/23  21003360        SP ORDER IMPLANT $0-$10,000; CHOICE      1    12000.00
                          PO 2301629 #S-TT10-1412C06
-02/03/23 -21003360---SP--ORDER--IMPLANT--$0-$10,000;-CHOICE---------1----3300.00-
                          PO 2301629 #S-TC10-1412605
02/03/23  21003360        SP ORDER IMPLANT $0-$10,000; CHOICE      1     2850.00
                          PO 2301629 #BT10-0010
02/03/23  24010008        SCREW; CHOICE PO 2301629 #BT20-D4014     2      690.00
                                                                       ----------
                                                                       30840.00
```

222.    HRH further billed out unbundled individual line items for the surgery per level, including an additional $23,744.45 per level for the insertion of Cohen's devices.

```
02/03/23  10008500    SPINE FUSE&REMV CERV BEL C2,SG      1    44286.00
02/03/23  10008501    SPN FUSE&RMV CRV BLW C2,EA ADL      1    47548.90
02/03/23  10010139    INSJ BIOMECHANICAL DEVICE           1    23774.45
02/03/23  10010139    INSJ BIOMECHANICAL DEVICE           1    23774.45
02/03/23  10008669    SP BONE ALGRFT MORSEL ADD-ON        1    11887.22
                                                              ----------
                                                              151271.02
```

223.    This brings the total for the surgery, before other facility costs, up to $182,111.02 for the implants and surgery alone. Together with all billed charges, the total was $216,185.50. A lien was asserted with a letter of protection to Defendant Liakas Firm for $146,916.03, leaving an unexplained gap of $69,269.47.

224.    It is alleged Cohen made the unjustifiable determination to perform this surgery for economic motive having to do with his referral stream and royalties without consideration of medical necessity.

225.    Later CT scans revealed the foreseeable result of such significant surgery – developing C5-6 osteophyte, and a new C2-3 posterior disc bulge.

60

226.    Claimant A presented to the hospital on the date of accident with a right knee abrasion and expressly denied neck pain. Four days after discharge she signed forms with Liakas, and three days thereafter presented directly to a spine surgeon who performed an unjustifiable two-level fusion on a 26-year-old's neck, implanting two devices to which he was self-interested, having transported himself to HRH and caused the transportation of Claimant A over state lines.

227.    In travelling to HRH in New Jersey on February 3, 2022, Cohen made use of interstate facilities with the intent to further an extortion, bribery, kickback and fraud scheme, and did in fact further same through performing the knowingly unnecessary multi-level spine fusion on Claimant A, with knowingly false justification, all in violation of 18 U.S.C. § 1952.

228.    Moshe and HRH facilitated the Cohen surgery with knowledge or reckless indifference to the falsity of the reports being created in furtherance of a claim for payment pursuant to an insurance policy, in violation of the NJ IFPA.

229.    In creating the multitude of falsified reports regarding Claimant A purporting to support that continuing and escalating treatments, and ultimately unnecessary surgeries, were plausibly justified, Cohen, Gotham, HRH, and PMR knew, or should have known, that such records were false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, as well as billing records for such treatment, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

230.    Such transmission did in fact occur on September 20, 2023, when Matthew Kerner of Liakas Firm mailed such hospital, surgical, and medical records of HRH, Cohen, Gotham, and PMR as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff TIC's medical records agent, constituting a violation of 18 U.S.C. § 1341.

61

231. Such transmission did in fact occur on November 28, 2023, when HRH mailed such hospital and surgical bills of HRH, Cohen, and Gotham, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff TIC's medical records agent, constituting a violation of 18 U.S.C. § 1341.

232. Such transmission did in fact occur on December 5, 2023, when HRH mailed such hospital and surgical records of HRH, Cohen, and Gotham, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff TIC's medical records agent, constituting a violation of 18 U.S.C. § 1341.

233. Such transmission did in fact occur on December 7, 2023, when PMR mailed such billing records of PMR, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff TIC's medical records agent, constituting a violation of 18 U.S.C. § 1343. PMR asserted a lien of $8,858.94.

234. Notably, between HRH, PMR, and a non-party MRI provider, these Defendants cost $234,044.44. As demonstrated by Claimant A's hospital billing record from date of accident, Claimant A had Medicaid. Each Defendant charged far in excess of Medicaid rates, with HRH and Cohen charging over **400%** the national average for an outpatient ACDF surgery. However, Medicaid requires that a procedure be medically necessary. Medicaid regulations further generally require participating providers to accept Medicaid reimbursement as payment in full and prohibit circumvention of Medicaid rate limitations. Yet Defendants avoided billing Medicaid entirely and instead pursued inflated charges through litigation liens.

235. On September 20, 2023, at the direction of Liakas Defendants, Matthew Kerner of Liakas Firm verified and mailed a Verified Bill of Particulars on behalf of Claimant A to Plaintiff

62

TIC and/or its panel counsel, alleging Claimant A suffered various injuries to her cervical spine as a result of the result of the purported accident, as a necessary step in furtherance of the scheme.

236.    As the Liakas Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the verified documents mailed to Plaintiff TIC and/or its panel counsel in the underlying matter were knowingly false, and mailed in furtherance and as a necessary step in the Fraud Scheme, in violation of 18 U.S.C. § 1341.

237.    In the matter of Claimant A, Liakas Firm, Gotham, and Cohen conspired to, attempted to, and did successfully extort Plaintiff TIC, each sufficient in its own right to constitute a violation of §§ 1951 & 1951(a), through the knowing and intentional use of unjustified surgery to subject Plaintiff TIC to fear of economic harm in obtaining Plaintiff TIC's money/property (18 USC § 1951[a]) through prohibited extortionate mechanisms aimed to induce Plaintiff TIC's consent (§1951[b][2]).

### B.    Claimant B

238.    Claimant B is, like dozens of others identified in the adjacent Union and GNY Actions, a Freeport, Nassau County resident,[7] who was represented by Liakas Firm in connection with a sidewalk trip and fall in Brooklyn, received funding from funder "FC-1" as identified in the GNY Action, attended HPM Clinics, and underwent spinal surgery by Cohen and further surgeries by McCulloch Ortho.

---

[7] Claimant B's co-resident at the Freeport address he owns, Delvys Adames, also claimed involvement in a trip and fall accident, with a date of loss of October 10, 2020. Adames also claimed a trip and fall in the city, retained Liakas Firm, who filed a suit (523550/2022), secured funding from "FC-1," treated with Defendants SMSR, Gotham, Cohen, and South Island Orthopedics, another HPM provider, consistent with the coordinated referral pipeline and patterned exploitation set forth in detail in the *Union* and *GNY* Actions.

239.    Claimant B claimed injuries from a November 2, 2020 accident at 8:00 am when he allegedly tripped and fell on broken sidewalk in front of AIIC insured's premises located at 304 Boerum Street, Brooklyn, New York 11206.

240.    The accident was unwitnessed, both in its occurrence and aftermath, with no notice to the insured property owner. The lawsuit was settled for $1,250,000.00 on March 22, 2024, $1,000,000.00 of which was to the detriment of, and as damages incurred by Plaintiff Associated Insurance Company.

241.    There is no accident report, witness statements and no ambulance was called to the scene of the accident. Claimant B arrived at 8:39 am at the Wyckoff Heights Medical Center ER by taxi with complaints of left ankle and knee and back pain.

242.    Physical examination at the ER revealed a steady gait, ability to bear weight on his left ankle with no limp or distress, mild swelling, tenderness at the base of his fifth metatarsal and thoracic spine, but no findings as to Claimant B's cervical or lumber spine.

243.    Claimant B's left ankle x-ray was unremarkable. No other radiology was deemed necessary or performed at the ER.

> X-rays left ankle. Three images.
>
> Bones intact. Joint spaces are maintained. No localized soft tissue findings.
>
> Impression: Unremarkable exam. No acute bone or joint findings.

244.    Claimant B was discharged later at 12:41 pm.

> Admit:  11/2/2020 8:39:00 AM
> Discharge:  11/2/2020 12:41:00 PM

245.    On the very same day, November 2, 2020, Claimant B signed a notarized Power of Attorney form with the Liakas Firm, indicating an in-person signing.



246.    Claimant B was thus routed to gatekeeper, orthopedic and spinal surgeon defendants DHD (another HPM Clinic), McCulloch Ortho with Capiola and Sharma, and Cohen at Gotham – all within the first two months post-accident before any conservative care was attempted[8], performed or exhausted.

247.    His very first appointment was directly with podiatrist Sharma at McCulloch Ortho on November 9, 2020. Sharma explicitly saw him "for initial evaluation of pain and swelling of the left ankle," which is beyond the permitted scope of practice in New York for a podiatrist with no standard or advanced ankle privileges – like Sharma.  Sharma advised Claimant B "that he likely has tears of ligaments or tendons present in his left ankle which would be best evaluated by an MRI," and gave "a referral for left ankle MRI." Both such actions were beyond his permitted scope of practice and violations of the NY Educ. Law.[9]

---

[8]  Initial "conservative care" visits: non-party pain management initial evaluation dated August 12, 2021; Defendant SMSR initial evaluation dated November 5, 2021; and Defendant DHD initial evaluation November 10, 2020.

[9] "The practice of podiatry may also include diagnosing, treating, operating and prescribing for any disease, injury, deformity or other condition of the ankle and soft tissue of the leg below the tibial tuberosity *if* the podiatrist has obtained an issuance of a privilege to perform podiatric

248.    On the referral slip provided by Sharma (on NY S&J letterhead) a number was handwritten on the back. It was the number for MSR Concierge, HPM's attorney-facing medical management and marketing, *supra*.

$$Y00-352-3600$$

SAVE IT. CALL US. 1-800-352-3600
EMAIL US. CONTACT@MSRCONCIERGE.COM
CONSIDER IT DONE.

**Shifting Gatekeeper Entities**

249.    Eight days post-accident, at his initial November 10, 2020 evaluation, Claimant B presented to Defendant DHD already on a case lien, evidencing immediate legal involvement in coordinating his care. Under the DHD umbrella, Claimant B remained in physical therapy through September 2021 with no documented objective improvement and no adjustment to account for same. The records –- largely illegible, check-box forms and templated markings – reflect no meaningful treatment, but a paper trail engineered to manufacture "conservative care failure" and pave the way for high-revenue surgical escalation in furtherance of the Enterprise's scheme.

250.    Exactly one-year post-accident, on November 5, 2021, the treating entity suddenly changed from DHD to Defendant SMSR [Hempstead], yet every substantive feature of the medical and billing records remained identical: same letterhead format, same templated forms, same sequencing of information, and the same contact number. Only the narrative changed – and

---

standard ankle surgery or advanced ankle surgery in accordance with section seven thousand nine of this article." NY Educ. Law § 7001.

the billing entity. Claimant B was now documented as presenting again for an "initial evaluation" following a *pedestrian hit by a car* incident – an entirely new mechanism of injury – despite continuous prior treatment under DHD form records. This was not a new course of care; it was the rebranding of the same operation.

251. Both DHD and SMSR billing records directed payment to the identical phone number – 516-294-4590 – the main line for HPM. The artificial reset of treatment under a new corporate name, coupled with identical documentation and centralized payment routing, reflects deliberate claim manipulation: repackaging ongoing treatment to generate additional billable events, extend reimbursement exposure, and obscure the Enterprise's unified control over nominally separate medical entities.

**McCulloch Ortho**

252. Following the initial appointment with Sharma on November 9, 2020, wherein Sharma impermissibly rendered purported ankle care without proper licensure, Claimant B presented for an MRI on November 24, 2020, which purportedly demonstrated a "severe bone contusion/microfracture talar head," "[p]artial-thickness tear of the anterior talofibular ligament," "Longitudinal tear of the peroneus brevis tendon beginning at the level of the lateral malleolus and extending to the peroneal tubercle," with "peroneal tenosynovitis," "[p]osterior tibial tendon [] tendinosis/tenosynovitis of the infra-malleolar segment of the tendon," and "[m]oderate tibiotalar and subtalar joint effusion." This is contrary to imaging on the purported date of accident at the hospital, which found "bones intact… No localized soft tissue findings. Unremarkable exam. No acute bone or joint findings."

253. Less than one-month post-accident on November 30, 2020, and after just five (5) PT visits, Claimant B returned to Sharma, who "[d]iscussed with patient that he is exhausted

67

conservative therapy and surgical intervention is medically necessary," despite being prohibited by scope of practice from recommending ankle surgery, and here, doing it after less than three (3) weeks, and five (5) total visits of physical therapy. This precise same assessment and recommendation was repeated by Sharma on purported visits on December 21, 2020, and again on January 14, 2021 by fellow McCulloch Ortho podiatrist Patricia Meehan, who similarly lacks standard or advanced ankle privileges credentials necessary to make such recommendations or treat the ankle.



254.    On February 12, 2021, Defendant Sharma performed a left ankle arthroscopy at Surgicore in Saddlebrook, New Jersey, which was marked as a "FUNDED CASE." FC-1's checks are contained within the records, both dated January 22, 2021.

255.    Inexplicably, and for the only time throughout multiple productions of identification, Claimant B provided Surgicore with a purported New Jersey driver's license which is facially implausible, with an address on the "license" which does not exist.

256.    Sharma's operative report reflects an intensive multi-procedure process, each step described as complex, purportedly including:

a.  arthroscopy with extensive debridement (portals, joint distension, thorough synovectomy of anterior/medial/lateral gutters, removal of fragments, multiple portal switches, gutter cleaning);

b.  modified Broström ligament repair (in reality, as described, not a Broström at all, but a thermal capsular shrinkage with radiofrequency ablation and FiberTape loop);

c.  posterior tibial tendon tenolysis (separate 2 cm medial incision, dissection, extensive debridement, Topaz radiofrequency treatment, irrigation, closure); and,

d.  peroneal tendon tenolysis and repair with tabularization (separate lateral incision, exposure of both tendons, identification and repair of longitudinal tears in brevis and longus, tubularization with 4-0 Vicryl, irrigation, closure).

257.    This was done in 18 minutes. This is facially not credible. Such a duration would be medically impossible.



258.    The documented time is irreconcilable with the purported complexity of the procedures billed and constitutes objective evidence that the surgery was not performed as represented. The falsified operative record was created to justify inflated billing, thereby furthering the scheme to generate high-value surgical claims through materially false medical documentation.

259.    The arthroscopic imaging produced further does not match the operative report's detail of "abundant synovium… several large synovial fragments… hypertrophied and hemorrhagic synovium… extensively debrided." The arthroscopic imaging showed mild, reactive synovium at best, and provided no substantiating support of the posterior tibial tendon tenolysis (medial open incision), the peroneal brevis and longus tear repair (lateral open incision), or the misnamed "Modified Brostrom" consisting of thermal capsular shrinkage and FiberTape.

69

260.    Indeed, the arthroscopic imaging only depicts mild synovium cleanup, a procedure which would itself take approximately 18 minutes from incision to close.

**Lumbar spine**

261.    Eleven days post-accident, on November 13, 2020, Claimant B presented directly to Defendant Cohen at Defendant Gotham for a neurosurgical consultation with complaints of 9/10 pain in his neck and back. Cohen referred Claimant B for MRIs of the cervical and lumber spine.

262.    On December 22, 2020 Claimant B underwent a lumbar spine MRI which identified no instability, ligamentous injury, marrow edema, trauma or acute injury. The L4-5 level demonstrated a disc bulge with mild central canal stenosis in conjunction with desiccation, a classic indicium of age-appropriate chronic degenerative disc disease. Claimant B's lumbar spine MRI impression was devoid of any sign of trauma.

263.    Despite no prior or contemporaneous documentation of any traumatic injury, listhesis, instability or emergent spinal condition flowing from accident and radiological confirmation by pre-surgical lumber spine MRI that there was no disc herniation or retrolisthesis, on January 28, 2021 (Claimant's first return visit over three months later) Defendant Cohen unilaterally – without radiological validation – diagnosed Claimant B with a L4-L5 herniation.

264.    On February 22, 2021, and his next visit seven (7) months later on September 20, 2021, Cohen reiterated this claim. On October 28, 2021, Defendant Cohen recommended that Claimant B undergo both cervical and lumber fusions.

265.    At a preoperative evaluation on January 19, 2022, Claimant B had no impression of any neurological symptoms, numbness or shooting pain or any other indication for surgical intervention – solely an unquantified finding of unspecific "limited ROM."

**Neurological symptoms:** Neuro: no numbness, weakness, tingling, burning, headache, dizziness, shooting pain, or loss of consciousness.

**Back:** Thoracolumbar Appearance: normal curvature.

**Musculoskeletal::** Joints, Bones, and Muscles: no malalignment or tenderness and **limited ROM**. Extremities: no cyanosis, edema, or varicosities.

**Neurologic:** Gait and Station: normal gait and station. Cranial Nerves: grossly intact. Sensation: grossly intact. Reflexes: DTRs 2+ bilaterally throughout.

266. Cohen had a pre-operative visit with Claimant B on January 24, 2022. Despite the MRI's year-old age at this point, no further imaging was performed.

267. On the date of the lumbar surgery, February 4, 2022, Defendant Cohen's preoperative diagnosis for the first time transformed into "L4/5 Disc Herniation with Retrolisthesis with Mechanical low back pain & Radicular pain." There was no imaging or clinical support for retrolisthesis; with radicular pain supported by an "evidence of" L4 radiculopathy EMG test, and a positive straight leg test Cohen purportedly performed after Claimant B's unnecessary ankle surgery – while he was still in a boot and crutches.

268. Retrolisthesis, a diagnosis signaling structural instability and serving as a classic predicate for fusion, appears nowhere in Dr. Cohen's pre-surgical lumbar assessments. At all times, from Cohen's initial encounter through the entirety of 2021 and until the date of the early 2022 surgery, the pathology was limited, at best, to a central disc herniation with loss of hydration. Nothing more. The surgery was performed for a herniation and retrolisthesis at L4-5 that the most recent MRI (Dec 2020), and the only MRI reviewed by Cohen, specifically said did not exist.

269. For reasons unknown and with elucidation, for a disc bulge with mild central canal stenosis, with mild bilateral foraminal narrowing, Defendant Cohen performed L4-L5 left laminectomy, partial facetectomy, discectomy, and decompression with posterolateral fusion,

71

instrumentation, and stabilization at HRH. There was no indication in Cohen's records, or even the facility records, that this was to be a one-sided surgery until the operative report itself.

270.    The decision to proceed with a unilateral construct – rather than bilateral stabilization traditionally employed in instrumented fusion – raises substantial questions as to surgical rationale and biomechanical necessity. There is no documented preoperative evidence of asymmetric instability requiring left-sided fixation alone. This is, however, entirely consistent with pattern and practice in performing lumbar surgeries on Liakas Firm Claimants at HRH as seen in multiple claimants in the *Union* and *GNY* Actions utilizing similarly unexplained one-sided structures that appear arbitrarily determined on the operating table.



271.    Defendant Cohen's selective, unilateral hardware placement underscores the broader pattern of escalation: a fusion performed without clear instability, executed in a manner inconsistent with the alleged pathology, and structured to generate implant billing and surgical reimbursement rather than to address objectively supported and individualized spinal mechanics.

272.    According to the op report, Cohen identified the disc herniation, mobilized the nerve root from the disc and removed the **disc fragment**. There was no previous identification of any such extruded disc on imaging, this purported disc fragment was never observed or documented, and despite purportedly removing a fragment, no specimen was preserved nor was any disc material sent for pathology, nor any notation of its destruction or disposal.

72



273.    HRH's records document a mere 40 minutes of surgical time (skin incision to closure) for what Defendant Cohen's operative report describes as a multi-component L4/5 decompression and instrumented fusion. That duration is facially inconsistent with the extensive steps actually required for laminectomy, partial facetectomy, discectomy, nerve-root mobilization, pedicle-screw placement, fusion-bed preparation, grafting, and hardware stabilization. A procedure of this claimed magnitude cannot reasonably or safely be performed in such an abbreviated timeframe.



274.    The stark mismatch between the operative narrative and the documented OR duration supports a compelling inference that the surgery was overstated or not performed as represented, inflating reimbursement and advancing the Enterprise's fraudulent scheme.

275.    Billing records reflect a $109,000 lien asserted by HRH for the surgery.

276.    No CT imaging was done post-surgery.

**Left Knee**

277.    Despite no initial left knee pain complaints at the ER, on November 19, 2020 upon referral by an employee of DHD, Claimant B underwent a left knee MRI at Damadian Canarsie. The post-accident baseline impression revealed a partial ACL tear, chondromalacia, distal quadriceps tendinosis, mild joint effusion, and degenerative cartilage irregularity—findings

73

routinely treated conservatively in a 55-year-old patient, *not warranting arthroscopic intervention absent documented mechanical locking or instability.* **Per the initial left knee MRI, Claimant B's menisci and collateral ligaments were otherwise unremarkable**, with no acute fracture or structural derangement requiring surgical correction identified.

> Osseous signal and morphology are, otherwise, unremarkable. The medial meniscus, the lateral meniscus, the medial and lateral collateral ligaments, the posterior cruciate ligament, quadriceps and patellar tendons are, otherwise, unremarkable.

278.    Two and half months post-accident on January 19, 2021, Defendant Capiola performed his initial evaluation of Claimant B's knee, who reported, despite waiting 2.5 months, that his knee was in 10/10 pain. Capiola, on that first visit, immediately recommended surgery.

279.    The last visit with Capiola before surgery was purportedly on July 11, 2022. Despite the left knee MRI being over a year-and-a-half old, Capiola never ordered updated films.

280.    Over a year-and-a-half of sporadic and virtually identical visit reports later (and a year and 10 months post-accident and post-only MRI), on September 15, 2022, Defendant Capiola performed arthroscopic knee surgery at Defendant ESASC to purportedly repair a tear of the medial meniscus.

281.    The preoperative diagnosis of a medial meniscus tear was the very first time a medial meniscal tear was identified. The justification was pulled from thin air, directly contradicting prior post-accident radiology confirming an unremarkable medial meniscus.

282.    The surgery as described was medically impossible to square with the (now 22-month-old) MRI findings:

| Area / Structure | Operative Report (Sept 2022) | MRI Findings (Nov 2020) |
| --- | --- | --- |
| ACL | **Grossly intact** when probed | **Partial tear** (edematous and indistinct distally) |

74

| Area / Structure | Operative Report (Sept 2022) | MRI Findings (Nov 2020) |
|---|---|---|
| **Lateral Meniscus** | **Tear** in inner third of posterior horn and body; **partial meniscectomy** performed | **Normal** (unremarkable) |
| **Trochlear Cartilage** | **Grade 3 chondromalacia / chondral defect; chondroplasty performed** | **Not mentioned** |
| **Medial Femoral Condyle** | **Not mentioned** | **Subchondral irregularity and erosion of articular cartilage** |
| **Patella** | **Not mentioned** | **Lateral patellar tilt + patellar chondromalacia** |
| **Synovitis** | **Complete synovectomy** performed; synovitis noted in multiple compartments | **Mild synovial fluid only (no synovitis described)** |
| **Adhesions** | Lysis of adhesions performed in suprapatellar pouch | Not mentioned |
| **Quadriceps Tendon** | **Not mentioned** | **Insertional tendinosis (distal)** |
| **Overall Pre-op Diagnosis** | **Left knee meniscal tear and synovitis** | **Partial ACL tear + cartilage damage on medial femoral condyle and patella** |

283. Total operative time, incredibly and as with Sharma's purported surgery, was eighteen (18) minutes. This is irreconcilable with the complexity of the procedures contemplated and constitutes objective evidence that the surgery was materially exaggerated, not performed as documented but as a calculated escalation in furtherance of the Fraud Scheme to inflate claim value, performed to purported repair conditions in the left knee that were never previously diagnosed or documented in pre-surgical MRI imaging.

Pt. In Time _08:45_    Incision Start _0911_    Incision End _0929_    Pt. Out _0935_

75

284.    Each of Claimant B's purported surgeries defy belief on their face – from impossibly short operative times to complete mismatch to prior imaging, to being undercut by real-time imaging.

285.    In travelling to Surgicore Surgical Center in New Jersey to perform the unjustified and facially impossible surgery on February 12, 2021, Defendant Sharma, on behalf of McCulloch Ortho, made use of interstate facilities with the intent to further, and in fact did further, a bribery, extortion, kickback and fraud scheme in violation of 18 U.S.C. § 1952, in performing a knowingly unnecessary ankle arthroscopy on Claimant B, to which he lacked the authority to diagnose, treat or recommend in NY, and in ultimately writing up a knowingly false operative report.

286.    In travelling to Hudson Regional Hospital in New Jersey to perform the unjustified surgery on February 4, 2022, Cohen made use of interstate facilities with the intent to further, and in fact did further, a bribery, extortion, kickback and fraud scheme in violation of 18 U.S.C. § 1952, in performing a knowingly unnecessary cervical spine fusion on Claimant B, with knowingly false justification, and creating a false record.

287.    Moshe and HRH facilitated the Cohen surgery with knowledge or reckless indifference to the falsity of the reports being created in furtherance of a claim for payment pursuant to an insurance policy, in violation of the NJ IFPA.

288.    ESASC facilitated the Capiola surgery with knowledge or reckless indifference to the falsity of the reports being created in furtherance of a claim for payment pursuant to an insurance policy.

289.    In creating the multitude of falsified reports regarding Claimant B purporting to support that continuing and escalating treatments, and ultimately unnecessary surgeries, were plausibly justified, Cohen, Gotham, HRH, Sharma, Capiola, McCulloch Ortho, DHD and SMSR

76

knew, or should have known, that such records were false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, as well as billing records for such treatment, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

290.    Such transmission did in fact occur on March 23, 2022, when Matthew Lerner of Liakas Firm mailed such hospital, surgical, and medical records of HRH, Cohen, Gotham, Sharma, Capiola, McCulloch Ortho, DHD and SMSR as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff AIIC's medical records agent, constituting a violation of 18 U.S.C. § 1341.

291.    Such transmission did in fact occur on February 16, 2023 when Salah Shawa of Liakas Firm mailed such hospital, surgical, and medical records of ESASC, Capiola, McCulloch Ortho, DHD and SMSR as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff AIIC's medical records agent, constituting a violation of 18 U.S.C. § 1341.

292.    Such transmission did in fact occur on April 12, 2022, when HRH mailed such hospital and surgical bills of HRH, Cohen, and Gotham, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff AIIC's medical records agent, constituting a violation of 18 U.S.C. § 1341.

293.    Such transmission did in fact occur on May 6, 2022, when HRH mailed such hospital and surgical records of HRH, Cohen, and Gotham, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff AIIC's medical records agent, constituting a violation of 18 U.S.C. § 1341.

294.    Such transmission did in fact occur on May 24, 2022, when McCulloch Ortho mailed such medical records of Sharma, Capiola, and McCulloch Ortho, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff AIIC's  medical records agent, constituting a violation of 18 U.S.C. § 1341.

295.    Such transmission did in fact occur on May 24, 2022, when Surgicore mailed such hospital and surgical records of Sharma and McCulloch Ortho, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff AIIC's medical records agent, constituting a violation of 18 U.S.C. § 1341.

296.    Such transmission did in fact occur on June 2, 2022, when Surgicore mailed such hospital and surgical billing records of Sharma and McCulloch Ortho, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff AIIC's medical records agent, constituting a violation of 18 U.S.C. § 1341.

297.    Such transmission did in fact occur on July 5, 2022, when McCulloch Ortho mailed such billing records of Sharma, Capiola, and McCulloch Ortho, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff AIIC's medical records agent, constituting a violation of 18 U.S.C. § 1341.

298.    Such transmission did in fact occur on July 6, 2022, when Gotham mailed such medical and surgical records of HRH, Cohen, and Gotham, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff AIIC's medical records agent, constituting a violation of 18 U.S.C. § 1341.

299.    Such transmission did in fact occur on July 11, 2022, when DHD mailed such medical and billing records of DHD, as a foreseeable, intended, and necessary step in furtherance

78

of the Fraud Scheme, to Plaintiff AIIC's medical records agent, constituting a violation of 18 U.S.C. § 1341.

300. Such transmission did in fact occur on July 11, 2022, when SMSR mailed such medical and billing records of SMSR, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff AIIC's medical records agent, constituting a violation of 18 U.S.C. § 1341.

301. Such transmission did in fact occur on May 16, 2023, when ESASC mailed such hospital and surgical records of Capiola, McCulloch Ortho, and ESASC, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff AIIC's medical records agent, constituting a violation of 18 U.S.C. § 1341.

302. Such transmission did in fact occur on October 11, 2023, when ESASC mailed such hospital and surgical billing records of Capiola, McCulloch Ortho, and ESASC, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff AIIC's medical records agent, constituting a violation of 18 U.S.C. § 1341.

303. On June 21, 2021, Dean Liakas verified and submitted over the internet *via* NYSCEF a Verified Complaint on behalf of Claimant B, alleging Claimant B "was severely injured, bruised and wounded, suffered, still suffers and will continue to suffer for some time physical pain and bodily injuries and became sick, sore, lame and disabled and so remained for a considerable length of time" as a result of the result of the purported accident, as a necessary step in furtherance of the scheme.

304. On March 23, 2022, at the direction of Liakas Defendants, Matthew Kerner of Liakas Firm verified and mailed a Verified Bill of Particulars on behalf of Claimant B to Plaintiff

79

AIIC and its panel counsel, alleging Claimant B suffered various injuries to her cervical spine as a result of the result of the purported accident, as a necessary step in furtherance of the scheme.

305.    On February 16, 2023, at the direction of Liakas Defendants, Salah Shawa of Liakas Firm verified and mailed a Supplemental Verified Bill of Particulars on behalf of Claimant B to Plaintiff AIIC and/or its panel counsel, alleging Claimant B suffered various injuries to her cervical spine as a result of the result of the purported accident, as a necessary step in furtherance of the scheme.

306.    As the Liakas Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the verified documents mailed to Plaintiff AIIC and/or its panel counsel were knowingly false, and mailed in furtherance and as a necessary step in the Fraud Scheme, in violation of 18 U.S.C. § 1341, and that the Verified Complaint filed on NYSCEF utilizing the wires was knowingly false, and transmitted in furtherance and as a necessary step in the Fraud Scheme, in violation of 18 U.S.C. § 1343.

307.    In the matter of Claimant B, Liakas Firm, Cohen, Gotham, Sharma, Capiola, and McCulloch Ortho conspired to, attempted to, and did successfully extort Plaintiff AIIC, each sufficient in its own right to constitute a violation of §§ 1951 & 1951(a), through the knowing and intentional use of unjustified surgery to subject Plaintiffs to fear of economic harm in obtaining Plaintiffs' money/property (18 USC § 1951[a]) through prohibited extortionate mechanisms aimed to induce Plaintiffs' consent (§1951[b][2]).

### C.    Claimant C

308.    Claimant C, a Brooklyn resident with no public records of anyone with his claimed name and date of birth, and no records related to his residency at his stated address despite

purportedly living there for over 20 years, claimed injuries from an August 27, 2021 trip and fall on broken sidewalk accident at 3:00 pm in Brooklyn, New York.

309.    The accident was unwitnessed, both in its occurrence and aftermath, with no notice to the insured property owner. The lawsuit was settled for $512,000 on April 16, 2024, to the detriment of, and as damages incurred by Plaintiff Wesco Insurance Company.

310.    There is no accident report, witness statements and no ambulance was called to the scene of the accident. Claimant C did not seek any emergency or medical care on the date of the accident, or the day thereafter.

311.    Two days post-accident, on August 29, 2021 at 8:30 am, Claimant C arrived by private car to the emergency room of Kings County Hospital with complaints of lower back pain after a fall two days prior.

312.    A thoracic lumber spine x-ray and exam revealed an impression of chronic low back pain with degenerative disc disease of the thoracic spine, and right knee x-ray revealed no evidence of fracture, dislocation, joint effusion, with joint spaces well preserved. Claimant C's sole diagnosis was mild degenerative disc disease with no evidence of traumatic injury, or any injury to, the lumbar spine. The area of concern with deformity was the thoracic spine.



**Thoracic vertebrae T12**

Where Cohen Ultimately did Surgery    DOA Area of Concern

FINDINGS:
Spine: There are 5 nonrib-bearing lumbar vertebrae. Vertebral body heights are preserved. Mild degenerative disc disease most prominent in the mid thoracic spine. The posterior elements are unremarkable.
Alignment: Vertebral body alignment is normal.
SI joints: Visualized sacroiliac joints are preserved.
Soft tissues: Paravertebral soft tissues are unremarkable.

Impression:
IMPRESSION:
No evidence of fracture or subluxation in the thoracic or lumbar spine. Mild degenerative disc disease in the mid thoracic spine.

313.    Claimant C was discharged the same day.

314.    On September 12, 2024, Claimant C returned to the hospital complaining of back pain, was diagnosed with *chronic bilateral* back pain without sciatica, and complained that he could not pick up his prescriptions due to cost. Notably, Claimant C denied radiating pain down the legs, and lower extremity weakness or numbness, and had a negative straight leg raise test, all indicating lack of compressed nerves. The only observable symptom was subjective bilateral paralumbar tenderness and limited ROM secondary to subjective pain complaint. Claimant C further stated he had a *lower back herniation due to a 2019 motor vehicle accident.*

44yoM PMH NIDDM, HTN, HLD, disc herniation (after MVC in 2019)

315.    Claimant C signed a Power of Attorney form with Liakas Firm, signed by Dean Liakas, on September 14, 2021.

316.    One-month post-accident on September 20, 2021, Claimant C presented to Defendant NJS whereupon he provided a different version of events, this time that he tripped and lost his balance and fell *backwards* yet also struck his right knee. He notably denied any radiating pain to the lower extremities or tingling. Hypertension, diabetes, hypercholesterolemia, prior left shoulder and right wrist surgeries from 2019 were all noted. A prior 2019 motor vehicle accident was listed with injuries to left shoulder, right wrist, and right ankle, with the lower back and known herniation omitted. While purportedly demonstrating severe range of motion restriction not observed at the hospital, Claimant C demonstrated an entirely normal neurological exam. He was diagnosed with a sprain, referred for PT, and referred for an MRI.

317.    On September 21, 2021, Claimant C started PT at NJS. It was noted he tolerated treatment well. He returned on 9/27, 9/28, 10/1, and 10/4, 2021; in all instances it was noted that Claimant C tolerated treatment well. There is no indication of individualized adjustments in treatment throughout the course of PT which, despite purportedly tolerating treatment well, never in fact improves in condition. It is repeated nonetheless with minimal or no alterations so as to generate billing and paper trail to substantiate "exhaustion" of conservative care.

318.    On September 21, 2021 despite no observable trauma or indicia of injury to the right knee at the hospital 2 days post-accident, and despite no mention of knee complaint whatsoever on the return visit to the hospital on September 12, 2021, Claimant C was directed to treatment with Wert at Wert Ortho. In direct contradiction to the previous contemporaneous

83

records, Wert purportedly identified voluminous indicia of injury flatly incompatible with prior lack thereof; there was now purportedly swelling, effusion, tenderness and various purportedly positive tests which Wert used to claim right knee and ankle (no prior complaint at all) derangement, send Claimant C for MRIs, and ultimately, repeatedly, advise Claimant C to undergo surgery, which he does not appear to have done.

319.    On October 6, 2021 Claimant C presented to Cohen at Defendant Gotham. In direct contradiction to all prior records, Cohen noted "pain radiates to his buttocks bilaterally. He describes as a sharp, shooting pain that can be disabling." He also now claimed he fell on the sidewalk backwards and landed on his back (while still reporting right knee pain). The report, and all of those that follow, erroneously identify the date of accident as August 29, 2021, with treatment sought at the hospital the following day, August 30, 2021. Cohen also referred for an MRI.

320.    On October 19, 2021, a lumbar MRI was performed demonstrating <u>multilevel degenerative disc and endplate changes</u> with facet arthropathy. L2-3 through L5-S1 showed narrowing of disc space heights with associated desiccation alongside Schmorl's nodes. The most pathological level, L5-S1, demonstrated endplate osteophytes. All of the above are individual hallmarks of, and collectively, indisputably, *degenerative conditions*, **not acute traumatic injury**. L3-4 – with *no bulge, herniation, canal or foraminal narrowing* – surrounded by discs evidencing those very things, is ultimately selected by Cohen for surgery, without explanation.

84

> The vertebral body heights are maintained. There is narrowing of the disc space heights at the L3-L4 and L5-S1 levels with associated disc desiccation. There are endplate Schmorl's nodes from the L2-L3 level through to the L5-S1 level.
>
> At T12-L1 and L1-L2, there is no canal or foraminal narrowing.
>
> At L2-L3, there is a left foraminal disc protrusion which results in mild/moderate left foraminal narrowing with contact of the exiting left L2 nerve root. There is no canal stenosis or right foraminal narrowing.
>
> At L3-L4, there is no canal or foraminal narrowing.
>
> At L4-L5, there is mild bulging of the disc without canal or foraminal narrowing.
>
> At L5-S1, there is a disc bulge with a superimposed central disc protrusion and annular fissure, endplate osteophytes and mild facet arthropathy which result in mild canal stenosis with mild/moderate bilateral lateral recess and foraminal narrowing with encroachment upon the exiting L5 nerve roots and of the descending S1 nerve roots.

321. At the next visit with Cohen on October 27, 2021, Cohen unilaterally transmogrified a *complete lack of disc pathology* at L3-4 into "**disc injuries with herniation and loss of height hydration L3-4 and loss of hydration with herniation L5-S1.**"

322. On November 22, 2021, Cohen identified, without explanation of his radical departure from the actual imaging, Claimant C as "a good candidate for an L3-4 discectomy decompression with interbody cage placement for re-expansion of disc height and sagittal balancing and also a left-sided L5-S1 discectomy decompression with fusion stabilization."

323. On January 5, 2022, Cohen shortened this recommendation to solely the disc level *with no disc pathology* and further added the fusion stabilization recommended for the L5-S1 level onto the former, stating Claimant C was a candidate for "L3/4 discectomy with decompression and re-expansion of the disc height for sagittal balancing with fusion stabilization… we will schedule for him in the near future."

324. Cohen performed the surgery on the L3/4 level with no disc pathology 2 days later, on January 7, 2022, at HRH in New Jersey.

325. Defendant Cohen fused Claimant C's spine at the L3-L4 [a level with no definitive diagnosis on pre-surgical radiology] citing to **a never-observed L3-L4 disc herniation,** with loss of height and hydration, and a new claim of modic changes (strongly associated with

85

degeneration), with mechanical back pain and left leg pain on the date of the surgery, while *still* referring to it as an "injured and herniated L3-4 disc," and notably **omitted the instrumented fusion while referring to the procedure as "minimally invasive."**

> **Preoperative Diagnosis:** L3/4 disc herniation with loss of height and hydration with modic changes, with mechanical back pain and left leg pain

> **Indication for Procedure:** Patient status trip and fall trauma on 8/29/2021 with resulting low back pain and left leg pain & who failed comprehensive conservative treatment and had an injured and herniated, L3-4 disc herniation with loss of height and hydration. He was given the option of a minimally invasive L3-4 discectomy and decompression with interbody cage placement for re-expansion of the disc height with sagittal and coronal balancing. The risks, benefits and alternatives to this procedure were discussed with him on multiple occasions and he agreed to proceed.



326.    This "minimally invasive" surgery, once again one-sided, was performed on a lien with partial funding. Given there was *no pathology* to address, the choice of left-sided surgery, once again apparently made on the operating table, is rendered even more arbitrary.

327.   In the only instance in the present four exemplars, Cohen in fact preserved a specimen of what he described as "injured disc" from a "Lumbar Herniation" – in a patient whose record demonstrates isolated degenerative disc disease without herniation or neural compression on MRI, no documented instability, no modic changes reported at any time except within the operative report itself as justification, and no legitimate symptom correlation.



> contralateral annulus.  We cleaned out the endplates while doing this in preparation for fusion.
> We were able to remove the injured disc material under direct visualization which appeared
> abnormal.  We then used lordotic trials to continue to reopen up the space and prepare for fusion.

328.   Pathology was equivocal, describing not "herniated disc material" – gelatinous nucleus pulposus through a torn annulus fibrosus, often including fragments of cartilaginous endplates – but generically "degenerated fibrocartilage," dehydrated, brittle, fibrous, *degenerated* disc material. Choice Spine was again utilized.

329.   It is alleged Cohen made this unjustifiable determination for economic motive having to do with his referral stream, self-interest, and having nothing to do with medical necessity.

330.   In travelling to HRH in New Jersey to perform this unjustified surgery on January 7, 2022, Cohen made use of interstate facilities with the intent to further, and in fact did further, a bribery, extortion, kickback and fraud scheme in violation of 18 U.S.C. § 1952, in performing a knowingly unnecessary lumber spine fusion on Claimant C, with knowingly false justification.

331. In creating the multitude of falsified reports regarding Claimant C purporting to support that continuing and escalating treatments, and ultimately unnecessary surgeries, were plausibly justified, Cohen, Gotham, HRH, Wert, Wert Ortho, and NJS knew, or should have known, that such records were false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, as well as billing records for such treatment, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

332. Such transmission did in fact occur on April 12, 2022, when HRH mailed such hospital and surgical bills of HRH, Cohen, and Gotham, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff Wesco's medical records agent, constituting a violation of 18 U.S.C. § 1341.

333. Such transmission did in fact occur on May 6, 2022, when HRH mailed such hospital and surgical records of HRH, Cohen, and Gotham, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff Wesco's medical records agent, constituting a violation of 18 U.S.C. § 1341.

334. Such transmission did in fact occur on April 17, 2023, when Gotham mailed such billing records of Gotham and Cohen, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff Wesco's medical records agent, constituting a violation of 18 U.S.C. § 1341. Gotham asserted a lien of $30,350.00. Notably, in an invoice which was sent to Liakas Firm demonstrated a $13,000 funding credit which was omitted from the invoice sent to Plaintiff Wesco's medical records agent.

335.    Such transmission did in fact occur on May 11, 2023, when Gotham mailed such medical records of Gotham and Cohen, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff Wesco's medical records agent, constituting a violation of 18 U.S.C. § 1341.

336.    Such transmission did in fact occur on May 19, 2023, when NJS mailed such medical and billing records of NJS, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff Wesco's medical records agent, constituting a violation of 18 U.S.C. § 1341.

337.    Such transmission did in fact occur on June 6, 2023, when HRH mailed such billing records of HRH, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff Wesco's medical records agent, constituting a violation of 18 U.S.C. § 1341.

338.    Such transmission did in fact occur on July 8, 2023, when HRH mailed such hospital and surgical records of HRH, Cohen, and Gotham as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff Wesco's medical records agent, constituting a violation of 18 U.S.C. § 1341.

339.    On April 25, 2022, Dean Liakas verified and submitted over the internet *via* NYSCEF a Verified Complaint on behalf of Claimant C, alleging Claimant C "was severely injured, bruised and wounded, suffered, still suffers and will continue to suffer for some time physical pain and bodily injuries and became sick, sore, lame and disabled and so remained for a considerable length of time" as a result of the result of the purported accident, as a necessary step in furtherance of the scheme.

340.    On February 24, 2023, at the direction of Liakas Defendants, Matthew Kerner of Liakas Firm verified and mailed a Verified Bill of Particulars on behalf of Claimant C to Plaintiff

89

Wesco and/or its panel counsel, alleging Claimant C suffered various injuries and underwent surgeries identified above as a result of the result of the purported accident, as a necessary step in furtherance of the scheme.

341.    As the Liakas Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the verified documents mailed to Plaintiff Wesco and/or its panel counsel in the underlying matter were knowingly false, and mailed in furtherance and as a necessary step in the Fraud Scheme, in violation of 18 U.S.C. § 1341, and that the Verified Complaint filed on NYSCEF utilizing the wires was knowingly false, and transmitted in furtherance and as a necessary step in the Fraud Scheme, in violation of 18 U.S.C. § 1343.

342.    In the matter of Claimant C, Liakas Firm, Cohen, Gotham, Wert, Wert Ortho, and NJS conspired to, attempted to, and did successfully extort Plaintiff Wesco, each sufficient in its own right to constitute a violation of §§ 1951 & 1951(a), through the knowing and intentional use of unjustified surgery to subject Plaintiff Wesco to fear of economic harm in obtaining Plaintiff Wesco's money/property (18 USC § 1951[a]) through prohibited extortionate mechanisms aimed to induce Plaintiff Wesco's consent (§1951[b][2]).

**D.    <u>Claimant D</u>**

343.    Claimant D, a resident of varyingly Elmont, Hempstead, Valley Stream, and Oceanside in Nassau County, NY (all neighboring or near to Freeport) claimed injuries from a trip and fall on April 16, 2022, at 9:00 pm, on an elevated portion of the sidewalk in Brooklyn, New York.

344.    The accident was unwitnessed, both in its occurrence and aftermath, with no notice to the insured property owner until two years later upon filing the complaint.  The lawsuit is active.

345.     Claimant D was found prone on the ground – **an hour and 12 minutes after purportedly falling** – and transported by the FDNY to the Interfaith Medical Center ER arriving at 10:12 pm where he reported that he fell and could not get up. His complaints were limited to his left arm, shoulder and lower back. He explicitly denied neck pain and loss of consciousness.



Pt BIBEMS c/o LUE/LLE pain s/p x today. Pt states falling down and breaking fall w/ left side shoulder. Limited range of motion observed in Left arm/leg. Present pedal pulses. Bilateral Equal sensation present. HS negative. No abrasion/laceration/hematoma observed upon inspection. Cap refill < 2. Denies blood thinners. Denies

346.     Despite having been injured so badly he could not get up for over an hour, Claimant D was in no acute distress, had a normal heart rate, and demonstrated no objective signs of trauma whatsoever, and an intact neurological exam.

347.     A left shoulder x-ray revealed no acute fracture or dislocation, with mild degenerative changes alongside mild soft tissue swelling. Claimant D was discharged a few hours later in the early morning of April 17, 2022.

348.     Claimant D promptly retained the Liakas firm as evidenced by the power of attorney dated and executed two days post-accident on April 18, 2022.

In Witness Whereof I have hereunto signed my name this __K__ day of __April__ 20 __22__

xx ▮▮▮▮▮▮▮▮▮▮
(Patient's Signature)

_Dean R. Liakas_ , Esq.
(Attorney)

349.     On April 22, 2022, Claimant D presented to Defendant PMR for an initial evaluation, already on lien. As with previously discussed DHD, SMSR, and NJS, PMR's records mirrored every substantive feature yielding virtually identical medical and billing records: same letterhead format, same templated forms, same sequencing of information as Defendants DHD,

SMSR, and NJS, as all were operating under the non-physician HPM umbrella, together with its private equity owner and attorney-facing marketing and services.

**Claimant D at Defendant PMR:**



PMR Of NY Rego Park
95 20 Queens Boulevard
Rego Park, NY 11374-1136
(718) 459-1280

Insurance:  LIEN - PMR

Date:        04/25/22
MRN:
Onset Date:       04/16/22
Case #:        320491

NGAEN : 1753942

Physical Therapy Initial Evaluation

**Claimant B at Defendant DHD:**

DHD Medical Canarsie
2132 Ralph Avenue
Brooklyn, NY 11234-5406
(718) 763-1400

Insurance:  LIEN - DHD

Date:        11/11/20
MRN:
Onset Date:       11/02/20
Case #:        265911

NGAEN : 89

350.     On that first April 22, 2022 visit, Claimant D made no complaints of neck pain. The visit note further stated Claimant D had already returned to work. No testing was done of the neck.

351.     On April 27, 2022, just 5 days after commencing PT, Claimant D presented to Defendant Cohen at Gotham, now for the first time referencing neck pain alongside his back pain. Claimant D purportedly described immediate sharp neck pain as a result of his fall, despite not telling EMTs, hospital staff, or PMR. Cohen recommended MRIs, discussed further below.

352.     On May 10, 2022 Claimant D presented to Stand-Up MRI for a left shoulder MRI which revealed no evidence of acute traumatic injury. The left shoulder impression revealed a variety of mild but widespread degenerative pathology: a partial-thickness bursal surface tear of the supraspinatus with underlying tendinosis, subacromial bursitis, AC joint hypertrophic change, a Type II downsloping acromion, subcortical cystic change of the humeral head with benign

features, and labral erosion with spur formation. Absent were any hallmarks of acute trauma – no marrow edema, no fracture, no avulsion, no full-thickness retracted tear, and no acute soft-tissue disruption.

353.    The next day, May 11, 2022, Claimant D was routed to Defendant Wert of Defendant Atlantic for an initial evaluation. Claimant D's complaints were again limited to left shoulder, left knee, and lower back, with no neck complaint. Wert proceeded to examine Claimant D's *right* shoulder and issue an assessment of *right* shoulder internal derangement with no left shoulder findings.

354.    At a follow up visit on June 30, 2022, Claimant D returned to Wert to review his MRI results from May 10, 2022. Gone was any reference to his prior exam or findings regarding Claimant D's right shoulder. Wert reiterated the MRI report effectively word for word, found 18 provocative tests positive (one negative), reduced range of motion, and immediately recommended surgery based on "the imaging results, positive objective findings on examination, present and ongoing symptomatology," with the purported present and ongoing symptomology being observed by Wert for the first time that day.

355.    On August 8, 2022, Claimant D returned to Wert, and for the first time complained to him of "ongoing" left-sided neck pain which is his "main pain generator," not having mentioned this for over four months. An August 30, 2022 visit was virtually identical.

356.    Notably, the MRI was done at *Wert's* request. It found as follows:

> **Cervical MRI 8/16/22:**
> 1. C6-7 circumferential small to moderate degenerative disc/osteophyte complex causing mild spinal stenosis, without cord flattening. The neural foramina are becoming narrowed, mild-to-moderate on the left, mild on the right.
> 2. C5-6 moderate narrowing of the left neural foramen due to bony encroachment.
> 3. Apparent hemangioma of bone in the C7 vertebra.

93

> At levels C2-3, C3-4 and C4-5, there are no definite disc bulges, and no focal disc herniations are seen. The neural foramina are all patent, and there is no spinal stenosis at any of these levels, and there is no spinal cord deformity either.
>
> At C5-6, the disc has a mildly bulging annulus, without focal herniation. There is no central spinal stenosis or cord flattening at this level. There is moderate narrowing of the left-sided neural foramen due to bony overgrowth at the uncovertebral and facet joints. The right foramen is relatively patent.
>
> At C6-7, there is a small-to-moderate circumferential degenerative disc/osteophyte complex. This causes mild spinal stenosis, without cord flattening. There is narrowing of both C6-7 neural foramina, mild to moderate on the left, mild on the right.
>
> At C7-T1, there is no disc bulge or herniation. The neural foramina are patent, and there is no spinal stenosis or cord flattening.

357.    These are facially hallmark degenerative findings limited to C5-6 and C6-7 with left-sided neural foraminal narrowing as a result of degenerative, developmental bone spurs.

358.    Meanwhile, the MRI done at *Cohen's* request on June 13, 2022 resulted as follows:

> At C3-4, disc bulge is noted deforming the thecal sac. Mild left neural foraminal narrowing is noted in conjunction with facet and uncinate hypertrophic changes. There is no evidence of right neural foraminal stenosis. Loss of disc signal with preservation of disc space height.
>
> At C4-5, disc bulge is noted deforming the thecal sac. Mild left neural foraminal narrowing is noted in conjunction with facet and uncinate hypertrophic changes. There is no evidence of right neural foraminal stenosis. Loss of disc signal with preservation of disc space height.
>
> At C5-6, disc bulge is noted deforming the thecal sac. Left neural foraminal narrowing is noted in conjunction with facet and uncinate hypertrophic changes. There is no evidence of right neural foraminal stenosis. Loss of disc signal with preservation of disc space height.
>
> At C6-7, disc herniation is noted deforming the thecal sac abutting the spinal cord demonstrating bilateral neural foraminal extension abutting the exiting C7 nerve roots contributing to left neural foraminal narrowing in conjunction with facet and uncinate hypertrophic changes. Loss of disc signal with preservation of disc space height with anterior disc extension.
>
> At C7-T1, central focal disc herniation is noted deforming the anterior margin of the thecal sac. There is no evidence of neural foraminal extension. Loss of disc signal with preservation of disc space height.

359.    Despite later sending Claimant D for a CT scan on March 3, 2023 to the same facility which performed the 8/18/22 MRI, which depicted entirely degenerative bony changes with at best a mild bulge at C5-6; and that the results from the March 3, 2023 CT scan *explicitly referenced the 8/18/22 MRI,* Cohen never notes reviewing the 8/18/22 MRI, never distinguishes it

94

or even notes its existence, and continued to rely solely on the 6/13/22 MRI - incompatible with every set of films that followed.

Exam requested by:
ANDERS COHEN MD
1 DOCK 72, 6TH FL
BROOKLYN NY 11205

SITE PERFORMED: LHR RIDGEWOOD

Patient
Date of
Phone:
MRN: 1
Date of Exam: 03-03-2023

**EXAM: CT CERVICAL SPINE WITHOUT CONTRAST**

**HISTORY:** Cervicalgia. Fall.

**TECHNIQUE:** Sections: 3.0 mm thick axial images and two-dimensional sagittal, axial oblique and coronal reformatted images were generated. Intravenous/intrathecal contrast: None. Scanner: Siemens Somatom. One or more of the following dose reduction techniques were used: automated exposure control, adjustment of the mA and/or kV according to patient size, use of iterative reconstruction technique.

**FINDINGS:** Comparison: MRI performed 8/16/2022.
Prevertebral space: No swelling.
Vertebral body height and alignment: Anatomic.
Pedicles, facet joints and posterior elements: Intact.
Fracture, lytic or blastic lesions: Again seen is the hemangioma in the posterior aspect of the C7 vertebral body.
Intervertebral discs:

C2-3: Intervertebral disc intact.
C3-4: There is early anterior osteophyte formation.
C4-5: Early anterior osteophyte formation.
C5-6: There is early disc degeneration. Endplate osteophyte is minimally encroaching upon the ventral subarachnoid space. There is moderate left neural foraminal stenosis.
C6-7: There is early disc degeneration with minimal annular bulging.
C7-T1: Intervertebral disc intact.

360.    Claimant D saw Cohen on February 2, 2023, who recommended a two-level ACDF surgery at C5-6 and C6-7, for "Cervicalgia and radiculopathy, C6-7 disc herniation with loss of height and hydration, nerve root encroachment and ventral spinal cord abutment, C5-6 disc herniation with loss of posterior disc height nerve encroachment." This is despite (even) the June 13, 2022 MRI noting at both levels "preservation of disc space height," with no loss of hydration/desiccation noted, and no C5-6 herniation identified; and, the August 18, 2022 MRI which noted "the cervical discs are of normal height," with no loss of hydration/desiccation noted,

solely a disc bulge at C5-6 "without focal herniation," and solely bone spurs at C6-7 without any disc pathology.

361.    Put simply, Cohen invented a reason to do surgery in flat contravention of the imaging, including imaging he himself had ordered.

362.    On that same date, Cohen ordered the CT scan seen above, which took place March 3, 2023. Despite seeing Claimant D on March 9, 2023 and July 24, 2023, Cohen either never reviewed the CT, or never acknowledged its results in the reports.

363.    Claimant D saw Wert again on February 9, 2023, and then did not see him again until September 6, 2023 where it was noted Claimant D had undergone a cervical fusion within the past month – and Wert scheduled him for shoulder surgery.

364.    Given the timing, it is notable that after initial recommendations by Wert on June 30, 2022, and by Cohen on February 2, 2023, there was an effective six-month hiatus, then promptly back-to-back surgeries starting in August 2023:



365.    On August 4, 2023, Cohen travelled to CareWell in New Jersey ("CareWell") to perform a two-level ACDF surgery based on precisely zero objectively substantiated indications.

Notably, CareWell's records reflect solely a minor, written off charge, and Gotham's billing records

reflect only a purchase order for a Blackhawk device (notably at half the price charged by HRH),

that noted the surgery was funded.

366.    The morning of August 4, 2024, Claimant D was seen in pre-op by another doctor.

That exam revealed his neck was supple and non-tender, he had normal range of motion, and the

doctor identified solely degenerative conditions as related to the surgery.

97



367.    Cohen performed an incision, approach, two-level discectomy and decompression, and instrumentation in *just 49 minutes.*

368.    In addition to the manufactured justification Cohen provided in recommending the surgery, Cohen now added a new clinical justification within his operative report which neither had been stated up until that very moment, nor was substantiated by *any* of the imaging or clinical exams.

> **Preoperative Diagnosis:** Injured C5-6 & C6-7 disc with herniation, kyphotic deformity and ventral spinal cord abutment and nerve root encroachment with cervicalgia and radiculopathy.

369.   Once again, this has no support in any records, including Cohen's.

370.   Cohen purportedly removed most if not all of the C5-6 disc, purportedly removed a herniated disc fragment (in identical fashion and language as with Claimant A), inserted an interbody cage, and anchored to the levels above and below, fusing C5-6. Notably, the C6-7 portion of the surgery was entirely abandoned upon approach based on inability to achieve visual due to high shoulder positioning and obesity.

371.   A subsequent post-op CT, which took place on November 6, 2023, is confirmation Cohen's operative report, and manufactured justifications, were not true:

> There is evidence for C5-6 ACDF with anterior approach interbody device with bone graft demonstrating evidence for solid arthrodesis with continuous bone density.
>
> There is normal bone density. There is no focal osseous lytic or blastic lesion
>
> C2-3: No gross disc herniation by noncontrast CT or bony stenosis. Normal facet joints.
>
> C3-4: No gross disc herniation by CT or bony stenosis. Normal facet joints. Status post C5-6 ACDF.
>
> C4-5: No gross disc herniation by CT or bony stenosis. Normal facet joints.
>
> C5-6: Status post ACDF. Interbody bone graft demonstrating evidence for arthrodesis. Bulging disc resulting in mild to moderate left foraminal bony stenosis. Patent central canal and right neural foramen.
>
> C6-7: No gross disc herniation by CT or bony stenosis. Normal facet joints.
>
> C7-T1: No gross disc herniation by CT or bony stenosis. Normal facet joints.

372.   **Cohen abandoned the C6-7 portion of the procedure without performing any work on it. Three months after the fact – and Cohen never touched that level – the level was now seen as perfectly normal.**

99

373.    **Second, at C5-6, there is now a disc bulge causes moderate bony stenosis. There should be barely,, *if any, disc material left to bulge at all,*** if Cohen's report of "discectomy side to side to the uncovertebral joints" was true. It plainly was not.

374.    Third, bony stenosis **was already there and Cohen did not fix it – removing the majority of disc material (if even done)** *does not fix a bone spur.*

> fluoroscopy. A Cloward retractor was brought in to retract the midline structures. A 15 blade was used to open the annulus of C5-6. A curette was used to loosen the disc which appeared to be abnormal. A combination of pituitary instruments and Kerrisons were used to do discectomy side to side to the uncovertebral joints. We

March 3, 2023 CT:

> C5-6: There is early disc degeneration. Endplate osteophyte is minimally encroaching upon the ventral subarachnoid space. There is moderate left neural foraminal stenosis.

August 18, 2022 MRI:

> At C5-6, the disc has a mildly bulging annulus, without focal herniation. There is no central spinal stenosis or cord flattening at this level. There is moderate narrowing of the left-sided neural foramen due to bony overgrowth at the uncovertebral and facet joints. The right foramen is relatively patent.

375.    Not only was the surgery not justifiable, the one consistently identified pathology – a degenerative bone spur – was left unattended.

376.    As Cohen, despite removing significant disc material and purportedly a herniated fragment (just as with Claimant A), failed to preserve a specimen of removed material (just as with Claimant A), there is thus no objective means to review if any material was removed at all – just as with Claimant A. There is a more than reasonable inference of intentionality as alleged above.

377.    Consistent with pattern and practice, Cohen again utilized the Blackhawk devices in which he maintains a self-interest. The circumstances of this operation plainly give rise to a

100

reasonable inference of a kickback scheme, in turn considered unlawful activity within the meaning of the Travel Act, rendering Cohen's travel to New Jersey on August 4, 2023 with the intent to carry on and facilitate such unlawful activity, and in fact doing so *via* the surgery and creation of a record alleged to be false, a violation of 18 § USC 1952.

378.    On October 13, 2023, Claimant D underwent left shoulder surgery by Defendant Wert at Defendant NYSCQ. Despite the MRI of the left shoulder being over 17 months old, no new imaging was ever performed prior to moving forward (with Wert urging such surgery for 16 of those months).

379.    The operative report reflects what appears to be a left shoulder of entirely different pathology than that demonstrated on the earlier MRI.

| Operative Report (10/13/2023) | MRI Report (05/10/2022) |
| --- | --- |
| Complete/full-thickness supraspinatus tear (repaired with anchors & sutures) | Partial-thickness bursal-surface tear (max 11 mm), tendinopathy only |
| Complete subscapularis tear (repaired with anchors & sutures) | **No tear.** |
| Tear of superior labrum + Type I SLAP lesion (debrided) | **No superior labrum tear** |
| Tear of anterior labrum (debrided) | Anterior labrum **erosion** with mild glenoid spur |
| Excessive hypertrophic glenohumeral synovitis (extensive synovectomy) | **No synovitis**; paucity of fluid in biceps sheath & subscapularis recess |
| Full subacromial decompression, acromioplasty, Mumford distal clavicle resection | "Fairly modest" AC joint hypertrophy, Type II acromion, no clavicle issue |
| Lysis and resection of adhesions | No adhesions mentioned |

380.    Wert purportedly removed a portion of Claimant D's clavicle bone despite no objective indication to do so. Wert purportedly repaired a tear which was not objectively supported

to exist – twice. "Excessive hypertrophic glenohumeral synovitis" was thoroughly corrected – despite no evidence it was ever there. The operative report is medically implausible on its face.

381.    Separately, the operative report reflects an incision-to-closure time of just fifty-two (52) minutes – for a purported complete synovectomy, dual labral debridement, rotator cuff repair of the supraspinatus, rotator cuff repair of the subscapularis, distal clavicle excision (Mumford procedure), lysis of adhesions, and subacromial decompression. This is medically impossible.



382.    The condensed 52-minute duration is inconsistent with the complexity of the procedures billed and raises substantial doubt that each component was performed as represented. This disparity between the expansive operative narrative and the abbreviated surgical window supports a reasonable inference that the surgery was overstated or inflated to justify stacked CPT billing and monetize the claim in furtherance of the Enterprise's fraud scheme. In conjunction with an operative report that is outright incompatible with the MRI findings provides a strong inference of knowing falsehood in the operative report's creation. This inference is only made stronger as Wert maintained a financial interest in the facility billing for such overstated coding.

383.    In travelling to CareWell Health Medical Center in East Orange, New Jersey to perform this unjustified surgery on August 4, 2023, Defendant Cohen made use of interstate facilities with the intent to further, and in fact did further, bribery of a witness, extortion, and fraud scheme in violation of 18 U.S.C. § 1952, in performing a knowingly unnecessary cervical spine fusion on Claimant B, with knowingly false justification.

384. In creating the multitude of falsified reports regarding Claimant D purporting to support that continuing and escalating treatments, and ultimately unnecessary surgeries, were plausibly justified, Cohen, Gotham, Wert, Wert Ortho, NYSCQ and PMR knew, or should have known, that such records were false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

385. Such transmission did in fact occur on August 22, 2024, when Gotham mailed such medical records of Gotham and Cohen, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff TIC's medical records agent, constituting a violation of 18 U.S.C. § 1341. Such billing noted in a handwritten note "Funded Case."

386. Such transmission did in fact occur on September 13, 2024, when Gotham mailed such billing records of Gotham and Cohen, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff TIC's medical records agent, constituting a violation of 18 U.S.C. § 1341. Such billing record included the Blackhawk device invoice noted in a handwritten note "Funded Case."

387. Such transmission did in fact occur on September 13, 2024, when Wert Ortho mailed such medical records of Wert and Wert Ortho, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff TIC and/or its panel counsel, constituting a violation of 18 U.S.C. § 1341.

388. Such transmission did in fact occur on October 29, 2024, when NYSCQ mailed such hospital and surgical bills of NYSCQ, Wert, and Wert Ortho, as a foreseeable, intended, and

103

necessary step in furtherance of the Fraud Scheme, to Plaintiff TIC and/or its panel counsel, constituting a violation of 18 U.S.C. § 1341.

389.  Such transmission did in fact occur on December 13, 2024, when CareWell faxed such hospital and surgical records of CareWell, Cohen, and Gotham, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff TIC and/or its panel counsel, constituting a violation of 18 U.S.C. § 1343.

390.  Such transmission did in fact occur on December 13, 2024, when NYSCQ mailed such hospital and surgical records of NYSCQ, Wert, and Wert Ortho, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff TIC and/or its panel counsel, constituting a violation of 18 U.S.C. § 1343.

391.  Such transmission did in fact occur on May 19, 2025, when PMR mailed such medical records of PMR, as a foreseeable, intended, and necessary step in furtherance of the Fraud Scheme, to Plaintiff TIC's medical records agent, constituting a violation of 18 U.S.C. § 1341.

392.  On June 28, 2024, at the direction of Liakas Defendants, Vinny Paradise of Liakas Firm verified and mailed a Verified Bill of Particulars on behalf of Claimant D to Plaintiff TIC and/or its panel counsel, alleging Claimant D suffered various injuries and underwent surgeries identified above as a result of the result of the purported accident, as a necessary step in furtherance of the scheme.

393.  As the Liakas Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the verified documents mailed to Plaintiff TIC and/or its panel counsel in the underlying matter were knowingly false.

394.  In the matter of Claimant D, Liakas Firm, Cohen, Gotham, Wert, and Wert Ortho, conspired and attempted to extort Plaintiff TIC, each sufficient in its own right to constitute a

104

violation of §§ 1951 & 1951(a), through the knowing and intentional use of unjustified surgery to subject Plaintiff TIC to fear of economic harm in obtaining Plaintiff TIC's money/property (18 USC § 1951[a]) through prohibited extortionate mechanisms aimed to induce Plaintiff TIC's consent (§1951[b][2]).

## VIII.   "IN FURTHERANCE" OR "JUSTIFIABLE RELIANCE"

395.   As the predicate acts sounding in mail and wire fraud as set forth against the Count I RICO Defendants herein are alleged to have been foreseeable, in furtherance of, and as a necessary step in the Fraud Scheme, reliance is not required element to be established or pled as to each individual such document mailed or transmitted.

396.   The NJ IFPA imposes no obligation to plead or prove reliance as a separate element.

397.   Plaintiff primary insurers at no time knew or had reason to know in the exercise of due diligence or reasonable care that Defendants were engaged in misrepresentations, omissions, concealment of material facts, and fraudulent conduct. The Fraud Scheme was specifically designed and implemented in order to thwart due diligence and court process.

398.   As to common law fraud, the mere filing of the subject Complaints in the State Courts mandated an actionable level of reliance – Plaintiff primary insurers were forced to rely on the misrepresentations of the Defendants insofar as the retention of attorneys, investigators, and experts was necessary to avoid default judgments; these are actions Plaintiff primary insurers would not have taken (or had to take) but for the knowing misrepresentations made by the Defendants, and they were the proximate and intended result of Defendants, the harm to Plaintiff primary insurers being a necessary element to the Fraud Scheme through protracted litigation and unnecessarily incurred and inflated costs.

105

399.    As to settlements made as a result of the Fraud Scheme, Plaintiff primary insurers at all times comported with reasonable due diligence requirements through the retention of reputable defense firms, investigators, and experts. However, the Fraud Scheme was designed and implemented in order to not just circumvent but exploit these safeguards. Further, the protections under HIPAA and attorney-client privilege, along with New York's insulation of litigation financing disclosures, rendered the scheme unable to be detected through the use of ordinary due diligence. Any payments made were after Plaintiff primary insurers had engaged in reasonable due diligence and were made in reasonably justified reliance.

## IX.    DAMAGES

400.    Plaintiffs are primary insurance carriers that underwrote policies intended to cover claims and lawsuits arising from legitimate accidents, negligence, and other tort-based losses, not fraudulent and staged claims generated through the Fraud Scheme.

401.    As a result of the Fraud Scheme, Plaintiff primary insurers have incurred substantial damages. Damages are concrete, paid and categorized. Such damages include the coerced and/or fraudulently induced payments that Plaintiff primary insurers made to Liakas Firm in the form of settlements due to Defendants' pattern of racketeering activity and fraudulent conduct. Damages also include payments Plaintiff primary insurers made as legal and investigative costs for defending fraudulent lawsuits and payments made as part of settlement which were diverted to Defendant Medical Providers through liens for treatment predicated upon, in whole or in part, the fraudulent reports generated by Defendants.

402.    Litigation costs, investigative costs, attorneys' fees, and other damages are expressly and statutorily proper damages under the NJ IFPA. Same have been identified as viable and proper damages under RICO by precedent within the Second Circuit.

106

403.    But for Defendants' perpetration of the Fraud Scheme, Plaintiff primary insurers would not have incurred such damages. Each and every predicate act contributed to the damages incurred, as the scheme is designed to reinforce itself, becoming more difficult to discern, more expensive to combat, and more effective generally upon each subsequent production of false statements and documents, effectuated through the use or mail and wire communication, and through reinvestment in the scheme and iteration, in an ever-escalating bootstrap; damages would have lessened or not incurred at all but for fraudulent scheme.

404.    Each transmission of fraudulent medical records caused direct and immediate damage to Plaintiff primary insurers by increasing defense costs, investigative expenses, legal fees, expert expenses, reserve exposure, and fraudulently inflated claim valuations and settlement exposure in connection with the underlying litigation.

405.    Defendants' racketeering conduct directly and proximately caused injury to Plaintiff primary insurers, who were the intended and foreseeable targets of the Fraud Scheme. Each fraudulent lawsuit triggered Plaintiff primary insurers' duty to defend, resulting in foreseeable defense costs, investigative expenses, expert fees, increased reserves, and fraudulently inflated settlement exposure. Defendants further escalated the fraudulent claims through fabricated medical records, unnecessary procedures, and inflated medical liens designed to create the appearance of severe injuries and coerce inflated settlements.

406.    The very object of the scheme was to extract insurers' money through fear of economic harm, and Plaintiffs' defense costs, investigative expenses, and settlement payments flowed in a direct straight causal line from Defendants' predicate acts. These injuries were not contingent on intervening decisions by third parties, were not derivative of harm to claimants or insureds, and did not depend on speculative reliance. These injuries flowed directly, as a natural

and intended consequence of Defendants' use of the mails, wires, and fraudulent litigation tactics to enforce sham claims against Plaintiff primary insurers.

407. As a direct and proximate result of Defendants' predicate acts of mail fraud, wire fraud, Hobbs Act extortion, and Travel Act violations, Plaintiff primary insurers suffered concrete, quantifiable out-of-pocket losses, including the following categories of damages.

a. First, under New York law, an insurer's duty to defend is triggered upon the filing of a claim or lawsuit, even where the allegations are false, groundless, or fraudulent; thus each fraudulent claim and lawsuit immediately and directly caused Plaintiff primary insurers to incur mandatory defense costs and related expenses in discharging their duty to defend insureds, to assign claims personnel and claims resources, retain counsel, investigators, and experts from the outset of each scheme-driven action.

b. Second, Plaintiff primary insurers paid inflated settlement amounts that were coerced by Defendants' use of fraudulent medical escalation including fabricated diagnoses, medically unnecessary surgeries, and inflated liens, designed to manufacture the threat of catastrophic verdict exposure. These settlement payments were the intended object of Defendants' extortionate scheme and a foreseeable consequence of the cited predicate acts.

c. Third, Plaintiff primary insurers incurred investigative, claims-handling, and expert costs directly attributable to reviewing, responding to, and attempting to verify falsified medical records, billing submissions, and litigation filings transmitted by mail and wire in furtherance of the Fraud Scheme.

d. Fourth, Plaintiff primary insurers incurred internal operational losses, including the diversion of personnel and resources beyond ordinary claims operations, as Defendants' patterned misconduct necessitated heightened investigation, fraud detection, claims escalation, and supervisory review.

e. Fifth, Plaintiff primary insurers were obligated to hire and retain additional personnel specifically to address fraudulent claims beyond the normal scope of business.

408. Plaintiff primary insurers' damages were not derivative or speculative. They were actually paid by each applicable Plaintiff primary insurer, and proximately caused by Defendants' racketeering activity because (a) the filing and prosecution of fraudulent lawsuits necessarily and by law inserted Plaintiff primary insurers into the first-step harm position, and (b) Defendants'

calculated and manufactured inflation of injuries and damages was designed specifically to extract settlement payments from insurers, who were identified and known – here, Plaintiff primary insurers - through mandatory disclosures.

409.   Plaintiff primary insurers are the sole proximately injured party as to the damages alleged and thus have standing to sue under 18 U.S.C. § 1964(c) because it suffered direct injury to its own business and property, independent of any hypothetical and injury to others which are not claimed herein.

410.   Defendants' racketeering conduct was aimed squarely at insurers as the intended payors of fraud-inflated claims, and Plaintiff primary insurers' losses were incurred, paid from its own accounts, and flowed directly from Defendants' predicate acts as alleged. Accordingly, Plaintiff primary insurers, Technology, Associated and Wesco are the proper plaintiffs to bring this action under 18 U.S.C. § 1964 and their damages are cognizable under § 1964(c).

411.   No more direct victim(s) exists to vindicate the injuries suffered by Plaintiff primary insurers and caused directly by Defendants' racketeering scheme. Accordingly, Plaintiff primary insurers seek recovery of their actual damages, treble damages pursuant to 18 U.S.C. § 1964(c), attorneys' fees, costs, and such other relief as permitted by law.

## X.    CAUSES OF ACTION

### COUNT I
### RICO Violation (§ 1962[c])
### *Fraud Scheme Enterprise* (Association-In-Fact)

### As Against:

### LIAKAS LAW, P.C.
### ANDERS J. COHEN, D.O.
### MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C.
### s/d/b/a NEW YORK SPORTS AND JOINTS ORTHOPAEDIC SPECIALISTS
### ATLANTIC ORTHOPEDICS & SPORTS MEDICINE a/k/a
### WERT ORTHOPEDICS AND SPORTS MEDICINE
### ("Count I Defendants")

412.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

413.    Each of Liakas Firm, Cohen, McCulloch Ortho, and Wert Ortho is a "person" as that term is defined by statute under 18 U.S.C. § 1961, et seq.

414.    The Count I Defendants constituted an association-in-fact enterprise as that term is defined by statute under 18 U.S.C. § 1961, et seq. (the "Fraud Enterprise").

415.    The Count I Defendants maintained a common purpose: to generate and monetize personal-injury claims through falsified medical records, false diagnosis and testimony, manufactured medical necessity, and performance of unnecessary, medically non-indicated, yet lucrative surgeries.

416.    The relationships among Count I Defendants and others enabled the enterprise's functions (gatekeepers, referrals, imaging, surgeries, liens, funding, and litigation coordination; closed loop referral systems). Roles have not always remained fixed, notably with other Enterprise participants, named herein and otherwise, assuming roles within certain iterations of the underlying scheme, with the Enterprise functioning as a continuing unit distinct from any

110

individual Count I Defendant. The Fraud Scheme Enterprise has maintained sufficient longevity to pursue its purpose, as well as continues through the present.

417.    Each Count I Defendant conducted the affairs, or participated in the conduct of the affairs, of the Enterprise as set forth at length *supra*, at § V.

418.    From at least 2020 through the present, each Count I Defendant conducted and/or participated in the conduct of the affairs of the Fraud Enterprise, by engaging in transactions and conduct constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

419.    This conduct included predicate acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, Hobbs Act violations under 18 U.S.C. § 1951 and Travel Act violations under 18 U.S.C. § 1952, directly and proximately causing Plaintiff primary insurer's recoverable and compensable damages. These acts included, but are not limited to, the following:

**Liakas Law**

| Claimant | When | Who | What | How | Statute Applicable | Plaintiff Carrier |
|---|---|---|---|---|---|---|
| A | 9.20.23 | Matthew Lerner of Liakas -> Plaintiffs' panel counsel | Verified Bill of Particulars | Mail | § 1341 | TIC |
| A | 9.20.23 | Matthew Lerner of Liakas -> Plaintiffs' panel counsel | Hospital, surgical, and medical records of HRH, Cohen, Gotham, Accelerad, and PMR | Mail | § 1341 | TIC |
| A | DOL until 2.26.24 | Liakas Firm -> Plaintiffs | Conspiracy to Extort | Fear of Economic Harm | § 1951 | TIC |
| A | DOL until 2.26.24 | Liakas Firm -> Plaintiffs | Attempt to Extort | Fear of Economic Harm | § 1951 | TIC |

| A | DOL until 2.26.24 | Liakas Firm -> Plaintiffs | Extortion | Fear of Economic Harm | § 1951 | TIC |
|---|---|---|---|---|---|---|
| B | 6.21.21 | Liakas -> NYSCEF | Verified Complaint | Wire /NYSCEF | § 1343 | AIIC |
| B | 3.23.22 | Liakas -> Plaintiffs' panel counsel | Verified Bill of Particulars | Mail | § 1341 | AIIC |
| B | 2.16.23 | Liakas -> Plaintiffs' panel counsel | Supplemental Verified Bill of Particulars | Mail | § 1341 | AIIC |
| B | 3.23.22 | Matthew Lerner of Liakas -> Plaintiffs' Medical Agent | Medical records of HRH, Cohen, Gotham, Sharma, Capiola, McCulloch Ortho, DHD and SMSR | Mail | § 1341 | AIIC |
| B | 2.16.23 | Salah Shawa of Liakas -> Plaintiffs' medical records agent | Hospital, surgical, and medical records of HRH, Cohen, Gotham, Sharma, Capiola, McCulloch Ortho, DHD and SMSR | Mail | § 1341 | AIIC |
| B | DOL Until 3.22.24 | Liakas Firm -> Plaintiffs | Conspiracy to Extort | Fear of Economic Harm | § 1951 | AIIC |
| B | DOL until 3.22.24 | Liakas Firm -> Plaintiffs | Attempt to Extort | Fear of Economic Harm | § 1951 | AIIC |
| B | DOL until 3.22.24 | Liakas Firm -> Plaintiffs | Extortion | Fear of Economic Harm | § 1951 | AIIC |
| C | 4.25.22 | Liakas -> NYSCEF | Verified Complaint | Wire /NYSCEF | § 1343 | Wesco |
| C | 2.24.23 | Liakas -> Plaintiffs' panel counsel | Verified Bill of Particulars | Mail | § 1341 | Wesco |

112

| C | DOL until 4.16.24 | Liakas Firm -> Plaintiffs | Conspiracy to Extort | Fear of Economic Harm | § 1951 | Wesco |
| C | DOL until 4.16.24 | Liakas Firm -> Plaintiffs | Attempt to Extort | Fear of Economic Harm | § 1951 | Wesco |
| C | DOL until 4.16.24 | Liakas Firm -> Plaintiffs | Extortion | Fear of Economic Harm | § 1951 | Wesco |
| D | 1.5.24 | Liakas -> NYSCEF | Verified Complaint | Wire/NYSCEF | § 1343 | TIC |
| D | 6.28.24 | Vinny Paradise of Liakas -> Plaintiffs' panel counsel | Verified Bill of Particulars | Mail | § 1341 | TIC |
| D | Ongoing | Liakas Firm -> Plaintiffs | Conspiracy to Extort | Fear of Economic Harm | § 1951 | TIC |
| D | Ongoing | Liakas Firm -> Plaintiffs | Attempt to Extort | Fear of Economic Harm | § 1951 | TIC |

**Cohen**

| Claimant | When | Who | What | How | Statute Applicable | Plaintiff Carrier |
|---|---|---|---|---|---|---|
| A | 2.3.23 | NY->NJ for ACDF surgery by Cohen | Travel to NJ/Inter-state Use of Facilities with intent to further scheme | Intent to, and did, further bribery, extortion, kickback and fraud scheme through knowingly unnecessary surgery | § 1952 | TIC |
| A | Initial evaluation until 2.26.24 | Cohen -> Plaintiffs | Conspiracy to Extort | Fear of Economic Harm | § 1951 | TIC |

113

| | | | | | | |
|---|---|---|---|---|---|---|
| A | 11.28.23 | HRH-> Plaintiffs' medical record agent | Billing records of Cohen surgery | Mail | § 1341 | TIC |
| A | 12.5.23 | HRH -> Plaintiffs' medical record agent | Medical Records of Cohen ACDF Surgery | Mail | § 1341 | TIC |
| B | 7.6.22 | Gotham -> Plaintiffs' medical records agent | Medical and surgical records of HRH, Cohen & Gotham | Mail | § 1341 | AIIC |
| B | 4.12.22 | HRH -> Plaintiffs' medical record agent | Hospital and Cohen Surgical billing records | Mail | § 1341 | AIIC |
| B | 5.6.22 | HRH -> Plaintiffs' medical record agent | Hospital and Cohen's Surgical Medical Records | Mail | § 1341 | AIIC |
| B | Initial Evaluation Until 3.22.24 | Cohen -> Plaintiffs | Conspiracy to Extort | Fear of Economic Harm | § 1951 | AIIC |
| B | 2.4.22 | NY->NJ for lumber fusion surgery by Cohen | Travel to NJ/Inter-state Use of Facilities with intent to further scheme | Intent to, and did, further bribery, extortion, kickback and fraud scheme through knowingly unnecessary surgery | § 1952 | AIIC |
| C | 4.17.23 | Aysa Cohen of Gotham -> Plaintiffs' medical records agent | Billing records of Cohen surgery and asserting $30,350.00 lien | Mail | § 1341 | Wesco |
| C | 5.11.23 | Gotham -> Plaintiffs' medical records agent | Medical Records of Cohen and Gotham (10.6.21-2.2.23) | Mail | § 1341 | Wesco |

114

| C | 6.6.23 | HRH -> Plaintiffs' medical record agent | Billing records of HRH, Cohen and Gotham for Lumber Surgery, Implant, inpatient admission | Mail | § 1341 | Wesco |
|---|---|---|---|---|---|---|
| C | 7.8.23 | HRH -> Plaintiffs' medical record agent | Medical and Surgical Records of Cohen Lumber Surgery | Mail | § 1341 | Wesco |
| C | 1.7.22 | NY->NJ for lumber fusion surgery by Cohen | Travel to NJ/Inter-state Use of Facilities with intent to further scheme | Intent to, and did, further bribery, extortion, kickback and fraud scheme through knowingly unnecessary surgery | § 1952 | Wesco |
| C | Initial Evaluation Until 4.16.24 | Gotham -> Plaintiffs | Conspiracy to Extort | Fear of Economic Harm | § 1951 | Wesco |
| D | 8.22.24 | Gotham -> Plaintiffs' medical records agent | Gotham surgical implant billing records | Mail | § 1341 | TIC |
| D | 8.22.24 | Gotham -> Plaintiffs' medical records agent | Medical Records of Cohen and Gotham | Mail | § 1341 | TIC |
| D | 12.13.24 | CareWell -> Plaintiffs' panel counsel | Hospital and surgical records of Cohen and Gotham | Fax | § 1343 | TIC |
| D | 12.13.24 | CareWell -> Plaintiffs' panel counsel | Hospital and surgical records of Cohen and Gotham | Mail | § 1341 | TIC |
| D | 8.4.23 | NY->NJ for ACDF | Travel to NJ for surgery, Inter-state Use | Intent to, and did, further bribery, | § 1952 | TIC |

115

| | | surgery by Cohen | Facilities with intent to further scheme | extortion, kickback and fraud scheme through knowingly unnecessary surgery | | |
|---|---|---|---|---|---|---|
| D | Ongoing | Cohen -> Plaintiffs | Conspiracy to Extort | Fear of Economic Harm | § 1951 | TIC |

## McCulloch Ortho

| Claimant | When | Who | What | How | Statute Applicable | Plaintiff Carrier |
|---|---|---|---|---|---|---|
| B | 2.12.21 | NY->NJ for surgery by Sharma | Travel to NJ/Inter-state Use of Facilities with intent to further scheme | Intent to, and did, further bribery, extortion, kickback and fraud scheme through knowingly unnecessary surgery | § 1952 | AIC |
| B | 5.24.22 | McCulloch Ortho -> Plaintiffs' medical records agent | Medical Records of Sharma & Capiola (11.9.20-3.15.22) | Mail | § 1341 | AIC |
| B | 7.5.22 | McCulloch Ortho -> Plaintiffs' medical records agent | Billing Records of Sharma and McCulloch Ortho directed to B on Lien | Mail | § 1341 | AIC |
| B | 5.24.22 | Surgicore -> Plaintiffs' medical records agent | Hospital and Sharma Surgical Records | Mail | § 1341 | AIC |

116

| | | | | | | |
|---|---|---|---|---|---|---|
| B | 6.2.22 | Surgicore -> Plaintiffs' medical records agent | Hospital and Sharma's Surgery Billing Records | Mail | § 1341 | AIC |
| B | 10.11.23 | ESASC -> Plaintiffs' medical record agent | Billing records of Capiola, McCulloch and ESASC | Mail | § 1341 | AIC |
| B | 5.16.23 | ESASC -> Plaintiffs' medical records agent | Medical and Surgical Records of Capiola, McCulloch Ortho and ESASC | Mail | § 1341 | AIC |
| B | Initial Evaluation Until 3.22.24 | McCulloch Ortho -> Plaintiffs | Conspiracy / Attempt to Extort | Fear of Economic Harm/ Use of Force | § 1951 | AIC |

**Wert Ortho**

| Claimant | When | Who | What | How | Statute Applicable | Plaintiff Carrier |
|---|---|---|---|---|---|---|
| C | 4.18.23 | Wert Ortho -> Plaintiffs' panel counsel | Billing records of Wert | Mail | § 1341 | Wesco |
| C | 4.21.23 | Wert Ortho -> Plaintiffs' panel counsel | Medical records of Atlantic (Wert) (09/21 – 2/22) | Mail | § 1341 | Wesco |
| C | DOL until 4.16.24 | Wert Ortho-> Plaintiffs | Conspiracy to Extort | Fear of Economic Harm | § 1951 | Wesco |
| D | 9.13.24 | Wert Ortho -> Plaintiffs' medical records agent | Medical records of Atlantic, Wert Ortho and (8.2.22-6.10.24) | Mail | § 1341 | TIC |
| D | 10.4.23 | NYSCQ -> Plaintiffs' medical record agent | Medical and surgery records from left shoulder Surgery by Wert | Mail | § 1341 | TIC |
| D | 10.29.24 | NYSCQ -> Plaintiffs' | Billing records for left shoulder surgery by Wert | Mail | § 1341 | TIC |

117

| | | medical record agent | | | | |
|---|---|---|---|---|---|---|
| D | Ongoing | Wert Ortho -> Plaintiffs | Conspiracy to Extort | Fear of Economic Harm/ Use of Force | § 1951 | TIC |

420. The predicate acts were horizontally related in that they shared purposes, results, participants, victims, methods of commission, and generally similar *modus operandi* with the other predicate acts alleged. The predicate acts were vertically related in that the offenses related to the activities of the Enterprise; the scheme behind the predicate acts alleged could only function in conjunction with the other predicate acts alleged as against the other members.

421. The transactions and predicate acts occurred over a substantial period of time, at least five years, and through to the present, with credible risk of continuing into the future.

422. Upon information and belief, there exists a presently unknown number of additional predicate acts in the same pattern and practice which are within the exclusive knowledge of Count I Defendants which Plaintiffs cannot readily ascertain without discovery.

423. For purposes of pattern of racketeering activity, the predicate acts as alleged against Liakas Firm, McCulloch Ortho, and Cohen in the *Union* Action and the *GNY* Action are incorporated by reference as if fully set forth herein.

424. The predicate acts of mail and wire fraud have been pled with particularity, within the table of predicates set forth above detailing who sent the mail and/or wires, how, when, and to whom, and in what manner they a) were in furtherance of, foreseeable, and an intended and necessary step in the scheme or artifice to defraud as set forth within each applicable Claimant section, with the details of such overarching scheme detailed *en passim,* and specifically within § IV, *supra*, and/or b) why were contents of those mail/wire transmissions were themselves fraudulent, as set forth at length within the applicable Claimant section. Each Count I Defendant

118

knew, intended, and/or could reasonably foresee the use of such mails and wires as a necessary step in furtherance of the larger scheme or artifice to defraud.

425. The Hobbs Act violations pled are not subject to heightened pleading requirements, and sufficient allegations have been set forth as to affecting commerce through obtaining of, attempting to obtain, and/or conspiring to obtain property from Plaintiff primary insurers through their consent, as induced or attempted to induce by wrongful use of actual force and violence (upon Claimants), as well as fear of economic harm as set forth at length in Count I.

426. Conspiracy to extort, attempt to extort, and the completed extortion are equally viable claims under 18 U.S.C. § 1951 and constitute violative acts, each sufficient in their own right as a predicate act under § 1961.

427. Liakas Firm agreed, conspired to, attempted to, and as to Claimant A-C in fact did, impose such fear of economic harm upon Plaintiffs TIC, AIIC and Wesco so as to induce consent for Plaintiffs' property to be obtained in at least the matters of the Claimants herein, constituting, at minimum, eleven (11) discreet such violations of § 1951.

428. Defendant Cohen agreed, conspired to impose such fear of economic harm upon Plaintiffs TIC, AIIC and Wesco, and engaged in actual force or violence in performing knowingly unnecessary surgeries which permanently altered Claimants' spines, so as to induce consent for Plaintiffs' property to be wrongfully obtained in at least the matters of Claimants A-D, constituting four (4) discreet such violations of § 1952.

429. McCulloch Ortho agreed and conspired to impose such fear of economic harm upon Plaintiffs TIC and AIIC and engaged in actual force or violence in performing knowingly unnecessary surgeries on Claimants A and B to induce consent for Plaintiffs' TIC and AIIC

119

property to be wrongfully obtained in the matters of Claimants A and B, two discreet violations of § 1951.

430. Wert Ortho agreed and conspired to impose such fear of economic harm upon Plaintiffs Wesco and TIC, and engaged in actual force or violence in performing and/or attempting to perform knowingly unnecessary surgeries on Claimants C and D, so as to induce consent for Plaintiffs Wesco and TIC's property to be wrongfully obtained in at least the matters of Claimants C and D, two discreet violation of § 1951.

431. The Travel Act violations pled, here as against Cohen and McCulloch Ortho, are not subject to heightened pleading requirements, and sufficient allegations have been set forth regarding interstate travel to New Jersey, with intent to carry on or facilitate the carrying on, an extortion scheme (Hobbs Act, § 1951 above) and/or bribery/kickback scheme (below) (sufficient "unlawful activity" under § 1952[b]), and did in fact so carry on or facilitate the carrying on of such scheme through the performance of knowingly unnecessary surgeries, in at least the matters of Claimant A through D.

432. Liakas Firm's lawsuits, proxy filings *via* affiliates, pre-suit demands, *ad damnum* demands, and lien/assignment claims (collectively, the "Sham Claims") lacked any probable cause and were/are objectively baseless. Across even, and at least, the exemplars herein, Liakas Firm, with the substantial assistance of all Defendants and others known and unknown:

    a. knowingly pursued injury claims contradicted by contemporaneous medical records, IME findings, even their own referred diagnostic reviews;

    b. knowingly relied on templated reports cut-and-paste across patients with identical "findings" and billing codes;

    c. knowingly relied on inflated or fabricated treatment records;

    d. coordinated and managed Claimants' medical care for the express purpose of the production of knowingly inflated or fabricated treatment records;

120

e.   brought cases forward provided by knowingly illicit referral sources;

f.   knowingly, or in conscious avoidance of the truth, engaged in business, and provided things of value, to induce Claimants for the Fraud Scheme and to maintain their cooperation, including through the use of coordinated and predatory advance schemes;

g.   utilized escalating and unjustified medical treatments and surgeries, and intentionally relied on referrals who Liakas Firm knew would utilize escalating and unjustified medical treatments and surgeries, on non-English speaking, often undocumented, immigrants with limited education and understanding, not to obtain legitimate redress on any merits, but to impose escalating litigation and discovery costs and exposure risk upon Plaintiff primary insurers so as to coerce payments unrelated to claim validity - *i.e.*, to use the governmental process, as opposed to the valid outcome of that process, as a weapon.

433.   As evidenced herein and elsewhere, Liakas Firm wages a repeated and identifiable campaign in Courts to block, burden, and penalize Plaintiff primary insurers' right and ability to contest claims, flooding calendars with virtually identical actions and repeated allegation supplements so as to prevent any sustained scrutiny on any individual treatment, surgery, or provider, to multiply the expense of defense, and to continuously raise exposure risk so as to impose the falsely imposed construct of settling at or near policy or risking bad faith exposure for failing to so *via* potential bad faith claims.

434.   Liakas Firm abused process through knowing and material falsehoods to Court and other litigants, as well as Plaintiff primary insurers and similarly situated ultimate-payors *via* fabricated accident narratives, testimony, and medical findings, false statements of treatment rendered, and intentionally utilizing a network of concealed kickbacks and closed-loop self-referral arrangements. The lawsuits and claims were (a) objectively baseless and (b) subjectively intended to burden and coerce rather than to win legitimate merits.

435.   As the ultimate goal of the Fraud Scheme Enterprise was to extort and/or defraud Plaintiff primary insurers out of settlements and awards, Plaintiff primary insurers are the intended

121

victim of the Fraud Scheme Enterprise and the pattern of racketeering activity. This is rendered further certain by mandatory disclosures in State Court on Claimant cases wherein carriers, such as Plaintiffs, must be identified early in the cases.

436. Put simply, should the Fraud Scheme succeed, the success is marked by a settlement check. Plaintiff primary insurers' account would be, and has been, drawn upon for purposes of such check, and in the interim, such accounts are drawn upon to pay investigative fees, expert fees, legal fees, and litigation costs as required under the legally mandated duty to defend. There is no break in the causal chain between Defendants' conduct and Plaintiff primary insurers' damages.

437. As a result of the pattern of racketeering activity, Plaintiff primary insurers have suffered damage to their business and property.

**WHEREFORE**, Plaintiffs demands judgment against the Count I Defendants, and each of them, jointly and severally, for:

    a. An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

    b. Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

    c. Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

    d. Such other relief as the Court deems just and proper.

**COUNT II**
**RICO Conspiracy (§ 1962[d])**
***Fraud Scheme Enterprise***

**As Against All Defendants**

438. Plaintiffs repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

122

439. From at least 2020 to the present, Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d).

440. The pattern of racketeering activity in which the Defendants intentionally combined to engage in, or otherwise conspired to engage in, involved numerous specific acts and conduct as described in detail in this Complaint, constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), Travel Act violations (18 U.S.C. § 1952), and Hobbs Act violations (18 U.S.C. § 1951) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

441. The predicate acts of mail fraud, wire fraud, Travel Act violations, and Hobbs Act violations also involved the transmission and use of false and misleading documentation in furtherance of the Defendants' scheme to defraud Plaintiff primary insurers in connection with submitting, filing, prosecuting, and asserting claims and personal injury lawsuits arising out of fraudulent accidents.

442. Acts in furtherance of those predicate violations were necessary steps in and in furtherance of the Fraud Scheme Enterprise itself, in satisfying the necessary steps to effectuate the Fraud Scheme agreed upon by the Defendants, including, *inter alia*:

    a. Recruiting Claimants and staging accidents;

    b. Securing retainer of the attorneys within the Fraud Scheme Enterprise;

    c. Managing Claimants through pre-determined protocol treatments;

    d. Exaggerating and/or manufacturing claims of injury or severity thereto;

    e. Creating inaccurate documentation to falsely support the claims;

123

f. Creating paper trails of no legitimate medical value so as to "exhaust" conservative treatment and drive up liens;

g. Performing pre-determined and unnecessary surgeries;

h. Filing and prosecuting the fraudulent suits;

i. Providing and transmitting false documentation;

j. Providing or facilitating funding to support the Fraud Scheme;

k. Concealing the nature of the Fraud Scheme itself to perpetuate the scheme.

443. Each Defendant knew that the acts detailed herein were part of a pattern of racketeering activity and agreed to facilitate, and did facilitate, the Fraud Scheme to the benefit of the Fraud Scheme Enterprise.

444. In addition to the acts set forth in Count I, each Defendant knowingly agreed to participate in, adopted the goals of, and facilitated the common purpose of the enterprise.

445. The Liakas Firm agreed to, and did, provide substantial assistance through the management of the Fraud Scheme Enterprise, supervision and management of the litigation proceedings, management of Claimants and Medical Providers, recruitment of Claimants and management of referral networks and funders in furtherance of the scheme through its principals, employees, and agents.

446. Dean Liakas agreed to, and did, provide substantial assistance through the management of the Fraud Scheme Enterprise, supervision and management of the litigation proceedings, managing Claimants and Medical Providers, and managing Liakas Firm attorneys and employees in furtherance of the scheme.

447. N. Liakas agreed to, and did, provide substantial assistance through the management of the Fraud Scheme Enterprise, supervision and management of the litigation proceedings, managing Claimants and Medical Providers, and managing Liakas Firm attorneys

124

and employees in furtherance of the scheme, as well as facilitating the involvement of Funders and generating referral sources and relationships with Fraud Scheme-friendly medical providers.

448.    Gotham, including its principal, Defendant Cohen, agreed to, and did, provide substantial assistance both individually and through supervision and management of Gotham employees, in performing knowingly unnecessary surgeries and treatment, and providing falsified records of Claimant treatment and purported observation, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values to coerce needlessly exorbitant settlements, and unnecessary defense costs.

449.    Defendants McCulloch Ortho, Capiola and Sharma agreed to, and did, provide substantial assistance both individually and through supervision and management of McCulloch Ortho employees, in performing knowingly unnecessary surgeries and providing falsified records of Claimant treatment and purported observation, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, and coerce needlessly exorbitant settlements and unnecessary defense costs.

450.    The Wert Defendants, including Defendant Wert, agreed to, and did, provide substantial assistance in performing knowingly unnecessary surgeries and providing falsified records of Claimant treatment and purported observation, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, and coerce needlessly exorbitant settlements and unnecessary defense costs.

451.    The HPM Clinic Defendants including DHD, PMR, SMSR, and NJS agreed to, and did, provide substantial assistance, both individually and through supervision and management of the HPM Clinics, the individual clinic employees, and *via* the HPM Clinics generally on behalf of its non-physician owners, in providing falsified records of conservative, as well as escalating

125

treatments and performative conservative care so as to facially and falsely support unnecessary surgeries and continuing, escalating, and unnecessary treatments, inflate medical billings, prolong litigation, and falsely inflate case and settlement values as well as defense costs.

452.    HRH, including its principal, Defendant Moshe, agreed to, and did, provide substantial assistance, both individually and through supervision and management of its respective employees, and *via* facilitation and compensation of affiliated providers including Cohen, in providing the facilities, support staff, and logistical support to facilitate falsified records, unnecessary surgeries, and inflated medical billings, so as to falsely drive up liens and upfront finding, prolong litigation, and falsely inflate case and settlement values as well as defense costs.

453.    ESASC agreed to, and did, provide substantial assistance, both individually and through supervision and management of its respective employees, and *via* facilitation and compensation of affiliated providers including Capiola, in providing the facilities, support staff, and logistical support to facilitate falsified records, unnecessary surgeries, and inflated medical billings, so as to falsely drive up liens and upfront finding, prolong litigation, and falsely inflate case and settlement values as well as defense costs.

454.    NYSCQ and its principals, including Wert, agreed to, and did, provide substantial assistance, both individually and through supervision and management of its respective employees, and *via* facilitation and compensation of affiliated providers including Wert, in providing the facilities, support staff, and logistical support to facilitate falsified records, unnecessary surgeries, and inflated medical billings, so as to falsely drive up liens and upfront finding, prolong litigation, and falsely inflate case and settlement values as well as defense costs.

455.    At least one conspirator – and in fact, all – committed overt acts in furtherance of the conspiracy, including but not limited to the predicate acts as alleged in Count I.

456.     Each Defendant had knowledge of, at minimum, the general contours of the overall scheme, Enterprise, and common objective; specifically, defrauding Plaintiff primary insurers and those similarly situated.

457.     As a direct and proximate result of the § 1962(c) violations including, *inter alia*, those set forth in Count I to which Count II Defendants were conspirators, Plaintiff primary insurers have been injured in its business or property in an amount to be determined at trial, including but not limited to fraudulent claim payments, settlements, investigative costs, claims handling fees, attorneys' fees, expert costs, and litigation costs.

458.     As a result of the pattern of racketeering activity and the conspiracy to commit same, Plaintiff primary insurers have suffered damage to their business and property.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for:

a.     An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b.     Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

c.     Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

d.     Such other relief as the Court deems just and proper.

**COUNT III**
**RICO Violation (§ 1962[c])**
*__Gotham Enterprise__*

**As Against:**

**LIAKAS LAW, P.C.**
**ANDERS J. COHEN, D.O.**
**("Count III Defendants")**

459. Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

460. Each of the Liakas Firm and Cohen is a "person" as that term is defined by statute under 18 U.S.C. § 1961, *et seq.*

461. Gotham Neurosurgery, P.L.L.C. (as referenced within this Count III, "Gotham Enterprise"), as a corporate entity, is an expressly defined "enterprise" as that term is defined by statute under 18 U.S.C. § 1961, *et seq.*

462. From at least 2020 through the present, each of the Count III Defendants have conducted and/or participated in the conduct of the affairs of Gotham Enterprise, and continue to so conduct and participate in conducting, by engaging in transactions and conduct which constitute a pattern of racketeering activity, as that term is statutorily defined under § 1961(5), in violation of 18 U.S.C. § 1962(c).

463. The predicate acts as set forth in Count I are incorporated and alleged as if set forth fully herein.

464. The predicate acts were horizontally related in that they share common purposes, results, participants, victims, methods of commission, and generally similar *modus operandi* with the other predicate acts alleged.

465. The predicate acts were vertically related in that the offenses related to the activities of the Gotham Enterprise; the scheme behind the predicate acts alleged only functioned in conjunction with the other predicate acts alleged as against the other members.

466. The transactions and predicate acts occurred over a substantial period of time, at least five years, and through to the present, with credible risk of continuing into the future.

128

467. This conduct included predicate acts of mail and wire fraud under 18 USC §§ 1341 and 1343, Travel Act violations under 18 USC § 1952, and Hobbs Act violations under 18 USC § 1951, directly and proximately causing Plaintiff primary insurers' compensable damages, as well as numerous other 18 USC §§ 1341 and 1343, Travel Act violations under 18 USC § 1952, and Hobbs Act violations under 18 USC § 1951, as set forth regarding substantially similar related predicate acts extending from 2020 through the present, and likely to continue into the future. These acts included but are not limited to the acts as set forth at length in Count I.

468. Upon information and belief, there exists a presently unknown number of additional predicate acts in the same pattern and practice which are within the exclusive knowledge of Count III Defendants which Plaintiff primary insurers cannot readily ascertain without discovery.

469. The predicate acts of mail fraud and wire fraud which have proximately and directly caused Plaintiff primary insurers' damages have been pled with particularity, detailing who sent the mail and wires, how, when, and to whom, and in what manner they were fraudulent. In addition, as such mailings were in furtherance of a larger scheme or artifice to defraud, it has been plausibly pled that Count III Defendants knew, intended, and/or could reasonably foresee the use of such mails and wires, same being a necessary step in furtherance of the larger scheme or artifice to defraud; reliance need not be pled in this context.

470. The Travel Act violations pled are not subject to heightened pleading requirements, and sufficient allegations have been set forth as to use of interstate facilities, intent to facilitate, carry on, and/or promote specified unlawful conduct, and that same was in fact carried out, and the underlying unlawful conduct as alleged plausibly permits inference of unlawful bribery *via* kickback scheme and Hobbs Act violations/extortion, including the matters of Claimants A, B, C and D, and as set forth at length in Count I.

129

471.     The Hobbs Act violations pled are not subject to heightened pleading requirements, and sufficient allegations have been set forth as to affecting commerce through obtaining of, attempting to obtain, and/or conspiring to obtain property from Plaintiff primary insurers' through their consent, as induced or attempted to induce by wrongful use of actual force and violence (upon Claimants), as well as fear of economic harm (upon Plaintiffs), as set forth at length in Count I.

472.     Each of Liakas Firm and Cohen agreed, conspired to, and in fact did, provide substantial assistance in the performance of unnecessary, non-medically indicated and/or fraudulent invasive surgeries for the purpose of obtaining property from Plaintiff primary insurers through their consent, as induced and/or attempted to be induced by wrongful use of actual force and violence (upon Claimants), as well as fear of economic harm (to Plaintiffs). Notably, in New York, *pro forma* consent is not a defense to violence where there is risk of serious injury or death.[10]

473.     Liakas Firm and Cohen attempted to obtain, and/or conspired to obtain money from Plaintiff primary insurers, to the benefit of the Gotham Enterprise, by inducing their consent through wrongful use of fear of economic harm - including the threatened risk of inflated and/or excess verdicts and settlements premised on knowingly falsified operative reports and by the wrongful use of actual force and violence upon Claimants in the form of medically unnecessary surgeries with falsely inflated costs, including the matters of Claimants A, B, C and D, and as set forth in Count I.

---

[10] *See*, *e.g.*, New York Penal Law § 120.05(2) ("With intent to cause physical injury to another person, he causes such injury… by means of a… dangerous instrument") (Assault in the Second Degree); New York Penal Law §§ 120.00(1)("With intent to cause physical injury to another person, he causes such injury…"), 120.00(2)("He recklessly causes physical injury to another person"), 120.00(3) ("With criminal negligence, he causes physical injury to another person by means of a… a dangerous instrument") (all Assault in the Third Degree).

474.    The transmissions pled herein were made in support of claims and monetary demands backed by such wrongful use of fear and violence and/or economic harm and thus constituted acts of attempted extortion affecting interstate commerce.

475.    The sufficiency of the mail and wire fraud predicates, as well as the Travel Act predicates, are as set forth at length in Count I and incorporated as if fully set forth herein.

476.    As a result of the pattern of racketeering activity, Plaintiff primary insurers have directly and proximately suffered damages to their business and property.

**WHEREFORE**, Plaintiffs demand judgment against Count III Defendants, jointly and severally, for:

a.  An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b.  Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

c.  Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

d.  Such other relief as the Court deems just and proper.

**COUNT IV**
**RICO Conspiracy (§ 1962[d])**
***Gotham Enterprise Conspiracy***

**As Against:**

**LIAKAS LAW, P.C.**
**DEAN N. LIAKAS,**
**NICHOLAS LIAKAS,**
**ANDERS J. COHEN, D.O.**
**NJMHMC, LLC d/b/a HUDSON REGIONAL HOSPITAL,**
**YAN MOSHE a/k/a YAN LEVIYEV,**

**("Count IV Defendants")**

131

477.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

478.    From at least 2020 to the present, Count IV Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Liakas Firm Enterprise through a pattern of racketeering activity set forth in Count III herein in violation of 18 U.S.C. § 1962(d).

479.    The substantive 18 U.S.C. § 1962(c) violations upon which this Conspiracy is based are set forth in Count III above (and by reference, the relevant predicate acts set forth in Count I).

480.    The predicate acts of mail fraud, wire fraud, Travel Act violations, and Hobbs Act violations, involved the transmission and use of false and misleading documentation in furtherance of the Count IV Defendants' scheme to defraud Plaintiff primary insurers in connection with submitting, filing, prosecuting and asserting claims and personal injury lawsuits arising out of fraudulent accidents.

481.    The conduct alleged as to knowing agreement and engagement with the Enterprise as to the Count IV Defendants, which included agreement as to any two of its members to engage in a pattern of racketeering activity, are set forth at length in Count III (and Count I by reference), and incorporated herein as if set forth at length. This same conduct is alleged as in furtherance and/facilitation of the Gotham Enterprise, specifically in facilitating the performance of unnecessary, non-medically indicated and/or fraudulent invasive surgeries and then obtaining inflated payments from Plaintiff primary insurers.

482.    Each Count IV Defendant knew that the acts detailed herein were part of a pattern of racketeering activity and agreed to facilitate, and did facilitate, such acts to the benefit of the

132

Gotham Enterprise. At least one conspirator committed overt acts in furtherance of the conspiracy, including the predicate acts as alleged in Counts I & III. Each Count IV Defendant had knowledge of, at minimum, the general contours of the overall scheme and common objective; specifically, *inter alia*, defrauding Plaintiff primary insurers and those similarly situated.

483.    Each Count IV Defendant not named in Count III, agreed to, and did, provide substantial assistance through the same participation and assistance as set forth in Count II as against each such Count IV Defendant; those allegations, particularly ¶¶ 427.

484.    As a direct and proximate result of the § 1962(c) violations in Count III in which Count IV Defendants were conspirators, Plaintiff primary insurers have been injured in their business or property in an amount to be determined at trial, including but not limited to fraudulent claim payments, settlements, investigative costs, claims handling fees, attorneys' fees, expert costs, and litigation costs.

485.    As a result of the pattern of racketeering activity and the conspiracy to commit same, Plaintiff primary insurers have suffered damage to their business and property.

**WHEREFORE**, Plaintiffs demand judgment against the Count IV Defendants, and each of them, jointly and severally, for:

a.   An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b.   Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

c.   Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

d.   Such other relief as the Court deems just and proper.

## <u>COUNT V</u>
### New Jersey Insurance Fraud Prevention Act
### (N.J.S.A. § 17:33A-1, *et seq.*)

133

**By Plaintiffs Wesco and Technology As Against:**

**LIAKAS LAW, P.C.**
**ANDERS J. COHEN, D.O.**
**YAN MOSHE a/k/a YAN LEVIYEV**

**("Count V Defendants")**

486.    The New Jersey Insurance Fraud Prevention Act ("NJ IFPA") allows insurance companies to bring an action relating to fraudulent claims in any court of competent jurisdiction pursuant to § 17:33A-7(a). Plaintiffs Wesco and Technology ("Count V Plaintiffs") are insurance carriers authorized to do business in New Jersey, and thereby each an "insurance company" pursuant to § 17:33A-1.

487.    The NJ IFPA is violated when a person or practitioner, *inter alia*:

a. § 1733A-4(a)(1): Presents or causes to be presented any written or oral statement as part of, or in support of… a claim for payment or other benefit pursuant to an insurance policy… knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim (herein, "Presentation Violation");

b. § 1733A-4(a)(2): Prepares or makes any written or oral statement that is intended to be presented to any insurance company… or in support of… any claim for payment or other benefit pursuant to an insurance policy…, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim (herein, "Creation Violation");

c. § 1733A-4(b): A person or practitioner violates this act if he knowingly assists, conspires with, or urges any person or practitioner to violate any of the provisions of this act (herein, "Conspiracy Violation").

d. § 1733A-4(c): A person or practitioner violates this act if, due to the assistance, conspiracy or urging of any person or practitioner, he knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act (herein, "Derived Benefit Violation").

e. § 1733A-4(d): A person or practitioner who is the owner, administrator or employee of any hospital violates this act if he knowingly allows the use of the facilities of the hospital by any person in furtherance of a scheme or conspiracy to violate any of the provisions of this act (herein, "Facilitation Violation").

134

488.    § 1733A-3 explicitly defines a "statement," as that term is used in the foregoing provisions, to include a medical record, as well as any writing, notice, invoice, or bill.

489.    § 1733A-3 defines "hospital" broadly, including "any general hospital… or any other institution, whether operated for profit or not, which maintains or operates facilities for health care." Defendant HRH is a "hospital" as that term is used in § 1733A-4(d).

490.    § 1733A-7(a) expressly permits an insurance company injured through violations therein to recover compensatory damages, which shall include reasonable investigation expenses, costs of suit and attorney's fees. § 1733A-7(b) provides that such insurance company so injured shall recover treble damages if the court determines that the defendant has engaged in a pattern of violating the NJ IFPA.

491.    A "pattern" is defined under § 17:33A as "five or more related violations... Violations are related if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged." As to the allegations set forth below, all of which involve the same victim – the Plaintiff primary insurers – and allege the same or similar actions against the Defendants as part of the same scheme and the violations set forth below are "related" within the meaning of the statute.

492.    Each of the Count V Defendants is alleged to have engaged in at least the following number of related NJ IFPA violations:

| Count V Defendant | No. of Violations |
| --- | --- |
| Liakas Firm | 6 |
| Cohen | 18 |
| Moshe | 8 |

135

493.    Count V Plaintiffs have mailed a copy of this Complaint to the New Jersey Commissioner of Banking and Insurance contemporaneous with the filing of this Complaint, and shall report to the commissioner, on a form prescribed by the commissioner, the amount ultimately recovered and such other information as is required by the commissioner.

**Claimant A**

494.    Cohen travelled to New Jersey on February 3, 2023, and availed himself of New Jersey's laws, performed a knowingly needless anterior cervical discectomy and fusion surgery at HRH, *despite providing all prior and prerequisite treatment within the State of New York*, and prepared records thereto which were knowingly intended to be presented to Plaintiff TIC in connection with, or in support of, a claim for payment. The records were material to the claim as they formed the basis for the damages claimed. The records contained misrepresentations in justifying the surgery due to purported pre-operative diagnosis and purported intra-operative findings that were knowingly false. In engaging in this conduct, including the preparation of materials in advance and in support, Cohen committed multiple NJ IFPA Creation Violations.

| No. | Who | When | What | How | Plaintiff damaged |
|---|---|---|---|---|---|
| 1 | Cohen | 09.01.2022 | Created record of assessment of C3/C4 pathology in absence of objective or radiological indication intended to be presented to Plaintiff primary insurer TIC in support of claim for payment for unnecessary surgery knowing that the statement contained false or misleading information concerning material fact. | §1733A-4(a)(2) Creation | TIC |
| 2 | Cohen | 09.29.2022 | Created record of assessment of C3/C4 pathology in absence of objective or radiological indication intended to be presented to Plaintiff primary insurer TIC in support of claim for payment for unnecessary surgery knowing that the | § 1733A-4(a)(2) Creation | TIC |

| | | | | | |
|---|---|---|---|---|---|
| | | | statement contained false or misleading information concerning material fact. | | |
| 3 | Cohen | 12.01.2022 | Created record recommending Claimant A for knowingly unnecessary C3-4 & C4-5 anterior cervical discectomy in support of claim for payment for unnecessary surgery knowing that the statement contained false or misleading information concerning material fact. | § 1733A-4(a)(2) Creation | TIC |
| 4 | Cohen | 01.26.2023 | Created record recommending and clearing Claimant A for knowingly unnecessary C3-4 & C4-5 anterior cervical discectomy in support of claim for payment for unnecessary surgery knowing that the statement contained false or misleading information concerning material fact. | § 1733A-4(a)(2) Creation | TIC |
| 5 | Cohen | 11.28.23 | Caused to be presented billing records of unnecessary surgery knowing that the statement contained false or misleading information concerning material fact, *i.e.,* medical necessity (*see* No. 7). | § 1733A-4(a)(1) Presentation | TIC |
| 6 | Moshe | 02.03.2023 | Knowingly assisted Cohen in his ACDF Surgery Creation Violation through providing logistical, staff, and other support. | § 17:33A-4(b) Conspiracy | TIC |
| 7 | Moshe | 11.28.23 | Presented a Claim for payment, knowing that the statement contains false or misleading information concerning material fact; *i.e.*, the medical necessity of the surgery, pursuant to practice with Cohen. Mailed Billing Records of Cohen Surgery -> Plaintiff primary insurer TIC | § 1733A-4(a)(1) Presentation | TIC |
| 8 | Moshe | 2.3.23 | Knowingly benefited from the proceeds derived from performance of unnecessary surgery in NJ through Cohen's violations *via* assertion of lien for facility fees thereto | § 1733A-4(c) Derived Benefit | TIC |
| 9 | Moshe | 2.3.23 | Knowingly allowed use of the facilities of the hospital in furtherance of the fraud scheme | § 17:33A-4(d) Facilitation | TIC |
| 10 | Liakas Firm | 2.3.23 | Knowingly benefited from the proceeds derived from performance of unnecessary surgery in NJ through Cohen's violations through artificially inflated settlement value of claim. | § 1733A-4(c) Derived Benefit | TIC |
| 11 | Liakas Firm | 2.3.23 | Knowingly assisted Cohen in his ACDF Surgery Creation Violation, and Moshe in | § 17:33A-4(b) | TIC |

137

| | | | his Facilitation and Derived Benefit violations, through facilitating funding. | Conspiracy | |
|---|---|---|---|---|---|

**Claimant C**

495.    Cohen travelled to New Jersey on January 7, 2022, and availed himself of New Jersey's laws, performed a knowingly needless lumber discectomy and fusion surgery, and prepared records thereto which were knowingly intended to be presented to Plaintiff Wesco in connection with, or in support of, a claim for payment. The records were material to the claim as they formed the basis for the damages claimed. The records contained misrepresentations in justifying the surgery due to purported pre-operative diagnosis and purported intra-operative findings that were knowingly false, on a disc level that was imaged multiple times to have no traumatic pathology. In engaging in this conduct, Cohen committed an NJ IFPA Creation Violation.

| No. | Who | When | What | How | Plaintiff damaged |
|---|---|---|---|---|---|
| 1 | Cohen | 10.06.21 | Created record assessing disabling radicular pain, contrary to all prior records, and prior to any radiology, intended to be presented to Plaintiff primary insurer Wesco in support of claim for payment for unnecessary surgery knowing that the statement contained false or misleading information concerning material fact. | §1733A-4(a)(2) Creation | Wesco |
| 2 | Cohen | 10.27.21 | Created record finding unilaterally and in direct contradiction to MRI imaging, an L3/L4 herniation with loss of height and hydration with nerve root encroachment, intended to be presented to Plaintiff primary insurer Wesco in support of claim for payment for unnecessary surgery knowing that the statement contained false or misleading information concerning material fact. | §1733A-4(a)(2) Creation | Wesco |
| 3 | Cohen | 11.22.21 | Created record recommending an L3/L4 discectomy decompression with interbody | §1733A-4(a)(2) | Wesco |

138

| | | | | Creation | |
|---|---|---|---|---|---|
| | | | cage placement and fusion, despite no radiological findings at the L3/L4 level, intended to be presented to Plaintiff primary insurer Wesco in support of claim for payment for unnecessary surgery knowing that the statement contained false or misleading information concerning material fact. | Creation | |
| 4 | Cohen | 01.05.22 | Created record indicating surgery would be scheduled (two days pre-operatively) despite no radiological findings at the L3/L4 level, and no interim radiology, intended to be presented to Plaintiff primary insurer Wesco in support of claim for payment for unnecessary surgery knowing that the statement contained false or misleading information concerning material fact. | §1733A-4(a)(2) Creation | Wesco |
| 5 | Cohen | 1.07.22 | Created record of knowingly unjustified and unnecessary lumbar discectomy and fusion surgery, intended to be presented to Plaintiff primary insurer Wesco in support of claim for payment for unnecessary surgery knowing that the statement contained false or misleading information concerning material fact. | §1733A-4(a)(2) Creation | Wesco |
| 6 | Cohen | 06.06.23 | Caused to be presented billing records of unnecessary surgery knowing that the statement contained false or misleading information concerning material fact, *i.e.,* medical necessity (*see* No. 8). | § 1733A-4(a)(1) Presentation | Wesco |
| 7 | Moshe | 01.07.22 | Knowingly assisted Cohen in his surgery record Creation Violation through providing logistical, staff, and other support. | § 17:33A-4(b) Conspiracy | Wesco |
| 8 | Moshe | 06.06.23 | Presented a Claim for payment, knowing that the statement contains false or misleading information concerning material fact; *i.e.*, the medical necessity of the surgery, pursuant to practice with Cohen. Mailed Billing Records of Cohen Surgery -> Plaintiff primary insurer Wesco | § 1733A-4(a)(1) Presentation | Wesco |
| 9 | Moshe | 01.07.22 | Knowingly benefited from the proceeds derived from performance of unnecessary surgery in NJ through Cohen's violations *via* assertion of lien for facility fees thereto | § 1733A-4(c) Derived Benefit | Wesco |

139

| 10 | Moshe | 01.07.22 | Knowingly allowed use of the facilities of the hospital in furtherance of the fraud scheme | § 17:33A-4(d) Facilitation | Wesco |
| 11 | Liakas Firm | 01.07.22 | Knowingly benefited from the proceeds derived from performance of unnecessary surgery in NJ | § 1733A-4(c) Derived Benefit | Wesco |
| 12 | Liakas Firm | 01.07.22 | Knowingly assisted Cohen in his surgery record Creation Violation through facilitating funding. | § 1733A-4(b) Conspiracy | Wesco |

## **Claimant D**

496.    Cohen travelled to New Jersey on August 4, 2023, and availed himself of New Jersey's laws, performed a knowingly needless ACDF surgery, and prepared records thereto which were knowingly intended to be presented to Plaintiff TIC in connection with, or in support of, a claim for payment. The records were material to the claim as they formed the basis for the damages claimed. The records contained misrepresentations in justifying the surgery due to purported pre-operative diagnosis and purported intra-operative findings that were knowingly false, on a disc level that was imaged multiple times to have no traumatic pathology. In engaging in this conduct, Cohen committed an NJ IFPA Creation Violation.

| No. | Who | When | What | How | Plaintiff primary insurer damaged |
|-----|-----|------|------|-----|-----------------------------------|
| 1 | Cohen | 04.27.2022 | Created records finding persistent neck pain at initial evaluation, despite no initial or prior neck complaints, and radicular symptoms denied to every other provider to that date, intended to be presented to Plaintiff primary insurer TIC in support of claim for payment for unnecessary surgery knowing that the statement contained false or misleading information concerning material fact. | §1733A-4(a)(2) Creation | TIC |

140

| 2 | Cohen | 06.22.2022 | Created record unilaterally diagnosing a disc herniations in direct contradiction to MRI imaging, and diagnosed radiculopathy clinical or diagnostic support, and knowingly presented degenerative findings as "injuries," intended to be presented to Plaintiff primary insurer TIC in support of claim for payment for unnecessary surgery knowing that the statement contained false or misleading information concerning material fact. | §1733A-4(a)(2) Creation | TIC |
| 3 | Cohen | 02.02.2023 | Created record unilaterally diagnosing a disc herniations in direct contradiction to MRI imaging, and diagnosed radiculopathy clinical or diagnostic support, and knowingly presented degenerative findings as "injuries," intended to be presented to Plaintiff primary insurer TIC in support of claim for payment for unnecessary surgery knowing that the statement contained false or misleading information concerning material fact. | §1733A-4(a)(2) Creation | TIC |
| 4 | Cohen | 03.09.2023 | Created record unilaterally diagnosing a disc herniations in direct contradiction to MRI imaging, and diagnosed radiculopathy clinical or diagnostic support, and knowingly presented degenerative findings as "injuries," intended to be presented to Plaintiff primary insurer TIC in support of claim for payment for unnecessary surgery knowing that the statement contained false or misleading information concerning material fact. | §1733A-4(a)(2) Creation | TIC |
| 5 | Cohen | 07.24.2023 | Created record unilaterally diagnosing a disc herniations in direct contradiction to MRI imaging, and diagnosed radiculopathy clinical or diagnostic support, and knowingly presented degenerative findings as "injuries," intended to be presented to Plaintiff primary insurer TIC in support of claim for payment for unnecessary surgery knowing that the statement contained false or misleading information concerning material fact. | §1733A-4(a)(2) Creation | TIC |
| 6 | Cohen | 08.04.2023 | Created record of knowingly unjustified and unnecessary lumbar discectomy and fusion | §1733A-4(a)(2) | TIC |

141

| | | | | | |
|---|---|---|---|---|---|
| | | | surgery, intended to be presented to Plaintiff primary insurer TIC in support of claim for payment for unnecessary surgery knowing that the statement contained false or misleading information concerning material fact. | Creation | |
| 7 | Cohen | 08.22.2024 | Caused to be presented billing records of unnecessary surgery knowing that the statement contained false or misleading information concerning material fact, *i.e.,* medical necessity, from CareWell to Plaintiff primary insurer TIC | § 1733A-4(a)(1) Presentation | TIC |
| 9 | Liakas Firm | 08.04.2023 | Knowingly benefited from the proceeds derived from performance of unnecessary surgery in NJ | § 1733A-4(c) Derived Benefit | TIC |
| 10 | Liakas Firm | 08.04.2023 | Knowingly assisted Cohen in his surgery record Creation Violation through facilitating funding. | § 17:33A-4(b) Conspiracy | TIC |

497.    Count V Plaintiff primary insurers TIC and Wesco are insurance companies which have been damaged as a result of all the foregoing alleged violations.

**WHEREFORE**, Count V Plaintiffs demand judgment against the Count V Defendants, jointly and severally, for:

a.    An award of Plaintiffs' compensatory damages, including reasonable investigation expenses, costs of suit and attorneys' fees incurred as a result of the pattern of related NJ IFPA violations of Liakas Firm, Cohen, Moshe, and Sharma pursuant to § 1733A-7(a), subject to statutory trebling under § 1733A-7(b) as applicable;

b.    Such other relief as the Court deems just and proper.

**COUNT VI**
**Common Law Fraud**
**Against**

**LIAKAS LAW, P.C.**
**ANDERS J. COHEN, D.O.**
**SIDDHARTHA SHARMA, DPM**
**DAVID R. CAPIOLA, M.D.**
**MATTHEW WERT, M.D.**

142

**HEALTH PLUS MANAGEMENT, LLC**
**("Count VI Defendants")**

498.     Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

499.     As set forth at length in the allegations in Counts I, II, and V, which are incorporated by reference as if fully set forth herein, the Count VI Defendants made knowing misrepresentations of facts, and deliberately concealed and omitted materials facts that they had a duty to disclose, in connection with lawsuits and/or claims for payment under New York law.

500.     These misrepresentations of fact by the Count VI Defendants included, but were not limited to, the material misrepresentations of fact made in asserting the legitimacy of accidents, the existence and nature of injuries, causality and the necessity of treatment, and the legitimacy of the medical providers themselves to render care. A list of such misrepresentations, who they were made by, and when, are detailed in the tables under Count I, with additional allegations in Count V, which is incorporated as if fully set forth herein. As to HPM, the material misrepresentations were made in omitting the material fact of non-physician ownership of the HPM clinics, in violation of law, and precluding the HPM clinics from providing services in regulated and licensed fields to which its true owners and/or controllers were not licensed.

501.     The Count VI Defendants made these misrepresentations with the intent they reach Plaintiff primary insurers and be relied upon thereto, and in furtherance of the Fraud Scheme to defraud Plaintiff primary insurers by submitting claims for payment and general liability insurance proceeds. Knowingly falsified testimony, treatment records, inflated liens, and other submissions were presented to Plaintiff primary insurers through the course of the Fraud Scheme. Count VI Defendants presented such misrepresentations in some instances directly to Plaintiff primary

143

insurers, and otherwise *via* the Liakas Firm and/or others as a conduit with Plaintiff primary insurers as the intended recipient.

502.    The Count VI Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Plaintiff primary insurers to make payments for claims that were not legitimate. The knowledge of such falsity can be reasonably inferred from the constellation of facts set forth in each Claimant section, *supra*.

503.    Plaintiff primary insurers reasonably and justifiably relied, to their detriment, on the Count VI Defendants' representations based on the intentionally and systematically structured facial legitimacy of such claims and treatment, and without knowledge of the Count VI Defendants' scheme and artifice to defraud them; and, even in the absence of such belief, Plaintiff primary insurers were mandated under New York law and the duty to defend to provide a defense to its insured and incur defense costs, investigative costs, experts fees, and other litigation costs. Count VI Defendants' conduct thus induced action by Plaintiff primary insurers as required by law, regardless of belief or knowledge of veracity.

504.    The Count VI Defendants knew, or should have known, that Plaintiff primary insurers would rely on such representations, and planned to exploit such reliance.

505.    But for the Count VI Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct, Plaintiff primary insurers would not have incurred damages.

506.    As a matter of New York law, which requires Plaintiff primary insurers to fulfill their duty to defend its insured immediately upon the filing of a claim or lawsuit, regardless of merit, and even in the face of suspected or blatant fraud, such reliance was thrust upon Plaintiff primary insurers. Plaintiff primary insurers were forced to take action and incur expenses it

144

otherwise would not have taken or incurred, so influenced as a direct result of the false representations.

507. Each subsequent falsified record produced in the course of the Fraud Scheme, upon disclosure and transmission to Plaintiff primary insurers, forced reliance upon Plaintiff primary insurers to, at minimum, rely on such submissions in discharging its legal obligation to provide a defense to its insured, including, *inter alia*, attorneys' fees, expert costs, investigative costs, and other litigation costs, as well as necessarily resulted in prolonged litigation, required additional reserves, and in valuing the claim as to exposure and/or settlement within the parameters of discharging its legal duty to defend.

508. As to settlements made as a result of the Fraud Scheme, Plaintiff primary insurers at all times comported with reasonable due diligence requirements through the retention of reputable defense firms, investigators, and experts. However, the Fraud Scheme was designed and implemented in order to circumvent these safeguards. Further, the protections under HIPAA and attorney-client privilege, along with New York's insulation of litigation financing disclosures, rendered the scheme unable to be detected through the use of ordinary due diligence. Any payments made were after Plaintiff primary insurers had engaged in reasonable due diligence and were made in reasonably justified reliance.

509. Plaintiff primary insurers at no time knew or had reason to know in the exercise of due diligence or reasonable care that the Count VI Defendants were engaged in misrepresentations, omissions, and rampant fraudulent conduct; this is particularly true where the conduit Liakas Firm are ostensibly officers of the Court, and the Medical Providers have taken oaths to do no harm.

510. As a direct and proximate cause of the Count VI Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct by the Count VI

145

Defendants, Plaintiff primary insurers have been damaged. Plaintiff primary insurers' damages include, but are not necessarily limited to, settlement payments, administration costs, investigative and defense costs paid by Plaintiff primary insurers to the Count VI Defendants or caused by the Count VI Defendants.

511.    Because the Count VI Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiff primary insurers are entitled to an award of punitive damages.

**WHEREFORE**, Count VI Plaintiffs demand judgment against Count VI Defendants for:

    a.  An award of Plaintiffs' actual and consequential damages to be established at trial;

    b.  Plaintiffs' costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct;

    c.  Punitive damages to be established at trial; and,

    d.  Such other relief as the Court deems just and proper.

<u>**COUNT VII**</u>
**Aiding and Abetting Fraud**

<u>**Against All Defendants**</u>

512.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

513.    All Defendants named herein had actual knowledge of the Fraud Scheme, and the common law fraud as set forth in Count VI.

514.    As set forth in detail, *supra*, and in the charts set forth under Counts I and III, and described further in Count II, each Defendant knowingly agreed to and did engage in overt acts in furtherance of the fraud or provided substantial assistance to advance such fraud's commission.

515.    But for the substantial assistance of each Defendant, such Fraud Scheme would not have been possible.

146

516.    As a direct and proximate cause of the Defendants' aiding and abetting of the Fraud Scheme, Plaintiff primary insurers have been damaged.

517.    Because the Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiff primary insurers are entitled to an award of punitive damages.

**WHEREFORE**, Count VII Plaintiffs demand judgment against Defendants, and each and all of them, jointly and severally, for:

a.  An award of Plaintiffs' actual and consequential damages to be established at trial;

b.  Plaintiffs' costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct;

c.  Punitive damages to be established at trial; and,

d.  Such other relief as the Court deems just and proper.

**XI.    JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims.

Dated: June 2, 2026

Respectfully submitted,

**THE WILLIS LAW GROUP, PLLC**

By:  _/s/ William J. Clay_____
**JENYA ROZENFELD**
**WILLIAM J. CLAY**
**DANIEL A. JOHNSTON**
1985 Forest Lane
Garland, Texas 75042
Telephone: 214-736-9433
Facsimile: 214-736-9994
Service Email: service@thewillislawgroup.com
*ATTORNEYS FOR THE PLAINTIFFS*